# No. 24-1314

# In the United States Court of Appeals for the Federal Circuit

---

**DILLON TRUST COMPANY LLC,**
**as trustee for Trusts 709204, 709210, and 8545,**

*Plaintiff-Appellant,*

v.

**UNITED STATES,**

*Defendant-Appellee.*

---

**On Appeal from the U.S. Court of Federal Claims**
**Nos. 1:17-cv-01898, 1:17-cv-02022 & 1:17-cv-02023**
**The Honorable Eric G. Bruggink**

---

**BRIEF OF PLAINTIFF-APPELLANT**
**DILLON TRUST COMPANY LLC**

---

Mark C. Savignac
Caitlin R. Tharp
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000
msavignac@steptoe.com
ctharp@steptoe.com

Lawrence M. Hill
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
lhill@steptoe.com

*Attorneys for Plaintiff-Appellant*
*Dillon Trust Company LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1314

**Short Case Caption** Dillon Trust Company LLC v. US

**Filing Party/Entity** Dillon Trust Company LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/03/2024

Signature: /s/ Lawrence M. Hill

Name: Lawrence M. Hill

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Dillon Trust Company LLC | Please see attached list. | Please see attached list. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Richard A. Nessler | Ida Adibi | Winston & Strawn LLP |
| Julia L. Gatto | Nicholas J. Sutter | |
| Steven R. Dixon | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)  ☑ No  ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

| 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
| --- | --- |
| ANNE DILLON 1935 TRUST PDC 709204<br>ANNE DILLON 1935 TRUST JDM 709210<br>TRUST 8545 U/A 12/31/31 CDD Family Et al<br>12-31-31 BY CDD FOR SSD TRUST<br>12-31-31 BY CDD FOR PDC TRUST<br>12-31-31 BY CDD FOR GS TRUST<br>14299 FOR PDC 12-31-31 BY DDE TRUST<br>14299 FOR GS 12-31-31 BY DDE TRUST<br>8963 FOR PDC 6-4-32 BY ADD TRUST<br>8963 FOR GS 6-4-32 BY ADD TRUST<br>TRUST fbo N.E. Allen DDE POA '26 by C. Dillon<br>TRUST fbo M.C. Zetterberg DDE POA '26<br>TRUST fbo Theodore Caplow DDE POA '26<br>TRUST fbo A.F. Allen DDE POA '26 by C. Dillon<br>TRUST fbo C.D Allen DDE POA '26 by C. Dillon<br>TRUST fbo A.D. Allen DDE POA '26 by C. Dillon<br>TRUST fbo D.D. Caplow DDE POA'26 by C. Dillon<br>8964 FOR PDC 5-31-32 BY CD TRUST<br>8964 FOR GS 5-31-32 BY CD TRUST<br>8964 FOR ACA 5/31/32 BY CD TRUST<br>8964 FOR PDA 5-31-32 BY CD TRUST<br>8964 FOR DEA 5-31-32 BY CD TRUST<br>14735 FOR PDC 6-4-32 BY ADD TRUST<br>14735 FOR GS 6-4-32 BY ADD TRUST<br>14735 FOR ACA 6-4-32 BY ADD TRUST<br>14735 FOR PDA 6-4-32 BY ADD TRUST<br>14735 FOR DEA 6-4-32BY ADD TRUST<br>8965 FOR PDC 5-31-32 BY CD TRUST<br>8965 FOR GS 5-31-32 BY CD TRUST<br>8965 FOR ACA 5-31-32 BY CD TRUST<br>8965 FOR PDA 5-31-32 BY CD TRUST<br>8965 FOR DEA 5-31-32 BY CD TRUST<br>Joan Frost<br>Robert de Luxembourg<br>Charlotte Cunningham<br>Phyllis Collins<br>Joan, Duchesse de Mouchy<br>The Goobatz Settlement<br>Nicholas Allen<br>Martin Zetterberg<br>Theodore Caplow<br>Alexandra Allen | ACA Member Trust, PDA Member Trust, DEA Member Trust, PDC Member Trust, JDM-JMF Member Trust, JDM-CC Member Trust, and JDM-RDL Member Trust |

Christopher Allen
Andrew Allen
Dorothy Caplow
Anne Zetterberg
Andrew Peipers
Philip Allen
Douglas Allen

**TABLE OF CONTENTS**

RELATED CASES ........................................................................................1

JURISDICTION..........................................................................................1

INTRODUCTION ........................................................................................1

ISSUES ON APPEAL .................................................................................2

STATEMENT OF THE CASE....................................................................2

    A.  Factual Background..................................................................3

    B.  Procedural History...................................................................8

        1.  Summary judgment on the interest issue .......................8

        2.  Bench trial on the remaining issues ..............................8

SUMMARY OF THE ARGUMENT .........................................................12

STANDARD OF REVIEW ........................................................................15

ARGUMENT .............................................................................................15

    I.  The Claims Court erred in holding that the Taxpayer was liable to the IRS as a transferee under New York law. ..................................................15

    A.  Legal framework: NYUFCA and 26 U.S.C. § 6901 ............................15

    B.  The Claims Court erred in "collapsing" the transactions....................17

        1.  The Claims Court erred by ruling that the Taxpayer had "inquiry knowledge" even though inquiry would have been fruitless........18

        2.  The Claims Court erred in holding that intent to commit tax fraud was the only economically plausible explanation for the three bids the Taxpayer received....................................................................22

        3.  The Claims Court erred in holding that the Taxpayer had constructive knowledge despite the lack of any "active steps" to avoid learning of Haber's fraudulent scheme...............................32

4. The Claims Court erred in extending the Second Circuit's *Diebold* decision, which had already stretched NYUFCA to assist the IRS. ...............................................................................33

II. The Claims Court erred in holding the Taxpayer liable for more than the alleged net value of the transfer it received. ........................37

III. The Claims Court erred in holding the Taxpayer liable for HSHC's tax penalty. ............................................................................41

IV. The Claims Court erred in holding that underpayment interest accrued against the Taxpayer while the IRS had the use of the Taxpayer's money. ...............................................................................44

   A. Section 6603 authorizes deposits to prevent interest from accruing. ...............................................................................44

   B. The IRS arbitrarily refused to use the deposit to pay the tax liability. ...............................................................................46

   C. The interest that purportedly accrued while the IRS had the use of the Taxpayer's money must be refunded. ..........................48

     1. The IRS's action is reviewable for abuse of discretion. ...............48

     2. The IRS abused its discretion by thwarting the statute's purpose. ...............................................................................48

     3. The trusts' different Employer Identification Numbers do not justify the IRS's arbitrary refusal to apply the deposits. ..............50

     4. The IRS's internal legal advice deserves no weight. .....................56

CONCLUSION ...............................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Federal Bureau of Prisons*,
552 U.S. 214 (2008)..................................................................52

*Alterman v. Commissioner*,
T.C. Memo. 2015-231 (Tax Ct. 2015)...............................22, 29, 34, 36

*American Pelagic Fishing Co. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004) ...............................................2, 15

*AMP Inc. v. United States*,
185 F.3d 1333 (Fed. Cir. 1999) ...............................................57

*Avon Products, Inc. v. United States*,
588 F.2d 342 (2d Cir. 1978) ..................................................49

*BASR Partnership v. United States*,
795 F.3d 1338 (Fed. Cir. 2015) ............................................38, 39

*In re Bayou Group, LLC*,
439 B.R. 284 (S.D.N.Y. 2010) ...............................................20

*Bentley v. Young*,
210 F. 202 (S.D.N.Y. 1914)..................................................20

*In re Bernard L. Madoff Investment Securities LLC*,
12 F.4th 171 (2d Cir. 2021) .................................................20

*Boyle v. United States*,
556 U.S. 938 (2009)..........................................................52

*Citibank, N.A. v. Brigade Capital Management, LP*,
49 F.4th 42 (2d Cir. 2022) ..............................................19, 20, 21, 36

*In re CNB International, Inc.*,
440 B.R. 31 (W.D.N.Y. 2010).................................................38

*Commissioner v. Stern*,
357 U.S. 39 (1958).......................................................16, 35, 43

*Matter of Continental Illinois Securities Litigation,*
    962 F.2d 566 (7th Cir. 1992) ...................................................................49

*DGI v. Daugerdas,*
    139 F. Supp. 2d 445 (S.D.N.Y. 2001) ............................................................31

*Dickman v. Commissioner,*
    465 U.S. 330 (1984).................................................................................49

*Diebold Foundation, Inc. v. Commissioner,*
    736 F.3d 172 (2d Cir. 2013) ........................ 4, 13, 16, 19, 22, 29, 33, 34, 35, 43

*Dillon Trust Co. v. United States,*
    162 Fed. Cl. 708 (2022) ...........................................................................8

*Dillon Trust Co. v. United States,*
    164 Fed. Cl. 92 (2023) .............................................................................8

*Dillon Trust Co. v. United States,*
    168 Fed. Cl. 228 (2023) ...........................................................................8

*Dixon v. Commissioner,*
    141 T.C. 173 (2013)...................................................................53, 54, 55

*Durland v. Crawford,*
    183 A.D. 763 (N.Y. App. Div. 1918) .........................................................42

*FEC v. Democratic Senatorial Campaign Committee,*
    454 U.S. 27 (1981)..................................................................................49

*Frank Sawyer Trust v. Commissioner,*
    712 F.3d. 597 (1st Cir. 2013).....................................................................34

*Great Concepts, LLC v. Chutter, Inc.,*
    90 F.4th 1333 (Fed. Cir. 2024) ................................................................52

*Heffernan v. City of Paterson,*
    578 U.S. 266 (2016)................................................................................54

*Julia R. Swords Trust v. Commissioner,*
    142 T.C. 317 (2014)...........................................................................29, 30

*Lua v. United States*,
123 Fed. Cl. 269 (2015) ................................................................45

*Majer v. Schmidt*,
169 A.D.2d 501 (N.Y. 1st Dep't 1991) ..........................................19

*Meyer v. Seidel*,
89 F.4th 117 (2d Cir. 2023) ...........................................................20

*Miner v. Edwards*,
221 A.D.2d 934 (N.Y. 4th Dep't 1995) .....................................19, 20

*National Bank v. Johnson*,
104 U.S. 271 (1881) .......................................................................49

*NLRB v. Brown*,
380 U.S. 278 (1965) .......................................................................49

*Old Colony Trust Co. v. Commissioner*,
279 U.S. 716 (1929) .......................................................................53

*Peoples Gas, Light & Coke Co. v. U.S. Postal Service*,
658 F.2d 1182 (7th Cir. 1981) .......................................................48

*Principal Life Insurance Co. v. United States*,
95 Fed. Cl. 786 (2010) ...................................................................45

*Schapansky v. Department of Transportation*,
735 F.2d 477 (Fed. Cir. 1984) .......................................................54

*Spalding v. Mason*,
161 U.S. 375 (1896) .......................................................................49

*Stanko v. Commissioner*,
209 F.3d 1082 (8th Cir. 2000) ..................................................43, 44

*Starnes v. Commissioner*,
680 F.3d 417 (4th Cir. 2012) .............................................21, 22, 34

*United States v. Cartwright*,
411 U.S. 546 (1973) .......................................................................25

*United States v. Love,*
    20 F.4th 407 (8th Cir. 2021) ........................................................24

*United States v. Mazzeo,*
    306 F. Supp. 2d 294 (E.D.N.Y. 2004) (vacated as moot) ...................................42

*United States v. Miller,*
    982 F.3d 412 (6th Cir. 2020) ........................................................24

*United States v. Williams,*
    514 U.S. 527 (1995).......................................................53, 55, 56

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service,*
    139 S. Ct. 361 (2018).......................................................48

**Statutes**

26 U.S.C. § 6603 ........................................... 7, 8, 14, 15, 44, 45, 48, 49, 50, 51, 52

26 U.S.C. § 6901 .......................................................15, 16, 42, 43

NYUFCA § 270 .......................................................42

NYUFCA § 273 .......................................................9, 17, 39, 40, 41, 42

NYUFCA § 276 .......................................................9, 17, 39, 41

NYUFCA § 278(1)........................................................41

NYUFCA § 278(2)........................................................ 12, 17, 37, 38, 39, 40

NYUFCA § 281 .......................................................22, 44

**Other Authorities**

Garrett Watson, "Advancing Net Operating Loss Deductions in Phase
    4 Business Relief," Tax Foundation (May 2020)...............................................27

H.R. Rep. No. 108-548 .......................................................45, 46, 49, 53

IRS Office of Chief Counsel Memorandum 20171801F........................................56

Merle M. Erickson et al., *The Effect of Acquirer Net Operating Losses on Acquisition Premiums and Acquirer Abnormal Returns,* 41 Journal of the American Taxation Association 103 (2019)..................................28

Revenue Procedure 2005-18 ................................................................45, 46, 48, 56

## RELATED CASES

No other appeal in or from the actions on appeal here is or was previously before this or any other appellate court. Counsel is unaware of any other pending case that would directly affect or be affected by this Court's decision here.

## JURISDICTION

The U.S. Court of Federal Claims ("Claims Court") had jurisdiction over this tax refund lawsuit under 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1). This Court has jurisdiction under 28 U.S.C. § 1295(a)(3). The Claims Court entered judgment on October 31, 2023. Appx53. Plaintiff timely appealed on December 26, 2023. Appx5969; *see* 28 U.S.C. §§ 2107(b), 2522; Fed. R. App. P. 4(a)(1)(B). This appeal is from a final order disposing of all parties' claims.

## INTRODUCTION

This is a tax refund case brought on behalf of a group of family trusts by their trustee, Plaintiff Dillon Trust Company LLC. For the sake of simplicity, this brief refers to the trusts collectively as "the Taxpayer."

The Claims Court held that the Taxpayer is liable as a transferee for taxes and penalties incurred by an unrelated entity that purchased two corporations from the Taxpayer and went on to engage in abusive tax shelter transactions without the Taxpayer's knowledge or involvement. The court also held that deposits that the Taxpayer made with the IRS to suspend the accrual of interest while it disputed the tax liability were ineffective and that the IRS's exaction of interest was lawful.

1

For the reasons set forth below, this Court should reverse.

## ISSUES ON APPEAL

**1.** Is the Taxpayer liable under New York fraudulent transfer law for the federal tax liability of non-party Humboldt Shelby Holding Corporation (HSHC)?

A ruling for the Taxpayer on this issue would resolve this case. If the Court does not rule for the Taxpayer, however, it should consider these additional issues:

**2.** Is the Taxpayer's liability capped at the net value of the transfer?

**3.** Is the Taxpayer liable for tax penalties that HSHC incurred after its purchase from the Taxpayer and without the Taxpayer's knowledge or involvement?

**4.** Did the IRS abuse its discretion by refusing to apply deposits that the Taxpayer made to suspend the accrual of interest and exacting that interest from the Taxpayer despite the deposits?

## STATEMENT OF THE CASE

The Claims Court entered judgment on the first three issues on appeal following a bench trial. This brief therefore construes the facts in the light most favorable to the Claims Court's opinion and accepts the findings of fact in that opinion unless clearly erroneous. *See American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004). The Claims Court decided the fourth issue on summary judgment. As to that issue, the material facts are undisputed. Appx69 n.1.

## A. Factual Background

The Taxpayer owned two business corporations, Humboldt and Shelby, which themselves owned farms and investment portfolios. Appx2, Appx6. In the early 2000s, the Taxpayer decided to sell these assets. Appx2. Because Humboldt and Shelby were C corporations, the Taxpayer faced two layers of taxation: (1) corporate income tax for Humboldt and Shelby when they disposed of their holdings, plus (2) income tax for the Taxpayer when it dissolved the corporations and distributed their assets. Appx2. This case concerns the first layer.

Humboldt and Shelby held assets worth around $93.7 million. Appx13.[1] Their basis in these assets was around $17.4 million, meaning that they had unrealized gains of around $76.3 million. Appx13. If Humboldt and Shelby simply sold the assets, thereby realizing the gains, they would incur substantial corporate tax liability on the gains. Appx2. This would in turn reduce the proceeds that could be distributed to the Taxpayer. Appx2. On the other hand, if the Taxpayer sold Humboldt and Shelby themselves to a third party, no corporate tax would be triggered. Appx9. But since the corporations would be sold with built-in unrealized gains, a buyer without tax attributes that would offset the tax on those gains would not be willing to pay anything near the full market value of the corporations' assets. Appx9. Rather, such a buyer would pay less for those assets because of the

_____

[1] This brief uses rounded figures for the sake of simplicity.

unrealized gains. *See Diebold Foundation, Inc. v. Commissioner*, 736 F.3d 172, 175 (2d Cir. 2013) (discussing tax implications of asset sales versus stock sales).

However, "the value of Humboldt and Shelby would be different for a buyer with NOLs [net operating losses]" or other favorable tax attributes. Appx12. Tax law allows a taxpayer who has incurred losses to use them to "offset" otherwise-taxable gains. Appx12. As the Claims Court explained: "For the buyer with sufficient [net operating losses], Humboldt and Shelby's underlying assets effectively had no associated tax liabilities: losses would offset the gains, so that taxes would be reduced or even eliminated." Appx12.

The Taxpayer concluded that a buyer with such tax attributes could pay close to the full market value of Humboldt and Shelby's assets to acquire their stock, because such a buyer would be able to realize the full value of those assets tax-free and turn a profit on the deal. Appx12, Appx14. To maximize the sale price, the Taxpayer retained the prominent law firm Shearman & Sterling to oversee an auction. Appx5-6, Appx13-14. Securities law prohibited advertising the offering publicly, so the Taxpayer and Shearman & Sterling reached out directly to five potential bidders: Citibank, Deutsche Bank, Merrill Lynch, K&Z Partners, and TranStar Capital. Appx13, Appx15.

It is undisputed that a stock sale to a buyer with legitimate losses or other offsetting tax attributes would be a lawful means of avoiding the corporate tax. Even

4

so, the Taxpayer was wary about whom it dealt with. *E.g.*, Appx9, Appx11, Appx15-16, Appx17. For example, the Taxpayer had the opportunity to connect with other potential bidders through the global accounting firm BDO Seidman, but decided to forgo that opportunity because "BDO was receiving adverse publicity over its [alleged] involvement in tax shelter transactions." Appx15. The Taxpayer "d[id] not want to include any entity which has a reputation for aggressive tax shelter promotion." Appx16.

Ultimately, three of the five potential buyers submitted bids. Appx16. K&Z submitted a bid on behalf of an entity called Diversified Group Incorporated (DGI), which offered 95% of the value of the Humboldt and Shelby assets. Appx16. Deutsche Bank offered 86%. Appx17. TranStar offered 95%. Appx17. All three offers far exceeded the maximum that a buyer without offsetting tax attributes would have been likely to bid, which the Claims Court assessed at around $65 million (around 71% of the assets' market value). Appx41.

The Taxpayer invited the two highest bidders, DGI and TranStar, to submit their best and final bids. Appx17. DGI submitted the higher bid. Appx19. After inquiring about DGI's plans for Humboldt and Shelby, Shearman & Sterling was told the plans were "proprietary" and would not be disclosed. Appx19. Because it was a cash sale and investors' plans are often confidential, this response was

unremarkable. Appx37. The Taxpayer chose to sell to DGI because its offer was highest. Appx19.

Both parties to the Stock Sale were represented by prominent law firms: Shearman & Sterling represented the Taxpayer, and the buyer was represented by Proskauer Rose. Appx19-20. Proskauer informed Shearman & Sterling that the buyer would not be DGI itself but rather a special-purpose entity, Humboldt Shelby Holding Corporation (HSHC), owned by DGI president James Haber. Appx19-20. Through their respective law firms, the parties negotiated contract terms for the sale, including representations and warranties in which HSHC committed that Humboldt and Shelby would retain substantial assets, HSHC would not become insolvent, and HSHC would be responsible for the Humboldt and Shelby post-closing tax liabilities. Appx6709-10, 6714. The Stock Sale closed on December 23, 2002, with HSHC paying around $87 million in cash. Appx2, Appx23.

Following the Stock Sale, HSHC caused Humboldt and Shelby to liquidate their assets in violation of HSHC's contractual warranties to the Taxpayer, thereby causing Humboldt and Shelby to realize the previously unrealized gains on those assets and incur federal tax liability on the gains. Appx3, Appx23. In spite of the price that it paid for Humboldt and Shelby, HSHC did not actually have tax attributes that would offset these gains. Rather, in the months following the Stock Sale, Haber caused HSHC to enter into tax-shelter transactions that generated bogus losses.

Appx3, Appx23-24.  Then, on its consolidated tax return for its group of corporations (including Humboldt and Shelby), HSHC offset $73.2 million in gains for Humboldt and Shelby with $74.1 million in purported losses.  Appx3, Appx24.

The Taxpayer was not involved in and did not know about the bogus transactions.  Appx3, Appx24.  Nor was it aware that HSHC had liquidated Humboldt and Shelby's assets.  Appx4204-06; *see* Appx3035-36, Appx3437-38.

The IRS caught up with Haber a few years later.  Appx24.  It asserted that the losses were bogus and that HSHC owed $25.6 million in tax, a $10.2 million penalty for the misstatement, and interest.  Appx24.  But HSHC never paid.  Appx3.

In 2014, the IRS notified the Taxpayer that it might seek to recover HSHC's unpaid liabilities from the Taxpayer via "transferee liability."  Appx3.  The Taxpayer deposited $71.7 million with the IRS under 26 U.S.C. § 6603 to suspend accrual of interest.  Appx3.

In 2016, the IRS formally asserted liability against the Taxpayer.  Appx24.  In the 12 years since HSHC filed its bogus return, the interest on its underpayment had ballooned, putting the total asserted liability at $79.9 million.  Appx3, Appx24.

The Taxpayer paid the asserted liability.  Appx24.  It then filed this tax refund litigation, seeking the return of all taxes, penalties, and interest that the IRS assessed against the Taxpayer as HSHC's supposed transferee.  Appx24.

7

### B. Procedural History

#### 1. Summary judgment on the interest issue

The Government moved for summary judgment on the Taxpayer's claim that, even assuming it was otherwise liable for HSHC's liabilities, it owed no interest for the period *after* it made the $71.7 million deposit with the IRS in early 2015. Appx4. The Tax Code provides that a taxpayer can make a deposit with the IRS to stop the running of interest. 26 U.S.C. § 6603(a). Then, "[t]o the extent that such deposit is used by the [IRS] to pay tax, for purposes of [underpayment interest], the tax shall be treated as paid when the deposit is made." *Id.* § 6603(b). Here, though, the IRS refused to use the deposit to pay the tax and asserted that interest had therefore continued to accrue. The Claims Court held that the IRS acted within its discretion. *Dillon Trust Co. v. United States*, 162 Fed. Cl. 708 (2022) (Appx54-68); *Dillon Trust Co. v. United States*, 164 Fed. Cl. 92 (2023) (Appx69-78).

#### 2. Bench trial on the remaining issues

The Claims Court held a bench trial on the remaining issues. Appx4. In its post-trial decision, the court ruled for the Government across the board. *Dillon Trust Co. v. United States*, 168 Fed. Cl. 228 (2023) (Appx1-52).

**a. NYFUCA transferee liability.** The Claims Court first held that the Taxpayer is liable for HSHC's debt to the IRS under the New York Uniform Fraudulent Conveyance Act (NYUFCA). Appx24-49. NYUFCA imposes

transferee liability for both intentional fraud (§ 276) and constructive fraud (§ 273), but the Claims Court recognized that the Government "does not rely on actual fraud under § 276," only § 273 constructive fraud. Appx27. Under NYUFCA, the creditor (here, the Government) bears the burden of proving fraud by clear and convincing evidence. Appx27-29 & n.16.

The Claims Court acknowledged a key hurdle for the Government. By definition, a fraudulent transfer claim requires a transfer (or "conveyance") from the debtor to the transferee. Appx29. But there was no transfer between the Taxpayer and the entities with the alleged liability to the IRS (Humboldt and Shelby). Appx29-30. Rather, there was a transfer between the Taxpayer and *HSHC* (the Stock Sale), followed by separate transfers that HSHC caused Humboldt and Shelby to make with unrelated entities (i.e., the sales of Humboldt and Shelby's assets). Appx29. The IRS won a judgment against HSHC, but that was because HSHC filed a consolidated tax return on behalf of Humboldt and Shelby—a matter of federal rather than New York law. Appx30. Humboldt and Shelby were not part of HSHC's tax group until after the Stock Sale. Appx30.

The Government could therefore prevail only if it could show that the separate transactions should be "collapsed" and "viewed as part of a single transaction" for NYUFCA purposes. Appx27, Appx30. If so, "the conveyance in question includes both the Stock Sale and Humboldt and Shelby's subsequent asset sales." Appx30.

The court could collapse the transactions only if the Government proved, by clear and convincing evidence, that the Taxpayer had actual or constructive knowledge of *the entire scheme* that renders the exchange with the debtor fraudulent. Appx32, Appx35. The Claims Court held that the Government had carried that burden by proving constructive (but not actual) fraud. Appx29, Appx49.

Specifically, the Claims Court held that the Taxpayer had "constructive knowledge" of Haber's entire scheme because the Taxpayer was supposedly on "inquiry notice" (in light of alleged "red flags") that Haber might be planning a fraud, but did not perform sufficient inquiry to uncover the fraud and, instead, actively avoided learning the truth. Appx39-49.

Crucially, the court acknowledged that Haber would not have revealed the scheme if asked. Appx36, Appx48. But it held that a party who fails to make reasonable inquiry is charged with constructive knowledge regardless of whether a reasonable inquiry would have actually yielded such knowledge. Appx36.

The central "red flag" was the court's belief, based on the opinions of the Government's hired experts, that there was a "total absence of any economic validity to the bids." Appx45. In the court's view, "no willing buyer would have paid more than the after-tax value of [the Humboldt and Shelby] assets" (around $65 million) unless it planned to commit tax fraud, and the Taxpayer must have understood this— even though three entities submitted bids far above the after-tax value—and these

included the prominent and sophisticated Deutsche Bank (a point that the court simply ignored). Appx39-41, Appx44-45.

The court acknowledged that a buyer could have offsetting losses or other legitimate tax attributes that would allow it to lawfully avoid the tax on the unrealized gains and thus turn a profit by obtaining the Humboldt and Shelby assets at a discount. Appx40. But the court believed that any entity with such offsetting attributes would prefer to buy stocks or other investments on the open market at full price, hold them and wait for their values to go up (since "on average, over time, stocks go up in value"), and then sell them and use the tax benefits to avoid tax on the increase in value, rather than effectively buying the assets at, say, 95% of market value and then selling for a 5% profit. Appx40. "In other words," the court believed, "there would be no incentive for a rational buyer to use accumulated [offsetting losses] as part of the purchase price to offset embedded [taxable] gain." Appx40. And, the court believed, the Taxpayer must have known that: "There was no mystery here in this regard other than that created by [the Taxpayer's] own desire to remain ignorant, or to feign ignorance." Appx45.

The court viewed the Taxpayer's use of an auction to find a buyer as another "red flag." Appx45-46. It also pointed to two contemporaneous court opinions regarding DGI that obliquely reference tax strategies, though it acknowledged that Shearman & Sterling's search did not find them. Appx17 & n.12, Appx46, Appx48.

11

The court concluded that the Taxpayer's "willful ignorance is sufficient to demonstrate constructive knowledge of fraud" and bad faith, and that the distinct transfers should therefore be "collapsed." Appx49. The court thus imposed transferee liability on the Taxpayer under NYUFCA. Appx49.

b. **The NYUFCA § 278(2) cap.** Next, the Claims Court rejected the Taxpayer's invocation of NYUFCA § 278(2), which caps a transferee's liability to the amount by which the value of the property that the transferee received exceeded the value that the transferee gave in return. Appx49-51. The § 278(2) cap applies if the transferee acted "without actual fraudulent intent." The Claims Court held that the Taxpayer bore the burden of proving lack of actual fraudulent intent and that, in light of certain supposed "badges of fraud," the Taxpayer had failed to carry that burden—even though the Government did not even argue actual fraud. Appx50-51.

c. **HSHC's gross misstatement penalty.** Finally, the Claims Court ruled that the Taxpayer is liable for the $10.2 million tax penalty imposed on HSHC as a result of its abusive tax shelter because "federal law" determines "whether [the penalty] can be collected from" a transferee. Appx3, Appx51.

## SUMMARY OF THE ARGUMENT

I. The Claims Court's ruling imposing transferee liability on the Taxpayer turned on its decision to collapse the transactions. But that decision rested on a series of significant errors, each of which independently requires reversal. *First*, contrary

12

to the ruling below, "inquiry notice" charges a person with constructive knowledge of only the facts that a reasonable inquiry *would have revealed*—and the Claims Court acknowledged that further inquiry in this case would have revealed nothing. *Second*, the Claims Court's belief that no one would bid more than the after-tax value of the Humboldt and Shelby assets unless it planned to commit tax fraud—and that the Taxpayer must have understood as much—is nonsense as economic theory and contrary to the undisputed facts of the case, including Deutsche Bank's bid far above the after-tax value (which the Claims Court never addressed). *Third*, despite acknowledging that the Government had to prove that the Taxpayer took "active steps" to avoid learning the truth of Haber's scheme, the court failed to identify any such active steps, instead faulting the Taxpayer for perceived *inaction*. *Fourth*, the decision here represents an unjustified extension of the Second Circuit's *Diebold* decision, which was already the high-water mark for transferee liability in tax cases.

**II.** At a minimum, the Taxpayer's transferee liability should be limited to the net value that it received from HSHC—which, even on the Government's and Claims Court's view, amounted to around $21 million (the difference between what HSHC paid the Taxpayer and the Government's position on the true value of the Humboldt and Shelby stock). New York law undisputedly imposes such a "cap" where the transferee gives less than fair consideration but acts "without actual fraudulent intent." Here, there is zero evidence that the Taxpayer had "actual

13

fraudulent intent." And the Government never argued that it actually did; it chose to argue only *constructive* fraud. It is precisely for such cases that the statutory cap exists.

**III.** There is no legal basis under NYUFCA for the Claims Court's decision to hold the Taxpayer liable for the $10.2 million gross valuation misstatement penalty (and related interest) that HSHC and Haber incurred after the Stock Sale when they claimed bogus losses. That debt arose only when HSHC filed its fraudulent tax return; it did not exist (even as a contingent or unliquidated liability) at the time of the transfer at issue here. And NYUFCA only permits *future* creditors to recover from a transferee where the creditor shows that the transferee acted with *actual intent to defraud*. Here, the Government only tried to prove *constructive fraud*; it did not assert that the Taxpayer had actual fraudulent intent, and the record contains no evidence to support such an assertion. The Government therefore cannot collect HSHC's post-transfer debts from the Taxpayer.

**IV.** The Taxpayer is due a refund of the interest that the IRS exacted for the period after May 2015, when the Taxpayer deposited $71 million with the IRS to stop interest from accruing. The Taxpayer made the deposit under 26 U.S.C. § 6603, which Congress enacted specifically to ensure that taxpayers could manage their exposure to underpayment interest by making such deposits. After sitting on the deposit for more than two years, however, the IRS refused to use it to pay the

14

assessed tax and assessed the Taxpayer $11 million in interest for those two years, even though it had the use of the Taxpayer's money throughout that time. Its sole rationale was that the particular trusts that made the deposits were technically distinct entities from the trusts against which the IRS initially assessed the tax—even though it ultimately did assess the tax against the trusts that made the deposits, which were successors of the trusts in the 2002 transaction. The IRS's decision to exact interest for the period when it had the use of the Taxpayer's deposit has no basis in the law, directly defeats the purpose of § 6603, and is a classic instance of abuse of agency discretion.

**STANDARD OF REVIEW**

The Claims Court decided most of the issues on appeal following a bench trial. This Court reviews its legal conclusions de novo and factual findings for clear error. *See American Pelagic*, 379 F.3d at 1371. The court decided the interest issue on summary judgment. This Court reviews summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. *See id.* at 1370-71.

**ARGUMENT**

**I.  The Claims Court erred in holding that the Taxpayer was liable to the IRS as a transferee under New York law.**

**A.  Legal framework: NYUFCA and 26 U.S.C. § 6901**

Under 26 U.S.C. § 6901, the IRS may assess the unpaid liability of a taxpayer against a transferee who received property from that taxpayer to the extent of the

15

transferee's "liability, at law or in equity," under state law.  26 U.S.C. § 6901(a)(1)(A).  Such liability may be "assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred."  *Id.* § 6901(a).  But § 6901 "neither creates nor defines a substantive liability"; it "provides merely a new procedure by which the Government may collect taxes" in lieu of suing the transferee in state court.  *Commissioner v. Stern*, 357 U.S. 39, 42 (1958).  In all § 6901 cases, "the existence and extent of liability should be determined by state law."  *Id.* at 45.

This means that the Government must take the applicable state law as it finds it: "The Government's substantive rights in this case are *precisely those which other creditors would have* under [state] law."  *Id.* at 47 (emphasis added).  "As such, § 6901 does not place the government in a better position than any other creditor under state law."  *Diebold*, 736 F.3d at 185.  This "symmetry of rights" forecloses any argument that the Government can prevail by making "a different showing" than state law would require of "an ordinary creditor."  *Id.*

The relevant state law here is the New York Uniform Fraudulent Conveyance Act (NYUFCA), codified at N.Y. Debtor & Creditor Law §§ 270-281 (2000).  The relevant provisions are in the Statutory Addendum to this brief.

NYUFCA imposes liability for both intentional and constructive fraud.  The intentional fraud provision states that "[e]very conveyance made … with actual

intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NYUFCA § 276. But "the government does not rely on actual fraud under § 276" in this case. Appx27. The Government's "assertions of actual intent [to commit fraud] are directed at the actions of Haber, not [the Taxpayer]." Appx26.

Thus, the Government relies only on § 273, the constructive fraud provision:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

NYUFCA § 273. However, NYUFCA § 278(2) limits the liability of a transferee "who without actual fraudulent intent has given less than a fair consideration."

The creditor bears the burden of proving a fraudulent conveyance by clear and convincing evidence. Appx27-29 & n.16.

## B. The Claims Court erred in "collapsing" the transactions.

The Claims Court's determination that the Taxpayer is liable as a transferee turned on its holding that the Stock Sale between the Taxpayer and HSHC and the later asset sales between Humboldt and Shelby and third parties should be "collapsed" and treated as a single transaction. Appx29-49. For each of the following reasons, that holding should be reversed.

17

**1. The Claims Court erred by ruling that the Taxpayer had "inquiry knowledge" even though inquiry would have been fruitless.**

Under the doctrine of "inquiry notice," one who learns facts that would lead a reasonable person to inquire further but fails to do so is charged with constructive knowledge of *the facts that a reasonable inquiry would have revealed*. But he is *not* charged with knowledge of facts that would *not* have been revealed. Collapsing the transactions here required proof that the Taxpayer had actual or constructive knowledge of Haber's *entire scheme* to sell Humboldt and Shelby's assets and fraudulently evade the resulting tax liability. Appx32. But the Taxpayer's counsel at Shearman & Sterling was told that the buyer's plans for Humboldt and Shelby were "proprietary" and confidential. Appx19. And the Claims Court found that it was "no doubt true" that Haber would not have revealed his plans to the Taxpayer had it inquired further. Appx48. Yet the court held that "it is sufficient [for the Government] to show that there were indicators of potential fraud and a refusal to ask further questions, irrespective of whether Haber would have admitted his plans in detail." Appx36. This legal error requires reversal.

It is blackletter law that, where the law deems "constructive knowledge" to include facts that would have been learned upon reasonable inquiry, the individual who fails to make such an inquiry is deemed to know only those facts that would actually have been revealed through the inquiry. Thus, since reasonable inquiry here would not have revealed Haber's entire scheme to the Taxpayer, the Taxpayer

18

cannot be charged with constructive knowledge of that entire scheme—and so the Government cannot collapse the transactions.

The Second Circuit's *Diebold* decision recognizes as much: "inquiry knowledge" is "the knowledge that ordinary diligence *would have elicited*." 736 F.3d at 187 (emphasis added; citation omitted). And the Second Circuit has recognized that this rule applies under New York law:

> One who has reasonable grounds for suspecting or inquiry ought to suspect, ought to inquire, and the law charges him with *the knowledge which the proper inquiry would disclose*. … [H]e is chargeable with *the knowledge which by ordinary diligence he would have acquired*.

*Citibank, N.A. v. Brigade Capital Management, LP*, 49 F4th 42, 61 (2d Cir. 2022) (emphases added) (quoting *Fidelity & Deposit Co v. Queens County Trust Co.*, 123 N.E. 370, 372-73 (N.Y. 1919)); *see also Majer v. Schmidt*, 169 A.D.2d 501, 503 (N.Y. 1st Dep't 1991) ("constructive notice" is limited to "any fact which would have been disclosed by a reasonably diligent inquiry").

In short, "[i]t is only if the facts within the knowledge of the purchaser are of such a nature, as, in reason, to put him upon inquiry, and to excite the suspicion of an ordinarily prudent person and he fails to make some investigation, [that] he will be chargeable with that knowledge which a reasonable inquiry, as suggested by the facts, *would have revealed*." *Miner v. Edwards*, 221 A.D.2d 934, 935 (N.Y. 4th Dep't 1995) (emphasis added). Accordingly, "the question is … whether the circumstances would have put a reasonable man in his situation upon inquiry, *and*

*whether that inquiry would have led to sufficient knowledge of the facts to prevent the [transaction].*" *Bentley v. Young*, 210 F. 202, 205 (S.D.N.Y. 1914) (L. Hand, J.) (emphasis added). If a reasonable inquiry would not have uncovered the facts in question, then there cannot be constructive knowledge. It is, in those circumstances, immaterial whether the person in fact made a reasonable inquiry.

Thus, in *Citibank*, after concluding that the facts would have led a reasonable person to inquire further, the Second Circuit assessed whether "[a] reasonable inquiry would have revealed the mistake" at issue. 49 F.4th at 72. Another Second Circuit case applying an inquiry notice standard likewise explains that "once the court has determined that a transferee had been put on inquiry notice, *the court must inquire whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer.*" *In re Bernard L. Madoff Investment Securities LLC*, 12 F.4th 171, 191-92 (2d Cir. 2021) (emphasis added; brackets and quotation marks omitted). It is beyond dispute that "a transferee is entitled to offer evidence and to argue to the finder of fact that no diligent investigation would have disclosed the transferor's insolvency or fraudulent purpose." *In re Bayou Group, LLC*, 439 B.R. 284, 17 (S.D.N.Y. 2010). To constitute inquiry notice, "[t]he fraud must be probable, not merely possible." *Meyer v. Seidel*, 89 F.4th 117, 135 (2d Cir. 2023).

Although the cases just discussed (with the exception of *Miner v. Edwards*) did not arise under NYUFCA, there is no reason to believe that New York law would

treat inquiry notice differently in that one context. To the contrary, "New York courts have applied this interpretation of constructive notice in many different contexts." *Citibank*, 49 F.4th at 62.

In *Starnes v. Commissioner*, 680 F.3d 417 (4th Cir. 2012), the Fourth Circuit similarly held that one can have constructive knowledge of only those facts that a reasonable inquiry would have revealed. Applying North Carolina's Uniform Fraudulent Transfer Act (UFTA), the Fourth Circuit explained that "the question of constructive knowledge has two components":

> First, did the Former Shareholders have actual knowledge of facts that would have led a reasonable person concerned about Tarcon's solvency to inquire further into MidCoast's post-closing plans? Second, if the Former Shareholders were thereby on "inquiry notice," whether the inquiry a reasonably diligent, similarly-situated person would have undertaken revealed MidCoast's plan to leave Tarcon unable to pay its 2003 taxes?

*Id.* at 434. "Thus, if the Former Shareholders were on inquiry notice of MidCoast's plans and failed to make reasonably diligent inquiry, they are charged with *the knowledge they would have acquired had they undertaken the reasonably diligent inquiry*." *Id.* (emphasis added).

The trial court in *Starnes* held that the taxpayers there had a duty to inquire and failed to do so. *Id.* But it also held that the Government "was required to prove that no reasonably diligent person in the Former Shareholders' position would have failed to discover that MidCoast would cause Tarcon not to pay its 2003 taxes." *Id.*

21

The Fourth Circuit agreed that "[t]his was the correct standard." *Id.*; *see also, e.g.,* *Alterman v. Commissioner*, T.C. Memo. 2015-231, at 50 (Tax Ct. 2015) (same under Florida UFTA).

Decisions under other states' uniform laws are particularly relevant given NYUFCA's mandate that it "shall be so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states which enact it." NYUFCA § 281.

The Government bears the burden of establishing constructive knowledge. Appx27-29; *Diebold*, 736 F.3d at 186 n.8; *Starnes*, 680 F.3d at 434. It failed to carry that burden by showing that a reasonable inquiry would have revealed Haber's entire fraudulent scheme. And the Claims Court affirmatively found the contrary—it was "no doubt true" that Haber would not have revealed his plans to the Taxpayer had it inquired further. Appx48. It follows as a matter of law that the Taxpayer cannot be charged with knowledge of Haber's entire scheme, and so the transactions cannot be collapsed and the Taxpayer cannot be held liable under NYUFCA. This mandates reversal.

### 2. The Claims Court erred in holding that intent to commit tax fraud was the only economically plausible explanation for the three bids the Taxpayer received.

The Taxpayer sought to legitimately minimize the tax on the Humboldt and Shelby assets by selling the stock of those corporations to a buyer with offsetting tax

attributes. Whereas a rational buyer without such attributes would value the stock based on the value of the corporations' assets minus the tax liability, a rational buyer that would not be subject to that tax would value the corporations' stock based on the full market value of their underlying assets. Such a buyer could realize a profit by acquiring the stock for less than the full market value and then selling the assets for market value. It is undisputed that if the stock had gone to a buyer with legitimate tax attributes, then the buyer could have offset the built-in gains and the Taxpayer would have had no transferee liability. Appx40.

To find buyers with such attributes and to get the highest price for the stock, the Taxpayer held an auction. The auction yielded three cash bids: DGI/HSHC and TranStar each offered around 95% of the market value of the corporations' assets, and Deutsche Bank offered around 86%. Appx16-17. All three offers vastly exceeded the value of the corporations' assets minus the tax on their unrealized gains, which the Claims Court put at around $65 million (roughly 71% of the assets' market value). Appx41.

Nonetheless, the Claims Court believed that there was a "total absence of any economic validity to the bids." Appx45. It concluded that "no willing buyer would have paid more than the after-tax value" (i.e., $65 million) unless the buyer planned to commit tax fraud. Appx41. And, the Claims Court reasoned, this point of economic theory was so obvious that the Taxpayer must have understood it, meaning

that the Taxpayer was on inquiry notice and had constructive knowledge of Haber's

entire fraudulent scheme: "There was no mystery here in this regard other than that

created by [the Taxpayer's] own desire to remain ignorant, or to feign ignorance."

Appx45; *see* Appx39-41, Appx44-45.

This conclusion—the crux of the Claims Court's decision to charge the

Taxpayer with knowledge of Haber's scheme and collapse the transactions—is

utterly wrongheaded as a matter of both basic economic theory and fact.[2]

Start with the facts. While the Claims Court believed based on its theoretical

speculation that no rational actor would have bid more than around 71% of the

assets' market value, the fact is that three real-world investment firms submitted bids

far in excess of that threshold. Appx16-17.[3] The Claims Court apparently concluded

that the HSHC and TranStar bids merely proved that those entities planned to

commit tax fraud. Appx44. In fact, though, the Claims Court pointed to no record

---

[2] Matters of abstract economic theory not tied to the facts and parties of a specific case are questions of "legislative fact" that appellate courts decide de novo. *See, e.g.*, *United States v. Love*, 20 F.4th 407, 412 (8th Cir. 2021) ("Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case." (quotation marks omitted)); *United States v. Miller*, 982 F.3d 412, 430 (6th Cir. 2020) (legislative facts are "legal issue[s] subject to de novo review" because they must be "decided uniformly," not "decided anew by hundreds of district judges").

[3] Moreover, the Taxpayer received an offer from Citibank that also greatly exceeded the Claims Court's threshold; the Taxpayer rejected that offer because it involved preferred stock rather than cash. Appx4190-91.

evidence to support its speculation about TranStar's supposed fraudulent intent. There was no evidence regarding the factual underpinnings of TranStar's bid.

And, even more glaringly, the Claims Court simply *ignored* Deutsche Bank's offer to pay 86% of the assets' value. That offer alone refutes the Claims Court's economic theory, unless one simply assumes that Deutsche Bank was looking to commit petty tax fraud—and the record shows that Deutsche Bank planned a vanilla hedging transaction. Appx9403-09. The suggestion that the Taxpayer *must have known* that no rational buyer would offer more than the assets' after-tax value is absurd because Deutsche Bank's offer passed that threshold by more than $10 million.

The law, like economics, defines "market value [as] the price at which the property would change hands between a willing buyer and a willing seller neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973). One thus determines market value by looking, if possible, at the actual prices produced by market forces—like the bids in this case. The Claims Court's alternate strategy—purporting to determine market value based on the court's and Government witnesses' economic speculation, and then dismissing the actual market prices

because they were higher than that speculation predicted—gets things precisely backwards.[4]

The Claims Court also ignored that HSHC's own attorney at Proskauer likewise believed that HSHC and Haber were engaged in a legitimate business, not planning a fraud. Appx4872. If a fraudster's *own attorney* is unaware of the fraudulent intent behind the transaction on which she represents it, the fraudster's counterparties in an arm's-length transaction can hardly be expected to sniff out the fraud.

Even if the concrete facts did not disprove it, the Claims Court's economic speculation would fail as a matter of basic economics. The court recognized that some entities have tax attributes that could have offset the taxable gains on a sale of the Humboldt and Shelby assets. Appx40. An entity that could buy the corporations for 95% of their assets' market value, sell those assets on the open market for their market value, and avoid tax on that sale would easily make a 5% profit—in this case, nearly $5 million. But the Claims Court declared that, unless the tax attributes were

---

[4] It is immaterial that Humboldt and Shelby's legitimate value *to HSHC* was considerably lower than its bid because HSHC did not actually have valid tax attributes. Many assets are worth more to some potential buyers than others. A factory, for instance, might be worth a certain amount to a business with experience in the relevant industry, but far less to an unsophisticated buyer who would lack the skills to turn a profit with the asset. The market price is determined by the top bids, and the seller cannot be charged with knowledge that a particular bidder may actually be idiosyncratically unable to extract the asset's full value.

about to expire, any entity in that position would prefer to simply buy the same assets on the market, paying 100% of their market value, and then wait for the assets to go up in value, sell them for the increased value, and use the tax attributes to avoid tax on those gains. Appx40.

That sweeping pronouncement of economic theory is both baseless and absurd. It may be true that some investors would indeed pick the Claims Court's investment strategy. But other entities, with differing risk tolerances, time horizons, and potential uses for their capital, could rationally take the easy $5 million profit. For one thing, the time value of money weighs in favor of converting favorable tax attributes into cash sooner rather than later, contrary to the Claims Court's belief that every rational actor would put off monetizing its tax attributes until the last minute. Appx40. The benefit provided by an NOL or other tax offset also decreases over time due to inflation. *See, e.g.*, Garrett Watson, "Advancing Net Operating Loss Deductions in Phase 4 Business Relief," Tax Foundation (May 2020), at 3 ("The longer a firm must wait to deduct an NOL deduction from future taxable income, the smaller the tax benefit the firm receives," because of the time value of money and inflation). And buying and holding stocks is a risky investment strategy. While it is historically true that "*on average*, over time, stocks go up in value," it does not remotely follow that a stock investor "could be assured" that his portfolio would see a meaningful increase in value over any particular time horizon. Appx 40 (emphasis

added).  The wide world of finance would be pointless if it were so simple.  Finally, even apart from the time value of money and varying risk tolerances, many investors would rather take the $5 million profit and move on to another investment opportunity rather than having their capital tied up in stocks for years to come.

For all these reasons, a rational buyer with NOLs or other favorable tax attributes could well decide to purchase a company with unrealized gains and to pay more for such a company than a rational buyer without such attributes.  *See, e.g.*, Merle M. Erickson et al., *The Effect of Acquirer Net Operating Losses on Acquisition Premiums and Acquirer Abnormal Returns*, 41 Journal of the American Taxation Association 103, 103 (2019) ("As a result of the increased cash flows resulting from more effective and timely use of the acquirer's NOLs, acquiring firms may be willing to share some of the value created with target shareholders in the form of higher acquisition premium.").  Indeed, the study just cited looked at "a sample of 1,959 acquisitions" and found that "acquirers with NOLs are associated with higher acquisition premiums than acquisitions by non-NOL acquirers," including because "an acquisition may enable the firm [with NOLs] to utilize its NOLs in a more timely manner." *Id.* at 103-04.

The Claims Court also reasoned that even if one potential buyer were willing to pay close to market value, it would not actually do so in the absence of other buyers in the same position who would bid against each other.  Appx40.  But the

court's speculation that there could be *only one* such buyer is just as baseless as its speculation that there would be none. The Taxpayer received *three* bids well above the threshold that the Claims Court viewed as the maximum rational bid, including a bid from a major financial institution that the Claims Court simply disregarded.

Unlike the Claims Court in this case, the U.S. Tax Court "acknowledge[s] that there are legitimate tax planning strategies involving built-in gains and losses and that it was not unreasonable, in the absence of contradictory information, for the representatives [of the alleged transferee] to believe that the buyer had a legitimate tax planning method." *Julia R. Swords Trust v. Commissioner*, 142 T.C. 317, 349 (2014). There, the Tax Court concluded that "while [the taxpayer's representatives] knew or had reason to believe that the buyer of [the taxpayer] trusts' stock had tax attributes that made the purchase of the stock attractive, [the representatives] did not know or have reason to know that any such tax attributes were improper or that the buyer intended to liquidate [the corporation] and to illegitimately avoid any resulting tax liability." *Id.* at 349-50; *see also Alterman*, 110 T.C.M. (CCH) 507, at \*20 ("Likewise, it was not unreasonable for the [taxpayer's] advisors to believe that [the buyer] had a legitimate tax deferral plan."). The Tax Court drew a contrast with *Diebold*, where the Second Circuit emphasized that the taxpayers' representatives "'had a sophisticated understanding of the structure of the entire transaction' and

had actively participated in implementing the transaction." *Swords*, 142 T.C. at 350 n.36 (quoting *Diebold*, 736 F.3d at 188-89).

In short, "legitimate transactions may be available to offset built-in gain, if recognized, and a taxpayer may contemplate the execution of such a transaction." *Id.* at 347. That is precisely what occurred here, and the Claims Court erred in holding otherwise based on the misguided economic theories of the Government's paid experts.

The Claims Court also viewed the Taxpayer's use of an auction to find a buyer as a "red flag" indicative of fraud. Appx44-46. The court believed that auctions only "make sense for hard-to-value assets, where there could be disagreement about value," not for publicly traded assets like the stocks held by Humboldt and Shelby. Appx44. Since an auction was not necessary to value the underlying assets, the court concluded that it was irrational for the Taxpayer to use an auction rather than "[a] straightforward sale on the open market of the assets," which would supposedly have reduced transaction costs—but would have resulted in "immediate tax liability." Appx44. But the Taxpayer has never contended that the point of the auction was to value the underlying assets. The point was to get the highest price for the assets and find buyers whose tax attributes would cause them to offer bids approaching the market price of the underlying assets. The auction in fact yielded three such bids. The auction was economically rational—not a "red flag" of any sort.

The Claims Court pointed to two court opinions that referenced DGI in connection with tax strategies. Appx17 & n.12, Appx46, Appx48. Both were innocuous. One simply stated in passing that DGI "engaged in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes." *DGI v. Daugerdas*, 139 F. Supp. 2d 445, 448 (S.D.N.Y. 2001). That is not an accusation of wrongdoing; it is what every tax adviser attempts to do. Indeed, DGI was the *plaintiff* in the lawsuit. It chose to make the transactions there a matter of public record, which, far from being a red flag, would lead a reasonable person to infer that the transactions were bona fide and that DGI had nothing to hide.

The other opinion was issued *after* the Taxpayer performed its due diligence on DGI, and it was not publicly available. Appx5791-92. This case, which concerned "an effort by the IRS to enforce a subpoena against DGI," noted that "[t]he IRS is currently investigating whether DGI has violated the tax laws regarding the registration and maintenance of records concerning tax shelters." Appx46 (quoting *United States v. DGI*, 2002 WL 31947904 (S.D.N.Y. 2002)). But an IRS investigation is not proof of wrongdoing, and NYUFCA does not commandeer private parties like the Taxpayer to act as agents of the IRS.

In any event, Shearman & Sterling investigated DGI but did not turn up either ruling. Appx17 & n.12, Appx46. Constructive knowledge does not include facts not revealed by a reasonable search.

Finally, the Claims Court believed that it was "unlikel[y] that HSHC itself had any useable [non-operating losses] because it was not and had never been an operating company" and had been recently formed in anticipation of the Stock Sale. Appx47. But mergers-and-acquisitions transactions typically involve special-purpose vehicles; the mere use of an SPV cannot be a red flag. Appx38. And the Government did not meet its burden to show that HSHC could not have had or acquired any legitimate offsetting tax attributes, much less that a reasonable person in the Taxpayer's position would have inferred fraud because HSHC was a newly formed SPV.

### 3. The Claims Court erred in holding that the Taxpayer had constructive knowledge despite the lack of any "active steps" to avoid learning of Haber's fraudulent scheme.

Even assuming that the Taxpayer was on inquiry notice about Haber's plans, the Claims Court recognized that the Taxpayer could not be charged with constructive knowledge unless "the government show[ed] that the [Taxpayer] actively avoided informing [itself] of the truth." Appx34. "[A]ctive avoidance means an individual suspects that the truth would be unfavorable so they take *active steps* to keep from finding it out." Appx 34 (emphasis added).

Yet the Claims Court did not point to, and the record does not include, any "active steps" by the Taxpayer to avoid confirming supposed suspicions about Haber's plans. At most, the Claims Court believed (erroneously) that the Taxpayer had been too *passive* in failing to *actively investigate* Haber and HSHC—but passivity is the very opposite of *active avoidance*. For this reason, too, the Taxpayer cannot be charged with constructive knowledge of Haber's entire fraudulent scheme, so the transactions cannot be collapsed and the Government cannot prevail.

### 4. The Claims Court erred in extending the Second Circuit's *Diebold* decision, which had already stretched NYUFCA to assist the IRS.

The Claims Court took the Second Circuit's *Diebold* decision as its model in imposing transferee liability under NYUFCA. Appx30-36. But *Diebold* is hardly on all fours with this case. To the contrary, in *Diebold*, the taxpayer "had a 'sophisticated understanding' of the structure of the entire transaction"—exactly what was lacking here. Appx35 (quoting *Diebold*, 736 F.3d at 188). The *Diebold* taxpayer "knew that the new entity was going to promptly sell the assets." Appx35; *see* 736 F.3d at 178. Indeed, the taxpayer's lawyers deleted language in a draft agreement that would have made the scope of their knowledge clear, evincing a guilty conscience and active avoidance of the truth. 736 F.3d at 179. The Second Circuit held that this cover-up showed that the sellers "did not want to know, or reveal that they knew, the details" of the fraudulent scheme. *Id.* at 189. Thus, the Second Circuit concluded, "the parties knew, or at least should have known *but for*

33

*active avoidance*, that the entire scheme was fraudulent." *Id.* at 188 (emphasis added).

Here, by contrast, the Taxpayer did not know Haber's plans and did nothing like the cover-up in *Diebold*. To the contrary, the Taxpayer negotiated representations and warranties in which HSHC committed that Humboldt and Shelby would retain substantial assets, HSHC would not become insolvent, and that HSHC would be responsible for the post-closing tax liabilities of Humboldt and Shelby. Appx6709-10, 6714. Courts have found that the sellers did not have constructive knowledge where the buyer violated such representations and warranties in executing its fraudulent scheme (thereby defrauding the seller as well as the IRS). *See Starnes,* 680 F.3d at 436 (sellers would not have learned of buyer's post-sale scheme where buyer represented that it would keep the corporation solvent, operating, and current on its tax liabilities); *Frank Sawyer Trust v. Commissioner,* 712 F.3d. 597, 606 (1st Cir. 2013) (contract term providing that buyer would be liable for companies' taxes supported finding no constructive knowledge); *Alterman,* 110 T.C.M. (CCH) 507, at *52-53 (shareholders engaged in due diligence by placing covenants, representations, and warranties in the share purchase agreement, and "[i]t was reasonable for the Alterman shareholders to rely on the covenants in the share purchase agreement"). Furthermore, the Taxpayer here did all it could to enforce the representations and warranties: When HSHC offered, about

six months after the Stock Sale, to pay the Taxpayer $100,000 in exchange for releasing HSHC from its obligations, the Taxpayer rejected the offer. Appx3428, Appx8868.

Congress has authority to increase the reach of the IRS if it so chooses, including by imposing broad liability on taxpayers that unwittingly do business with tax cheats and subjecting them to duties to investigate to protect the IRS's interests. But Congress has not done so. As the Supreme Court held in *Stern*, Congress has given the IRS no greater substantive rights against transferees than any other creditor would have under the law of the state in question. *See* 357 U.S. at 42, 45, 47. "The Government's substantive rights in this case are *precisely those which other creditors would have* under [state] law." *Id.* at 47 (emphasis added). Yet both *Diebold* and (to an even greater extent) the decision below stretched NYUFCA to provide special protection for the IRS. Both rulings commandeer private entities to serve as IRS agents—on pain of being held liable not merely for unpaid taxes but also for massive penalties and for interest that can rapidly compound (as it did here) over many years before the entity is even assessed with the liability.

Nothing in NYUFCA requires private parties in arm's-length transactions to investigate their counterparties' tax planning for the benefit of the IRS. In cases like this one, the Government effectively argues that a private party should be charged

35

with knowledge of the cash buyer's tax attributes—even though it is not the policy of the IRS or of Congress to make every company's tax attributes public.

"The standard that determines the inferences to be drawn and the inquiries to be made is that of a reasonable and prudent person whose interests would be served by obtaining the knowledge in question." *Citibank, N.A. v. Brigade Capital Management, LP*, 49 F.4th 42, 64 (2d Cir. 2022) (citation omitted). Thus, "[p]rudence does not impose a duty to learn the true facts when one is not at risk of loss." *Id.* The duty is at a minimum in the context of a cash sale, since the seller's only interest is in receiving the cash (by contrast to, say, a transaction where the seller extends credit to the buyer). In another case, "the Commissioner's own expert at trial admitted there are no standards for sell-side due diligence [in cash sales], only basic principles and accepted practices. A seller's main concern is whether the buyer will be able to close the deal." *Alterman*, 110 T.C.M. (CCH) 507, at *57. The Claims Court's proposition that the Taxpayer needed to go above and beyond to protect the IRS's interests—on pain of liability approaching *nine figures*—is a sweeping and unjustified expansion of generally applicable state-law protections for creditors.

It would be one thing if the Taxpayer here were merely liable for the tax that Humboldt and Shelby would have owed if the Taxpayer had used an asset sale rather than a stock sale, or for the amount by which the Claims Court believed that the

"true" value of Humboldt and Shelby fell short of what the Taxpayer was paid for them. But the vast majority of the judgment here is not the underlying tax itself—it is the penalties imposed on HSHC for its post-sale tax fraud (without the Taxpayer's knowledge or involvement) and the interest that accrued before the IRS actually assessed the tax and penalties against the Taxpayer. These points are further addressed in the sections that follow.

## II. The Claims Court erred in holding the Taxpayer liable for more than the alleged net value of the transfer it received.

Fraudulent transfer law protects creditors by allowing them to unwind transactions that took value from the debtor that would otherwise have been available to pay the creditor. Here, even on the Government's view, the Stock Sale took only around $21 million in value from the debtor: HSHC paid around $86.3 million for the Humboldt and Shelby stock, and the Claims Court accepted the Government's view that the stock was really worth around $65.8 million ($91 million in underlying asset value minus $26 million in tax liability). Appx41, Appx50. On the Government's view that the Taxpayer drained some $21 million in value from the debtor, the law makes the Taxpayer liable as a transferee for no more than $21 million.

This follows from NYUFCA § 278(2), which provides that "[a] purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for

37

repayment." NYUFCA § 278(2). This text is not a model of clarity. But the logic is clear: "a purchaser who does not have actual fraudulent intent … is only liable for the difference between the value it conferred to the debtor and the amount it received in exchange." *In re CNB International, Inc.*, 440 B.R. 31, 42 (W.D.N.Y. 2010). Thus, "if [the Taxpayer] gave something less than fair consideration but lacked actual fraudulent intent, it is only liable for the difference between the amount it received and the value it conveyed." *Id.* at 43.

The Claims Court accepted that the § 278(2) cap applies if the Taxpayer acted "without actual fraudulent intent." Appx49-51. But it held that the Taxpayer had failed to show that it acted without actual fraudulent intent here and, on that basis, refused to apply the cap. Appx50-51. This Court should reverse.

*First*, the Claims Court committed legal error in imposing the burden of disproving "actual fraudulent intent" on the Taxpayer. Appx50-51. As the court elsewhere correctly acknowledged, "New York law plainly holds that the party seeking to set aside a conveyance under the NYUFCA bears the burden." Appx28. Nothing in § 278(2) alters that allocation. As this Court has explained, the same is true under federal law: "When alleging taxpayer fraud … the IRS bears the burden." *BASR Partnership v. United States*, 795 F.3d 1338, 1344 (Fed. Cir. 2015). "Congress intended for the government to *always* carry the burden of proof for any

38

fraud allegation," to avoid "placing taxpayers in the difficult position of having to *disprove* the fraud charged against them." *Id.* at 1345 (first emphasis added).

In holding otherwise, the Claims Court cited only a federal bankruptcy court ruling that in turn relies on an inapposite 1927 trial court ruling. Appx50-51. These conclusory statements do not merit deference. Given that (as the Claims Court acknowledged), the government "does not rely on actual fraud under § 276" in this case and its "assertions of actual intent [to commit fraud] are directed at the actions of Haber, not [the Taxpayer]" (Appx26-27), the Government cannot possibly have carried its burden of showing that the Taxpayer acted with "actual fraudulent intent."

*Second*, even if § 278(2) puts the burden on the Taxpayer to show lack of actual fraudulent intent, it is beyond dispute that the Taxpayer did not act with such intent.

As noted above, NYUFCA includes distinct provisions for intentional and constructive fraud. The constructive fraud provision says that a conveyance by an insolvent debtor is fraudulent "without regard to his *actual intent*" if made "without a fair consideration." NYUFCA § 273 (emphasis added). By contrast, the intentional fraud provision—titled "Conveyance made with intent to defraud"—says that a conveyance is fraudulent if made "with *actual intent, as distinguished from intent presumed in law*, to hinder, delay, or defraud either present or future creditors." *Id.* § 276 (emphasis added).

As the Claims Court acknowledged, the Government argued only that the conveyance was fraudulent under § 273 because it was allegedly made "without a fair consideration." Appx26-27. The Government did not and could not contend that the Taxpayer had "actual intent, as distinguished from intent presumed in law" (i.e., constructive fraud.) Again, its "only assertions of actual intent are directed at the actions of Haber, not [the Taxpayer]." Appx26. And the Taxpayer's representatives made clear that they did not intend to commit fraud. In short, the evidence was one-sided, and the Taxpayer's lack of actual fraudulent intent was undisputed.[5]

As the Government itself argued, "a shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie." Appx5601 n.42. There was no "evidentiary tie" on the question of actual fraudulent intent; the Taxpayer should have prevailed regardless of the burden. But the Claims Court took it upon itself to apply certain "badges of fraud" to "infer[]" that the Taxpayer may have had actual fraudulent intent. Appx51. The cited "badges" boil down to the court's belief that the Taxpayer should have suspected that HSHC would not have legitimate offsetting tax attributes and should have investigated further (even though such an

---

[5] Notably, the Government's briefing on § 278(2) argued that the Taxpayer "lacked good faith" because they had "constructive knowledge" of Haber's scheme and sought, implausibly, to equate *constructive* bad faith with *actual* fraudulent intent; it did not argue that the Taxpayer truly possessed actual fraudulent intent as a matter of fact (the only relevant question under § 278(2)). *See* Appx5598-01.

investigation would have been fruitless).  Appx51.  The court's beliefs do not show actual fraudulent intent.  This Court should reverse.

### III. The Claims Court erred in holding the Taxpayer liable for HSHC's tax penalty.

Even assuming that the Taxpayer is liable under NYUFCA for the tax on the sales of the Humboldt and Shelby assets, it cannot be liable for the $10.2 million gross valuation misstatement tax penalty (plus related interest) that HSHC and Haber incurred in the tax year after the Stock Sale when they chose to attempt an abusive tax shelter strategy and offset their tax with phony losses.  Appx3.

NYUFCA allows a creditor to recover from a transferee only "[w]here a conveyance or obligation is fraudulent as to [that] creditor."  NYUFCA § 278(1).  Section 276 provides that a conveyance made with actual intent to defraud "is fraudulent as to both present and future creditors."  NYUFCA § 276.  But the Government "does not rely on actual fraud under § 276."  Appx27.  It relies on constructive fraud under NYUFCA § 273.  Appx27.  And transfers under that provision are only "fraudulent as to creditors"—not as to *future* creditors, as under § 276.  NYUFCA § 273.

NYUFCA specifies that "future creditors" can recover only in certain circumstances because the bare term "creditor" is clearly defined in the present tense as of the time of the transfer: "'Creditor' is a person *having* any claim, whether

mature or unmatured, liquidated or unliquidated, absolute, fixed or contingent."
NYUFCA § 270 (emphasis added).

Thus, under New York law, "a conveyance will not be held to be fraudulent against subsequent creditors unless the grantee herself received it with an intent to defraud, or participated in such fraud." *United States v. Mazzeo*, 306 F. Supp. 2d 294, 314 (E.D.N.Y. 2004) (vacated as moot); *see, e.g.*, *Durland v. Crawford*, 183 A.D. 763, 765-66 (N.Y. App. Div. 1918).

Here, the Government was not in any sense a creditor with respect to the later-imposed tax penalty as of the time of the Stock Sale, so it cannot collect that penalty from the Taxpayer under § 273. The Government did not have *any* claim, even a contingent one, for a tax penalty from HSHC (or Humboldt and Shelby) until HSHC filed its consolidated tax return claiming the bogus losses. If not for HSHC's unlawful statements on that return, there would have been no misstatement and no penalty. Because the penalty arose long after the Stock Sale, the Government cannot collect it under NYUFCA § 273.

The Claims Court concluded otherwise because it believed simply that "[t]he amount HSHC owed and whether that amount can be collected from a transferee under § 6901 is subject to federal law." Appx51. That statement is legally misguided. While federal tax law indeed determines the amount of *HSHC's liability* to the Government (including the penalty), the extent of *the Taxpayer's transferee*

42

*liability* for that debt is purely a matter of state law. That is the holding of *Stern*: "the existence and extent of [transferee] liability should be determined by state law," and "[t]he Government's substantive rights in this case are *precisely those which other creditors would have* under [state] law." 357 U.S. at 45, 47 (emphasis added). "As such, § 6901 does not place the government in a better position than any other creditor under state law." *Diebold*, 736 F.3d at 185. This "symmetry of rights" precludes the Government from collecting from a transferee on a claim that, because it did not exist at the time of the transfer, could not be collected under NYUFCA by "an ordinary creditor." *Id.*

The Eighth Circuit so held in *Stanko v. Commissioner*, 209 F.3d 1082, 1087-88 (8th Cir. 2000). The taxpayer was liable for the debtor's tax under Nebraska's UFCA. *Id.* at 1086. But she was not liable for the debtor's underpayment penalty. *Id.* at 1087-88. "[A] creditor whose debt does not exist at the date of the voluntary conveyance by the debtor cannot have the conveyance declared fraudulent unless he pleads and proves that the conveyance was made to defraud subsequent creditors whose debts were in contemplation at the time." *Id.* at 1087 (citation omitted). Since the Government did not prove intent to "defraud subsequent, contemplated creditors," its transferee claim was "limited to debts in existence at the time of the fraudulent conveyance." *Id.* And those debts did not include the penalty, for "penalties for negligent or intentional misconduct by the transferor that occurred

many months after the transfer, such as penalties for failure to file a return and for substantial underpayment of the year-end tax liability, are not, by any stretch of the imagination, existing at the time of the transfer." *Id.* at 1088.[6]

## IV. The Claims Court erred in holding that underpayment interest accrued against the Taxpayer while the IRS had the use of the Taxpayer's money.

Even if this Court were to find the Taxpayer otherwise liable, it should reverse the Claims Court's summary judgment orders (Appx54-78) denying refund of the $11 million in underpayment interest that accrued after May 2015, when the Taxpayer deposited $71 million with the IRS to stop interest from accruing. The Taxpayer made the deposit pursuant to 26 U.S.C. § 6603, which Congress enacted specifically to allow taxpayers prevent interest from accruing by making such deposits. Yet the IRS assessed the interest anyway. This was a classic abuse of agency discretion, and the Claims Court should not have allowed it.

### A. Section 6603 authorizes deposits to prevent interest from accruing.

Section 6603 of the Internal Revenue Code is titled "Deposits made to suspend running of interest on potential underpayments." 26 U.S.C. § 6603. It gives taxpayers "[a]uthority to make deposits other than as payment of tax": "A taxpayer may make a cash deposit with the [IRS] which may be used by the Secretary to pay

---

[6] NYUFCA should be construed to be uniform with other states' UFCAs. NYUFCA § 281.

any tax under [portions of the Internal Revenue Code including the ones governing income tax] which has not been assessed at the time of the deposit." *Id.* § 6603(a).

The point of a § 6603 deposit is to stop the accrual of interest:

> **No interest imposed.**—To the extent that such deposit is used by the [IRS] to pay tax, for purposes of section 6601 (relating to interest on underpayments), the tax shall be treated as paid when the deposit is made.

*Id.* § 6603(b).

The manifest purpose of § 6603 is to ensure that taxpayers can avoid interest on taxes that have not yet been assessed. *See, e.g.*, *Principal Life Insurance Co. v. United States*, 95 Fed. Cl. 786, 789 n.2 (2010); *Lua v. United States*, 123 Fed. Cl. 269, 276 (2015). The House Report thus explains:

> The Committee believes that *taxpayers should be able to limit their underpayment interest exposure* in a tax dispute. … The Committee believes that an improved deposit system … will provide *an effective way for taxpayers to manage their exposure to underpayment interest*.

H.R. Rep. No. 108-548, pt. 1, at 305, 2004 WL 1380512 (emphases added).[7]

Section 6603(a) provides that "a deposit shall be made in such manner as the Secretary shall prescribe." 26 U.S.C. § 6603(a). The IRS addressed § 6603 procedure in Revenue Procedure 2005-18. There, the IRS acknowledged that Congress "added new section 6603 to the Code to permit a taxpayer to make a

---

[7] While the House Report states the purpose clearly, that purpose is obvious from the face of § 6603.

deposit with the [IRS] to suspend the running of interest under section 6601 on a potential underpayment of tax."  Rev. Proc. 2005-18 § 2.01.  Consistent with that purpose, there is nothing in Revenue Procedure 2005-18 that so much as hints that the IRS would ever refuse to use a deposit to pay a tax, thereby exacting interest from a taxpayer who sought to "limit [his] underpayment interest exposure" as Congress intended.  H.R. Rep. No. 108-548, pt. 1, at 305.

**B.  The IRS arbitrarily refused to use the deposit to pay the tax liability.**

In the 2002 Stock Sale, nine Dillon trusts sold their Humboldt and Shelby stock to HSHC.  Appx69-70.  Between 2007 and 2012, six of these nine "Original Trusts" were dissolved and their assets were distributed to a number of "Successor Trusts."  Appx70.  A seventh Original Trust likewise distributed its assets to Successor Trusts but was not formally terminated.  Appx70.

Then, in late 2014, the IRS first advised the Taxpayer that it might seek to impose transferee liability on the Original Trusts.  Appx69-70.  The Taxpayer informed the IRS that six of these had terminated and distributed their assets.  Appx70.

In May 2015, since no tax had been formally assessed, the Taxpayer sent the IRS a check for $71.7 million to stop the running of interest for the two existing Original Trusts that still held assets and for the twenty-eight Successor Trusts that

had received the assets of the other seven Original Trusts (and could therefore expect to be assessed with those trusts' alleged liability to the IRS).  Appx70.

In October 2016, the IRS issued formal notices of liability to the nine Original Trusts.  Appx70.  It would be another two years before the IRS issued notices of liability to the Successor Trusts.  Appx70.

In January 2017, the Taxpayer asked the IRS to use deposited funds to pay liabilities assessed against Original Trusts.  Appx70-71.  But the IRS refused to apply the Successor Trusts' deposits to pay liability assessed against Original Trusts, on the ground that IRS procedures "do[] not authorize a person to direct the [IRS] to apply a deposit to pay another person's liability."  Appx71.  Instead, the IRS directed that "the Successor Trusts would need to submit a written request to the IRS and ask for the return of the deposits in order to make a tax payment for the Original Trusts."  Appx71.

The Taxpayer did so, and the deposits were returned in August and October 2017.  Appx71.  The Taxpayer then used the money to pay the liabilities assessed against the Original Trusts.  Appx71.  As the Claims Court noted, "[i]n the case of terminated Original Trusts, a Successor Trust made the tax payment on behalf of an Original Trust."  Appx71.  In other words, while the IRS refused to apply the Successor Trusts' *deposits* against the Original Trusts' liabilities, it readily accepted their *payments* of the Original Trusts' liabilities.

Because the IRS refused to apply the deposits to pay the Original Trusts' liabilities, instead requiring the Taxpayer to withdraw the deposits and make the payments itself, the IRS asserted that interest continued to accrue on the liabilities from the time of the deposits (May 2015) until the time of the payments (late 2017). Appx71. The interest from that period came to around $11 million. Appx59.

## C. The interest that purportedly accrued while the IRS had the use of the Taxpayer's money must be refunded.

### 1. The IRS's action is reviewable for abuse of discretion.

The Claims Court concluded that § 6603 gives the IRS discretion over whether to apply a deposit to pay a tax by stating that a deposit "*may* be used by the Secretary to pay any tax …." 26 U.S.C. § 6603(a) (emphasis added); *see* Appx74. But "[a]n exercise of discretion [by a federal agency] is presumptively reviewable for legal error, procedural defect, or abuse." *Peoples Gas, Light & Coke Co. v. U.S. Postal Service*, 658 F.2d 1182, 1191 (7th Cir. 1981) (collecting cases); *see also, e.g.*, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 139 S. Ct. 361, 370 (2018).

### 2. The IRS abused its discretion by thwarting the statute's purpose.

The Claims Court held that the IRS acted within its discretion because neither § 6603 nor Revenue Procedure 2005-18 expressly *requires* the agency to apply deposits at the taxpayer's request. Appx74-76. This Court should reverse.

As shown above, the purpose of § 6603 is to "provide an effective way for taxpayers to manage their exposure to underpayment interest" by giving them the

option of making a deposit that will prevent the accrual of interest.  H.R. Rep. No. 108-548, pt. 1, at 305.  Interest is "the price paid for the use of money," based on the time value of money.  *National Bank v. Johnson*, 104 U.S. 271, 277 (1881); *see, e.g.*, *Dickman v. Commissioner*, 465 U.S. 330, 337 (1984) ("The value of the use of money is found in what it can produce; the measure of that value is interest"); *Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 571 (7th Cir. 1992).  Federal tax law thus recognizes that "interest … is intended only to compensate the Government for delay in payment of a tax."  *Avon Products, Inc. v. United States*, 588 F.2d 342, 343 (2d Cir. 1978).  Consistent with this logic, § 6603 authorizes taxpayers to avoid the need for such "compensat[ion] … for delay" by avoiding the delay and simply giving the IRS the use of the money directly, as a deposit, in lieu of later paying interest for the period of the deposit.  *Cf. Spalding v. Mason*, 161 U.S. 375, 396 (1896) ("It is no hardship for one who has had the use of money owing to another to be required to pay interest thereon from the time when the payment should have been made.").

Courts must "reject administrative constructions of the statute … that frustrate the policy that Congress sought to implement."  *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32 (1981); *see also, e.g.*, *NLRB v. Brown*, 380 U.S. 278, 291 (1965) (finding judicial review appropriate for agency actions "that frustrate the congressional policy underlying a statute").  Thus, in its recent decision

in *Department of Commerce v. New York*, the Supreme Court rejected an argument that the relevant statute "furnishe[d] no meaningful standard by which to judge" the Commerce Department's conduct of the census and concluded that the statute's *purpose* imposed a judicially enforceable prohibition on conducting the census in a manner that would thwart that purpose: "[B]y mandating a population count that will be used to apportion representatives, the Act imposes a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census." 139 S. Ct. 2551, 2568-69 (2019) (citation and quotation marks omitted). In short, the *purpose* of the census demands accuracy, and that demand is judicially enforceable.

By the same token, the clear purpose of § 6603—enabling "taxpayers to manage their exposure to underpayment interest"—imposes a judicially enforceable prohibition on the IRS thwarting a taxpayer's attempted use of a deposit to avoid interest without a rational justification. In this case, however, by taking the use of the Taxpayer's money for more than two years and then charging interest for the same period anyway, the IRS undermined § 6603's purpose and subjected the Taxpayer to an unjust, irrational, and illegal exaction.

### 3. The trusts' different Employer Identification Numbers do not justify the IRS's arbitrary refusal to apply the deposits.

The Claims Court and IRS deemed it dispositive that the Successor Trusts that made the deposits technically are distinct entities from the Original Trusts against

which the IRS assessed the tax, with different IRS Employer Identification Numbers (EINs). Appx75-77. The extent of the Claims Court's reasoning on this point was: "In the administration of taxes, including the use of deposits for tax payments, the question of which taxpayer has actually been assessed the liability at issue is not an unreasonable factor for the IRS to consider." Appx76. This was error: The difference in the trusts' EINs does not make the agency's refusal reasonable or lawful.

It is important to understand the situation in which the IRS put the Taxpayer. By the time the IRS advised that it might seek to hold the Taxpayer liable as HSHC's transferee, most of the Original Trusts no longer existed. Appx69-71. They therefore could not post a § 6603 deposit. The deposit had to come instead from the Successor Trusts to which the Original Trusts had transferred their assets. If the IRS had assessed the liability against the Successor Trusts in 2016, the deposits would indisputably have been applied, and the interest at issue here would not have accrued. Yet the IRS issued the notices of liability to the Original Trusts—even though the Taxpayer had informed it that most of them no longer existed and that the assets had been transferred to the Successor Trusts. Under these circumstances, the Taxpayer had no choice but to request that the IRS apply the Successor Trusts' deposited funds to the Original Trusts' liability.

For the following reasons, despite the difference in EINs, the IRS had no lawful basis to reject that request and to exact a payment of interest that would not have accrued had the deposits been applied.

*First*, nothing in the statute or Revenue Procedure suggests that a taxpayer cannot make, or that the IRS cannot or will not apply, a deposit on behalf of an entity with a different EIN. To the contrary, the statute speaks broadly: "A taxpayer may make a cash deposit … which may be used by the Secretary to pay *any* tax imposed under subtitle A or B or chapter 41, 42, 43, or 44 which has not been assessed at the time of the deposit." 26 U.S.C. § 6603(a) (emphasis added). Needless to say, "the word 'any' has an expansive meaning, that is, 'one or some *indiscriminately of whatever kin*d.'" *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (emphasis added) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009). The *only* restrictions that the statute puts on the tax to which the deposit may be applied are that (1) the tax must be imposed under specified parts of the Internal Revenue Code and (2) the tax had not been assessed at the time of the deposit. Since the statute uses the term "any" and lists only two restrictions on applying the deposits, it follows that there are no other restrictions. *See, e.g.*, *Great Concepts, LLC v. Chutter, Inc.*, 90 F.4th 1333, 1340 (Fed. Cir. 2024). It is indisputable that the IRS had authority to apply the deposits here if it wished to do so.

*Second*, applying the deposits would have furthered the purpose underlying the statute—enabling "taxpayers to manage their exposure to underpayment interest." H.R. Rep. No. 108-548, pt. 1, at 305. The IRS's refusal to apply the deposits, on the other hand, utterly thwarted that purpose. That the trusts technically are different entities with different EINs does not make the statutory purpose any less salient here. After all, the IRS ultimately assessed the liability—with interest—against the Successor Trusts, despite their different EINs. Appx71. The Successor Trusts deserved the same chance as other taxpayers to "manage their exposure to underpayment interest."

*Third*, the IRS had no legitimate interest in refusing to apply deposits under the circumstances of this case. The IRS has never contended that applying the deposits to related entities with different EINs would have been burdensome. And there is no reason to think that it would have been, especially because the IRS allowed one entity to *pay* the tax liability of another entity with a different EIN here. Appx71.

*Fourth*, and perhaps most fundamentally, the IRS *does* permit—and in some cases, including this one, *requires*—one taxpayer to *pay* another's taxes. *See, e.g.*, *United States v. Williams*, 514 U.S. 527, 531 (1995) (plaintiff paid tax assessed against another); *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 719-20 (1929) (employer paid employee's taxes); *Dixon v. Commissioner*, 141 T.C. 173,

186 (2013) ("the IRS must honor the taxpayer's designation of a voluntary tax payment," including "where a taxpayer designates a voluntary payment toward the income tax liability of a named third party"); *id.* at 194 n.15 ("If a grandson remits $100,000 to the IRS and designates it toward payment of his grandmother's gift tax liability, the IRS would (we hope) credit that payment toward his grandmother's gift tax liability," even though no Code provision expressly *requires* it to do so).

It is patently unfair and irrational for the agency to demand that the Successor Trusts *pay* the liabilities, with interest, of the Original Trusts while denying them the opportunity to stop the running of interest as Congress intended. "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). This is all the more true here, where the IRS actually had the use of the Taxpayer's money for two years, without a hint that it would ultimately refuse to apply the deposits. "The law, like life, recognizes that one may not eat his cake … and have it too." *Schapansky v. Department of Transportation*, 735 F.2d 477, 483 (Fed. Cir. 1984).

In *Dixon*, a corporation designated that payments of its delinquent employment tax obligations should be applied as payments of its shareholder-employees' income tax liability. 141 T.C. at 175. When the IRS refused to honor that designation, the Tax Court found that "there is no legal basis" for the IRS's refusal, holding that "[w]e can discover no such limitation on the [agency's]

obligation to honor the designation of voluntary tax payments." 141 T.C. at 188. The Tax Court specifically rejected the notion that such a designation could be allowed only "by virtue of a specific Code provision." *Id.* at 194 n.15. Thus, the IRS's "failure to honor this designation was an abuse of discretion." *Id.* at 195. The fact that the Successor Trusts made the deposits and directed the IRS to apply them to the Original Trusts' liabilities is a distinction without a difference and a frivolous rationale for the IRS's refusal to convert the deposits into payments.

The IRS's assertion that the different EINs of the Original and Successor Trusts justified its treatment, even though it held the Successor Trusts liable as transferees of the Original Trusts, is also contrary to the Code's treatment of transferees. "[T]he Code treats the transferee as the taxpayer." *Williams*, 514 U.S. at 539 (citing 26 U.S.C. § 6901(a)(1)(A)). In *Williams*, the Supreme Court allowed the plaintiff to sue for a refund of a tax she paid to remove a lien on her property, even though the tax in question "was assessed against a third party." *Id.* at 529. The Court held that the plaintiff *was* "the taxpayer" within the meaning of the Code's definition of that term, which states that "[t]he term 'taxpayer' means any person subject to any internal revenue tax." *Williams*, 514 U.S. at 535 (quoting 26 U.S.C. § 7701(a)(14)). As the Court explained, the definition does not limit the term "taxpayer" to "any person who is *assessed* any internal revenue tax"; it uses the broader phrase "subject to," which swept in the plaintiff because the lien had been

placed on her property. *Id.* (emphasis added). Here, the Successor Trusts were plainly "subject to" the tax that they sought to pay with the deposit because they ultimately had to pay that tax (with interest) as alleged transferees.

At least in the narrow circumstances present here—where the depositor seeks to manage *its own* interest exposure by paying a tax that was imposed on a related entity but for which the IRS will seek to hold the depositor liable—it is an abuse of discretion for the IRS to refuse to use the deposit to pay the tax and to then exact the interest from the depositor who sought to avoid it through the process created for that purpose by Congress.

### 4. The IRS's internal legal advice deserves no weight.

In refusing to apply the deposits here, the IRS cited an internal advice memorandum stating that Revenue Procedure 2005-18 "does not authorize a person to direct the Service to apply a deposit to pay another person's liability." IRS Office of Chief Counsel Memorandum 20171801F at 1 (dated Feb. 27, 2017; released May 5, 2017) ("CCM").

This is merely the agency's legal argument on this issue, prepared long after the deposits were actually made and in connection with the agency's refusal to apply the deposits *in this very case*. The extent of its reasoning is that Revenue Procedure 2005-18 does not expressly say that a taxpayer can direct that a deposit be applied to another taxpayer's tax liability. *See* CCM 5. For all the reasons given above, that

does not relieve the agency of its obligation to exercise its discretion rationally and to avoid needlessly thwarting the purpose of the statute it is administering. The CCM is entitled to no weight whatsoever. *See AMP Inc. v. United States*, 185 F.3d 1333, 1338 (Fed. Cir. 1999) (holding that a revenue ruling issued to support the IRS's litigating position while the taxpayer's refund claims were pending with the IRS was "self-serving and not generally entitled to deference").

## CONCLUSION

This Court should reverse the judgment of the Court of Federal Claims and direct judgment for the Taxpayer for the taxes, penalties, and interest at issue.

Respectfully submitted,

/s/ Lawrence M. Hill

Mark C. Savignac
Caitlin R. Tharp
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000
msavignac@steptoe.com
ctharp@steptoe.com

April 3, 2024

Lawrence M. Hill
STEPTOE LLP
114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
lhill@steptoe.com

*Counsel for Plaintiff-Appellant*
*Dillon Trust Company LLC*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

26 U.S.C. § 6603 ...................................................................................Add1

26 U.S.C. § 6901 ...................................................................................Add1

NYUFCA § 271 ....................................................................................Add2

NYUFCA § 270 ....................................................................................Add2

NYUFCA § 271 ....................................................................................Add2

NYUFCA § 272 ....................................................................................Add2

NYUFCA § 273 ....................................................................................Add2

NYUFCA § 276 ....................................................................................Add2

NYUFCA § 278 ....................................................................................Add3

NYUFCA § 281 ....................................................................................Add3

**26 U.S.C. § 6603. Deposits made to suspend running of interest on potential underpayments, etc.**

**(a) Authority to make deposits other than as payment of tax.**--A taxpayer may make a cash deposit with the Secretary [of the Treasury] which may be used by the Secretary to pay any tax imposed under subtitle A or B or chapter 41, 42, 43, or 44 which has not been assessed at the time of the deposit. Such a deposit shall be made in such manner as the Secretary shall prescribe.

**(b) No interest imposed.**--To the extent that such deposit is used by the Secretary to pay tax, for purposes of section 6601 (relating to interest on underpayments), the tax shall be treated as paid when the deposit is made.

**(c) Return of deposit.**--Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing.

…

**26 U.S.C. § 6901. Transferred assets**

**(a) Method of collection.**--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

 **(1) Income, estate, and gift taxes.--**

 **(A) Transferees.--**The liability, at law or in equity, of a transferee of property—

 **(i)** of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

 … in respect of the tax imposed by subtitle A or B. …

Add1

**New York Debtor & Creditor Law (2000)**
**Art. 10. Uniform Fraudulent Conveyance Act**

**§ 270. Definition of terms**

In this article … "Creditor" is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent. …

**§ 271. Insolvency**

1. A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured. …

**§ 272. Fair consideration**

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent thereof, and in good faith, property is conveyed or an antecedent debt is satisfied, or …

**§ 273. Conveyances by insolvent**

Every conveyance made and every obligation incurred by a person who is or will thereby be rendered insolvent is fraudulent as to creditors without regard as to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

**§ 276. Conveyance made with intent to defraud**

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

## § 278. Rights of creditors whose claims have matured

1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser.

    a.      Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

    b.      Disregard the conveyance and attach or levy execution upon the property conveyed.

2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

## § 281. Construction of article

This article shall be so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states which enact it.

# CIRCUIT RULE 28(c)
# ADDENDUM

# TABLE OF CONTENTS

Post-Trial Opinion (Oct. 31, 2023),
reported at 168 Fed. Cl. 228 (2023) ........................................................Appx1

Judgment (Oct. 31, 2023)..............................................................................Appx53

Summary Judgment Opinion,
reported at 162 Fed. Cl. 708 (2022) ......................................................Appx54

Opinion Denying Reconsideration,
reported at 164 Fed. Cl. 92 (2023)........................................................Appx69

# In the United States Court of Federal Claims

Nos. 17-1898T, 17-2022T, 17-2023T
(Issued: October 31, 2023)

* * * * * * * * * * * * * * * * * * * * * * * *

DILLON TRUST COMPANY LLC, et al.,

        *Plaintiffs*,

v.

THE UNITED STATES,

        *Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * *

    *Lawrence M. Hill,* Steptoe & Johnson LLP, Washington, DC, with whom were *Julia L. Gatto*, *Steven R. Dixon*, *Caitlin R. Tharp*, *Nicholas J. Sutter, Ida Adibi*, for plaintiffs.

    *Joseph A. Sergi*, Attorney of Record, United States Department of Justice, Tax Division, Court of Federal Claims Section, Washington, DC, with whom were *David A. Hubbert*, Deputy Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, *Dara B. Oliphant*, Assistant Chief, Civil Trial Section – Central, *Margaret E. Sheer*, Trial Attorney, *Jeffrey N. Nuñez*, Trial Attorney, *Ryan O. McMonagle*, Trial Attorney, *Emily K. Miller*, Trial Attorney, for defendant.

OPINION

BRUGGINK, *Judge*.

    This is a consolidated group of cases brought by the Dillon Trust Company LLC, as trustee for Trust 709204, Trust 709210, and Trust 8545. Each trust was formed during the 1930s by Clarence Douglas Dillon and his wife, Anne D. Dillon, who created numerous trusts for the benefit of their descendants ("Dillon trusts"). Plaintiffs seek a refund of the taxes, penalties, and interest that the Internal Revenue Service ("IRS") collected pursuant to

1

**Appx1**

its determination that plaintiffs were liable as transferees of Humboldt Shelby Holding Corporation ("HSHC") under I.R.C. § 6901 (2018).

At the beginning of the current millennium, the Dillon trusts were in an enviable position. The assets held by the trusts had appreciated in value to approximately $90 million. The trusts owned to varying degrees the stock of two C corporations, Humboldt Corporation ("Humboldt") and Shelby Corporation ("Shelby").[1] These corporations actually owned the assets consisting almost entirely of blue-chip stocks and prime farmland. A new generation of beneficiaries were ready, however, to pass the value of the assets on to the individual trusts or their beneficiaries. That posed a problem: at that time, the two corporations had relatively low bases in those assets, approximately $16 million, leaving over $71 million in unrealized gains. Disposing of the assets and distributing the proceeds therefore meant paying a very substantial tax, not just at the corporate level when the assets were sold, but then a second time when the corporations were dissolved and the assets distributed. The prospect of this dual taxation meant that the net benefit could be reduced almost in half. This case involves the fallout from the trusts' efforts to minimize that tax effect. The question posed is whether the efforts stayed within the legitimate means available under the law, or, as the IRS insists, the plaintiffs violated the tax laws.

We set out here a brief summary of the facts in order to frame up a more detailed factual presentation below and in order to tee up the relevant tax issues. Although the facts are complex, what they lead to is the Dillon trusts' sale ("Stock Sale") on December 23, 2002, of the Humboldt and Shelby corporations to Humboldt Shelby Holding Company ("HSHC"), a newly created third party entity. By the time of the Stock Sale, Humboldt and Shelby had liquidated their physical assets and were no longer operating businesses; each corporation retained only cash, a portfolio of blue-chip stocks ("investment portfolios"), and high-quality installment notes whose principal payments were due in three years. HSHC was incorporated less than a month before the Stock Sale. Its sole shareholder and president was James Haber. In exchange for 100% of the stock of Humboldt and Shelby, HSHC paid $86.8 million in cash to the nine Dillon trusts, approximately 95% of the fair market value of the assets, using monies borrowed from Rabobank.

---

[1] Humboldt was owned by nine Dillon trusts, whereas Shelby was owned by Humboldt and two Dillon trusts (which also owned Humboldt). Plaintiffs in this action, Trust 709204, Trust 709210, and Trust 8545, are three of the nine Dillon trusts that owned Humboldt.

2

**Appx2**

As a result of the Stock Sale, Humboldt and Shelby passed on to HSHC significant unrealized gains on the underlying assets. Within hours of the stock sale, HSHC sold Humboldt and Shelby's investment portfolios to UBS PaineWebber, triggering substantial realized, taxable gains to the corporations. In January 2003, HSHC pledged one of the Humboldt and Shelby installment notes to Rabobank in exchange for an additional loan. In the meantime, between December 24, 2002, and May 5, 2003, Haber caused Humboldt and Shelby to engage in a series of financial transactions (known as "Son-of-BOSS transactions") that generated losses to offset the gains. The parties agree that those loss-generating transactions were entirely bogus. The Dillon trusts were not participants in any part of the Son-of-BOSS transactions.

On August 14, 2004, HSHC, as the common parent of the affiliated group of corporations including Humboldt and Shelby, filed a consolidated corporate income tax return for the tax year beginning December 23, 2002, and ending November 30, 2003 ("2003 Consolidated Return"). The 2003 Consolidated Return reported $73.2 million in gains ($42.9 million from the sale of the investment portfolios and $30.3 million from the sale of the three installment notes) and $74.1 million in losses, which theoretically offset any tax liability for the gains.

On August 14, 2007, the IRS issued a statutory notice of deficiency to HSHC based on the 2003 Consolidated Return. Specifically, the IRS determined that the Son-of-BOSS transactions were abusive tax shelters designed to create artificial losses and that HSHC owed $25.6 million in income tax and $10.2 million as a gross valuation misstatement penalty, along with underpayment interest. The U.S. Tax Court upheld the Commissioner's decision, *see Humboldt Shelby Holding Corp. v. Comm'r*, T.C. Memo. 2014-47 (2014), and the Second Circuit affirmed, 606 Fed. Appx. 20 (2d Cir. 2015). HSHC never paid those taxes, interest, and penalties.

On November 20, 2014, the IRS notified the nine Dillon trusts that were parties to the Stock Sale that they might be held liable as transferees under I.R.C. § 6901 for HSHC's unpaid taxes, penalties, and interest. The Dillon Trust Company then made a $71.7 million deposit (which was not yet a payment) under I.R.C. § 6603 in the event that the IRS asserted transferee liability. The IRS did in fact assert such liability on October 25, 2016, issuing notices of transferee liability to the Dillon trusts that were parties to the Stock Sale. The Dillon trusts paid the assessed transferee liabilities in full, approximately $79.9 million, in October 2017.

3

**Appx3**

In December 2017, the Dillon trusts filed suit in this court, seeking a refund of all taxes, penalties, and interest paid as purported transferees of HSHC.[2]  While discovery was ongoing, the parties jointly moved in June 2020 to pursue mediation.  Alternative dispute resolution proceedings followed, but the parties ultimately requested to return to the court's active docket in October 2021.  We held a hearing in January 2022 to determine whether the case needed to move forward to summary judgment or to trial.  In light of disputed factual issues, the court ordered the parties to prepare for trial.

In November 2022, defendant moved for partial dismissal for lack of subject matter jurisdiction, or in the alternative, for partial summary judgment, solely with respect to plaintiffs' interest-related claim.  Specifically, plaintiffs argued that alleged underpayment interest on HSHC's tax deficiency should not have accrued beyond May 8, 2015, the date when the IRS posted the Dillon trusts' I.R.C. § 6603 deposits.  We denied the partial motion to dismiss but granted the motion for partial summary judgment, holding that the continued accrual by the IRS of interest after plaintiffs made their § 6603 deposits did not violate the law, and therefore an illegal exaction claim could not be pursued.  *Dillon Trust Co. LLC. v. United States*, 162 Fed. Cl. 708 (2022), ECF No. 119.  Plaintiffs moved for reconsideration, which we denied.  *Dillon Trust Co. LLC v. United States*, 164 Fed. Cl. 92 (2023), ECF No. 150.

Trial followed: the first half took place from January 23 to February 1, 2023, and the second half, from March 9 to 15, 2023.  Post-trial briefing was completed, and closing arguments were heard on July 13, 2023.

FACTUAL BACKGROUND

## I.      The Dillon Family and Their Advisors

By 2000, there were four generations of Clarence and Anne Dillon's descendants, collectively referred to as the "Dillon family."  The Dillon

---

[2] Initially, nine Dillon trusts filed separate actions in this court.  But because the actions involved the same parties, the same operative facts, and the same legal issues and arguments, they were consolidated in August 2018.  Six were then voluntarily dismissed without prejudice in February 2019, leaving only Trust 709204, Trust 709210, and Trust 8545 as plaintiffs to this consolidated action.  The parties agree, however, that the liabilities of other Dillon trusts will be determined as if they were also parties to this action.

4

**Appx4**

family was involved in events leading up to the sale of Humboldt and Shelby in several capacities. First, Dillon family members were beneficiaries of the trusts that owned Humboldt and Shelby. Second, some of the Dillon family members were directors of Humboldt and Shelby. Third, some Dillon family members were trustees of the trusts that owned Humboldt and Shelby, alongside corporate trustees such as Brown Investment Advisory, CitiBank, and JP Morgan Chase.

Two Dillon family members, Mark Collins and Chris Allen, testified at trial as representatives of the family. Collins is currently chairman of the Dillon Trust Company, which was formed in 2006 to serve as a corporate trustee for all Dillon trusts. In the early 2000s, Collins was a co-trustee of multiple Dillon trusts and a director of both Humboldt and Shelby; he has an MBA and worked at Brown Investment Advisory as a partner. Allen was a director of Humboldt; he has a JD and worked as a mergers and acquisitions advisor at Trenwith, an investment banking affiliate of BDO Seidman.

At the time, Keswick Management, Inc. ("Keswick") was the "family office" that provided accounting, investment, and advisory services to the Dillon trusts as well as to individual family members. Crosby Smith was the Chairman of Keswick, and James Ruddy was its President. Donald Barclay began working at Keswick in 2002 as Vice President. Smith, Barclay and Ruddy testified at trial.

When asked what Keswick did for the Dillon family, Ruddy answered, "Pretty much everything . . . . We oversaw the assets. We prepared income statements and balance sheets with regard to family members, trusts, anything that we – the family owned. We reported to the family on a monthly basis, what their income was, what their expenses were, what their cash flow was . . . ." Tr. 458. Keswick thus had broad authority to act on behalf of the Dillon family and their trusts, apart from specific actions that required trustee approval. (Smith and Ruddy were in fact co-trustees of several Dillon trusts, as well as officers and directors at Humboldt and Shelby.)

The Dillon family was also a longtime client of the international law firm, Shearman & Sterling. Laurence Bambino was a partner in Shearman & Sterling's tax department who worked on tax aspects of merger and acquisition transactions. Most of his clients were multinational companies. From the mid-1980s, Bambino was a part of the team at Shearman & Sterling

5

**Appx5**

that advised the Dillon family;[3] the team included partners in other practice areas such as real estate and trusts and estates.  Bambino testified at trial.

Although Bambino was the tax attorney for the Dillon family, he did not prepare its tax returns.  *See* Tr. 1412 ("I believe they did that in-house.").  He described his approach with his clients, including the Dillon family, as one of reacting to questions and addressing tax issues related to the transactions the family wanted to pursue.[4]  *See id.* at 1413.  He also testified that he would not have written a memorandum to his clients without speaking first to the Dillon family on the subject.  *See id.* at 1296 ("You don't want to write them and send them a memo that they say, we don't want this, we don't want to pay for this.  My guess is I would have spoken to them first and then put this together.")  Such communications took place primarily through Keswick.

## II.     The Sale of Dunwalke Farm and the Decision to Sell Humboldt Stock

Incorporated during the 1940s, both Humboldt and Shelby were C corporations that owned farms and other assets.  Humboldt owned farmland in Bedminster, New Jersey, on which cattle were raised ("Dunwalke Farm"), whereas Shelby owned farmland in Illinois and Iowa which supported production of corn and soybeans ("Shelby Farms").   The investment portfolios that Humboldt and Shelby each owned were meant to help fund the farming operations.

By 2000, the Dillon family faced several concerns regarding Humboldt.  First, unlike the Shelby farms in the Midwest, the cost of running the cattle operation on Dunwalke Farm was greater than the income it generated.  Second, the family did not know what would happen to the property located at the center of Dunwalke Farm, which Clarence Dillon had

---

[3] During the mid-to-late 80s, Bambino worked on transactions related to a company called Dillon Family Corporation and its wholly-owned subsidiary, Haut-Brion Wines.  Regarding those transactions, Bambino testified that "to avoid two levels of tax, we dissolved the Dillon Family Corporation."  Tr. 1285.

[4] Even though Ruddy was professionally experienced in tax planning as it relates to trusts and estates, he testified that he had no expertise in corporate tax and that the corporate tax planning advice Bambino provided was not something that he or anyone at Keswick was able to offer.  *See* Tr. 539.

6

**Appx6**

donated to Princeton University to use for educational purposes in 1979 (the "Princeton Property"). The terms of the gift transferred ownership of the Princeton Property to the university in 2001, at which point it was free to sell the property if it wished. The Dillon family was worried about whether, and to whom, Princeton University might sell the Princeton Property in the future and how such a sale might affect the use of the rest of the adjacent Dunwalke Farm.

At the same time, the Dillon family was looking for ways to make Humboldt and Shelby more tax efficient. When asked about the questions that would come from the Dillon family during the 1990s, Bambino replied: "For example, can we convert the – Humboldt from a C corporation, which pays [corporate] tax, to an S corporation that doesn't pay [corporate] tax? . . . [I]s there another, you know, tax structure, like a spinoff or a conversion to a partnership that we could use to lower the tax . . . on Humboldt or Shelby?" Tr. 1290–91. Bambino acknowledged that Humboldt and Shelby were "not an efficient structure" for tax purposes, and that if one had formed them in the 2000s, one "would have formed these companies literally as partnerships, as limited liability companies, and you would not be paying corporate tax." [5] *Id.* at 1291.

At some point between May and December of 2000, while the Dillon family members were re-evaluating their use of Dunwalke Farm in order to reduce expenses and accommodate family interest in building homes on the land, they received an unsolicited offer for the property. The offer came from John Thornton, an executive of Goldman Sachs, who wanted to purchase the Princeton Property and all the surrounding farmland. [6] Collins testified that the Thorntons' interest "came really out of the blue" and that the Dillon family "had no idea that the Thorntons would be on our doorstep expressing an interest." Tr 148. Given the concerns that the family had about the costs of the cattle operation and the uncertain future of the Princeton Property, they decided to sell Dunwalke Farm to the Thorntons—but not all of the 900-plus

---

[5] The trial record is unclear whether Humboldt and Shelby were subject to personal holding company taxes during the 1990s. Ruddy's testimony suggests that the corporations only faced personal holding company treatment after their farmland was sold in 2002, whereas Collins's testimony suggests that they were personal holding companies even prior to the sale. *Compare* Tr. 173 *with* Tr. 514.

[6] The Thorntons were initially interested only in the Princeton Property. Their offer later was extended to include all of Dunwalke Farm.

acres. Some members of the Dillon family—namely Dorothy Eweson and her descendants—wanted to keep a portion of the land for residences.

In early April 2001, Ruddy communicated to Bambino the decision the Dillon family had made. Bambino's email to other Shearman & Sterling attorneys on April 5, 2001 stated:

> Jim called yesterday and told me that the Dillon family met on Wednesday and has decided to try to sell a substantial portion of the farmland to the Goldman Sachs executive and a smaller portion to D. Eweson. . . . I'll send you each a copy of the tax memorandum Jim asked me to prepare, which will include various approaches for disposing of Humboldt and its assets.

JX 19. A draft of that memo, dated April 17, 2001, suggests that consideration of selling farmland had morphed into something more substantial: "You have requested our advice with regards to the disposition of Humboldt Corporation ('Humboldt') and its assets. This memorandum discusses alternative strategies for doing so and the US federal income tax consequences of each." DX 3 at 000016. As this summary suggests, the scope of the memorandum was not limited to the sale of Dunwalke Farm. It also considered transactions that might follow the sale of the farmland, which would dispose of Humboldt altogether. And, as will be discussed in more detail below, it is apparent as well that, beginning as early as mid-2001, James Ruddy was seeking ways to dispose of the corporations in a tax-efficient manner.

Specifically, the draft presented two principal strategies for disposing of Humboldt: "Subsequent to the sale of the farmland, the shareholders may either liquidate the corporation by selling its portfolio and distributing the proceeds, or they may sell their shares in Humboldt to unrelated investors."[7]

---

[7] At trial, Bambino testified that this sentence may have been a "throw-away sentence I told the associate to put in there because we didn't know what they were going to do at the time." Tr. 1323; 1419 ("I did not know at the time I wrote this that they were going to do either or none."). While it may be true that the Dillon family had not committed to anything by April 2001, Bambino's testimony about his practices suggests that he would not have drafted a memorandum on a subject without having been asked to do so. Moreover, Ruddy testified at trial that "[t]here is no reason to have a corporation if it doesn't have a purpose for it, and the purpose [of Humboldt] was the farm and the land and the cows." Tr. 517. A decision to sell Dunwalke Farm likely would have led to an interest in disposing of

**Appx8**

*Id.* The first was, in essence, an asset sale and the second a stock sale—tax consequences being the "biggest distinction" between the two. *See* Tr. 1294 (Bambino). As Bambino expected the Dillon family to be generally aware,[8] an asset sale triggered two levels of tax for built-in gains (at the corporate and the shareholder level), while a stock sale triggered only one level of tax for built-in gains (only at the shareholder level). *See id.* at 1294; DX 4 (Draft of Bambino tax memo). The reason why a stock sale did not trigger corporate-level taxes on built-in gains was because that liability would in essence be passed on to the buyer, although the purchase price might reflect a discount for that fact. The buyer of a corporation would acquire its underlying assets with the built-in gains intact, so that gains were realized and taxes triggered when the buyer subsequently sold those assets.

Bambino understood that what the buyer did in a stock sale with the corporation's assets could become problematic. The draft of the memo dated April 19, 2001, stated: "This [stock sale] poses a problem, however, if the investor then sells the Humboldt assets to a third party, because the transaction may be characterized as a tax shelter by the IRS." DX 4 at 000021. We are persuaded as well that his clients, specifically Chris Allen and James Ruddy, both "tax guys," along with Mark Collins, were equally aware of the potential problem.

Meanwhile, the sale to the Thorntons proceeded: Humboldt signed a contract on July 2, 2001, to sell 633 acres of Dunwalke Farm to the Thorntons for $19.4 million, with $2.0 million as a down payment and $17.4 million due in cash upon closing. Closing of the sale was subject to municipal approval, which meant that it could take several months. The contract also contained provisions in which the buyer proposed purchasing the Princeton Property from the Trustees of Princeton University, and the seller proposed selling the remaining 280-acre parcel to Dorothy Eweson.

On August 9, 2001, after a meeting that had taken place a week prior, Bambino sent Smith and Ruddy a follow-up memorandum about how Humboldt might be disposed of after the farmland was sold. First, Bambino noted that Humboldt had signed a contract of sale to the Thorntons and that, if retained in the present form, Humboldt would be subject not only to federal

---

Humboldt.

[8] *See* Tr. 1295 ("I mean, Chris Allen was a tax guy, so they had a – Ruddy is a tax guy. They have a general understanding that there's two levels of tax versus one level of tax.").

**Appx9**

corporate income tax at a rate of 35%, but also a personal holding company tax of about 40% on its interest and dividend income unless Humboldt distributed that income annually to shareholders.  Afterwards, Bambino calculated the net proceeds of four hypothetical transactions—one involving a liquidating distribution after all assets were sold and three involving a stock sale of Humboldt.[9]

Bambino assumed that Humboldt stock would be sold at a price equal to 93% of the fair market value of the underlying assets, i.e., with very little discount for the embedded tax liability.  On that assumption, his calculations showed that the net proceeds to shareholders were greater by as much as $20 million in a stock sale as opposed to an asset sale.  But, as in the memo drafted in April, Bambino referred to IRS scrutiny about tax shelters: "As we discussed, there are certain tax risks that need to be explored and addressed when deciding to pursue [the options involving a stock sale of Humboldt].  *These include special IRS rules and penalties for certain intermediary tax shelter transactions*, failed installment sales and de facto liquidation treatment for Humboldt."  PX 73 at 001078 (emphasis added).

On December 7, 2001, about a month before the closing of the land sale, the contract was amended so that Humboldt would receive a promissory note (the "Thornton Note") instead of cash.  The amendment was, in short, a tax deferral strategy.  The farmland was paid for by an installment note, with capital gain realized and reported only when the principal was repaid.  And under the terms of the Thornton Note, Humboldt would not be paid the principal sum of $17,366,779 until January 2005.  The contract specifically forbade prepayment of the Thornton Note, so that taxes would not be triggered before 2005.  *See* Tr. 1303 (Bambino) ("You would stay away from prepayments because prepayments would trigger gain to the person who's holding the installment note.  The whole purpose behind the installment note is to defer the tax.").  At the same time, the Thornton Note was backed by an irrevocable standby letter of credit issued by Citibank by which Citibank would be liable for payment of the note if the Thorntons failed to pay.

---

[9] Two of those strategies proposed amending the Thornton contract to restructure the transaction as an installment sale in which taxes were deferred until payments were made.  This was not the first time Bambino presented the idea of deferring taxes by selling Humboldt's farmland on an installment basis.  Bambino had previously sent a memorandum to Ruddy on June 29, 2001, about the strategy.

When Humboldt later sold the remaining 280 acres of Dunwalke Farm on August 9, 2002, the sale was once again structured as an installment sale. Dunwalke Farm Property, LLC—formed ahead of the sale by Trust 7373, a Dillon trust benefiting Dorothy Eweson and her descendants—purchased the land with a note (the "Dunwalke Note").[10]  Payment of the Dunwalke Note was due in August 2005, for the principal sum of $11,200,000.  And, like the Thornton Note, the Dunwalke Note was backed by an irrevocable letter of credit and could not be prepaid before its date of maturity.  As such, Humboldt deferred taxes on the gains associated with the 280 acres until August 2005.

### III.     The Decision to Sell Shelby Stock to the Same Buyer of Humboldt Stock

On January 11, 2002, as the sale of Dunwalke Farm was underway, Bambino sent a memorandum to Smith and Ruddy about alternative strategies for transferring the shares of Shelby, which Humboldt owned, before a potential stock sale of Humboldt.  As it stood, Humboldt owned 3500 shares of Shelby common stock, or 51.4% of Shelby.  Unless those shares were sold or distributed to Dillon trusts beforehand, a buyer of Humboldt would then own the majority of Shelby as well.  Before he explained the tax consequences of each strategy, however, Bambino summarized the applicable tax rules.  One of them referred to IRS scrutiny regarding intermediary tax shelters, as mentioned previously in the August memo: "The IRS has cautioned taxpayers against participating in certain conduit or intermediary tax shelter transactions where a party with losses acquired assets with built-in gain for resale.  See IRS Notice 2001-16."  JX 35 at 001427.

On February 15, 2002, Bambino sent a memorandum to Smith and Ruddy regarding a "new alternative we discussed last week."  JX 36 at 001431.  Because some of the Dillon family members wanted to keep Shelby's farms, *see* Tr. 518 (Ruddy), the alternative proposed that Shelby would first sell its farmland on an installment basis to Trust 8545.  Then, "if and when Humboldt is sold, the Dillon family trusts . . . would sell their Shelby stock to the unrelated investor that is also purchasing Humboldt."  JX 36 at 001431.  (In other words, the purchaser of Humboldt would also buy the 49% of Shelby stock not owned by Humboldt, so that the purchaser would own 100% of both Humboldt and Shelby.)  Smith presented this alternative

---

[10] Dunwalke Farm, LLC—a limited liability company formed by Trust 7373—first purchased the farm's personal property for cash on June 27, 2002.

as the "most cost effective" option in his March 2002 memorandum to the Dillon family and included calculations of sales proceeds which assumed that the buyer of Humboldt and Shelby stocks would offer a price equal to 95% of the fair market value of the corporations' assets. *See* JX 40 at 001442. He used that figure despite his understanding that there was an embedded tax liability of approximately $26 million.

The Dillon family did not choose this strategy right away. Bambino testified that he met with accounting firms at the request of the Dillon family in the spring of 2002 and that those firms suggested other strategies to dispose of Humboldt and Shelby, namely a "distressed debt transaction" and a "loan assumption transaction." *See* Tr. 1462; JX 56. Bambino was concerned about these alternatives and sent presentation slides to Smith and Ruddy that included IRS warnings about those specific strategies. *See* Tr. 1466 ("[T]he other goal was I didn't like the other two transactions, so I wanted to kill them."). At the same time, the presentation slides included an asset sale and a stock sale as a point of comparison. The asset sale was projected to yield $48 million of net after-tax-return to the shareholders, while a stock sale at "90% of FMV to NOL [net operating loss] Investor" was projected to yield $69 million of net after-tax-return to shareholders. *See* JX 56 at 001503.

When asked what he meant by an "NOL investor," Bambino answered, "[t]o me it meant someone who had tax attributes. I picked net operating losses because it's easy for people to understand, but it could be U.S. tax credits. It could be foreign tax credits. It's tax attributes that reduce tax on gain." Tr. 1464. The buyer's tax attributes were relevant to the stock sale because, in Bambino's words, the "shareholders [were] selling tax." *Id.* at 1465. In short, Bambino recognized that the value of Humboldt and Shelby would be different for a buyer with NOLs versus a buyer without NOLs. For the buyer with sufficient NOLs, Humboldt and Shelby's underlying assets effectively had no associated tax liabilities: losses would offset the gains, so that taxes would be reduced or even eliminated.

As for why Bambino assumed that the NOL investor would offer 90% or more of the market value of Humboldt and Shelby's assets, he testified that he relied on an "instinct formed by partner tax lunches, by going to a – I remember the Tax Club in New York." *Id.* at 1463. Bambino was "a little reluctant" to say that he had "never seen" such a figure before, but he nonetheless stated that "this transaction was a one-off transaction for me." *Id.* at 1463–64.

**Appx12**

Ultimately, the Dillon family chose to sell Humboldt and Shelby through a stock sale after first becoming completely liquid.  On September 19, 2002, Shelby sold its remaining farmland to Shelby Farms, LLC, which was formed ahead of the sale by Trust 8545.  Shelby sold the farmland for a note with the principal sum of $5,017,205, due in September 2005 ("Shelby Note").

As a result, both Humboldt and Shelby were left with only cash and near-liquid assets, which included investment portfolios, notes from the sale of farmland (which were not to be prepaid), and shares of each other's stock.  (Shelby owned 3,200 shares of Humboldt preferred stock.)  At this point, Humboldt and Shelby's assets had a fair market value of around $93.7 million, with a cost basis of around $17.4 million.  *See* JX 80; JX 119.  The corporations' underlying assets therefore had unrealized gains of around $76.3 million.

Although a stock sale would not trigger the gains in the underlying assets, it was going to trigger gains in the *stock* of Humboldt and Shelby, for which the shareholders of Humboldt and Shelby would have to pay tax.  In an email dated June 18, 2002, Ruddy wrote, "In early September we plan to sell Humboldt Corporation, holding common stocks, 3 installment notes and cash to a third party for cash at a discounted price.  Each of the trusts receiving the sales proceeds will separately enter into a transaction in order to help offset the capital gain."  DX 34 at 000118.  When asked what he had meant by that separate transaction, Ruddy testified that the Dillon trusts receiving the stock sale proceeds were going to examine the portfolios of securities they owned and "sell securities that had losses in order to offset the gains from the sale."  Tr. 584.

## IV.     Auction for the Sale of Humboldt and Shelby Stock

### a.  *Requesting Shearman & Sterling to Run a Limited Auction in Late 2002*

On September 26, 2002, Crosby Smith of Keswick emailed Bambino, asking for Shearman & Sterling's help in running an auction for the sale of Humboldt and Shelby stock.  As Peter Rooney, the mergers and acquisitions partner at Shearman & Sterling overseeing the auction, testified, the stock sale of Humboldt and Shelby could not be publicly advertised because of securities regulations prohibiting a public offering of unregistered securities.  The auction therefore had to be a limited one, with the offering memorandum sent only to select potential bidders.  ("[S]o how do you make sure you're not engaging in a public offering by going around trying to sell stock to

13

**Appx13**

people? One thing you do is you only go to a limited number of people who are all sophisticated investors." Tr. 1057.).

The Dillon family, however, decided not to hire an investment bank to run the auction, which would have entrusted the bank with the task of identifying bidders and soliciting their bids. Collins testified that he trusted Shearman & Sterling to handle the auction because hiring an investment bank would have only added to the cost of what he believed was a "pretty straightforward" stock sale; he also expected "no great difficulty in . . . finding buyers for the stock" because "during this time, there were plenty of prospective buyers with NOLs [net operating losses]." *See* Tr. 211.

The timing of the auction—before the end of 2002—was an important consideration for Collins. Earlier, in April 2002, he had written in an email to his sister that "it is important to keep this moving forward as there is a second, timing related rather complex tax oriented transaction that needs to be completed this year . . . . This transaction will save considerable $ for family trusts that own Humboldt." JX 45 at 001454. When asked at trial what he had meant in this email, Collins explained that one of the things he had in mind were market conditions "after the dot-com bubble burst"—specifically, his belief was that there were "very large companies that had net operating losses and that could ultimately be purchasers of [Humboldt and Shelby]." Tr. 169. Collins saw such a moment in the market, when many companies had losses, as an "opportune time" for the stock sale of Humboldt and Shelby. *Id.* In short, he believed that companies with NOLs were the "logical buyers" of Humboldt and Shelby. *Id.*

Peter Rooney likewise recalled that there "were a lot of economic problems" in 2002 because of the "dot-com bust" and the "stock market [going] down enormously." Tr. 1062. Ironically, however, Rooney further recalled that such events led to a poor liquidity market in 2002—in other words, "all the investors pull back and they don't want to buy anything, so you can't sell anything because they don't want to buy anything. That's an illiquidity." *Id.* at 1063. Consistent with Rooney's testimony about poor liquidity, Collins did not expect buyers with NOLs to offer 100% of the net value of Humboldt and Shelby's underlying assets: "[W]ell, that would be nice if we could have received 100 percent, but you know . . . those bidders coming in are entities that I presume to have losses, and it's advantageous for them to acquire these assets at a discount . . . ." Tr. 215.

b. *Identifying Potential Bidders*

14

By October 21, 2002, the list of potential bidders included five entities: Merrill Lynch, Deutsche Bank, CitiSSB ("CitiBank"), K&Z Partners LLC ("K&Z"), and TranStar Capital Corporation ("TranStar"). *See* JX 88. Of that list, Bambino had identified the first three—they were "folks [he] had worked with before, planning transactions, at these various large banks." Tr. 1457–58. In his own words, Bambino "did not actively go out and seek bidders."[11] Tr. 1457.

The final two entities, K&Z and TranStar, were firms that Ruddy had identified in his October 8 email. *See* JX 83 ("Here are the firms that I have had discussions with for over a year."). When asked what those discussions had been about, Ruddy replied that the only conversations that he could remember with those firms had to do with hedging the investment portfolios owned by Humboldt and Shelby, and not a stock sale. *See* Tr. 604. Collins had introduced Ruddy to Richard Zack, the managing partner of K&Z, to explore the possibilities of hedging; Collins had learned about Zack through his work at Brown Advisory. *See* Tr. 266–67. Ruddy had been in discussions as early as mid-2001 with potential buyers of Humboldt corporation. In an email to Bill Jones of Keswick, he wrote that he was about to meet with Richard Zack on August 13, 2001, to discuss "hedging the portfolio." Dx 40. "Zack . . . is the first person I discussed selling Humboldt with a year ago." *Id.*

Bambino's email on October 21, however, left room for that list to grow. He wrote, "Chris Allen called me last week and said that he and BDO [Seidman] have identified 2 other potential bidders. I suggested that Chris send you and I their names by email and that we would discuss whether we should contact them." JX 88. Around the time of the transaction, however, BDO was receiving adverse publicity over its involvement in tax shelter transactions. Mr. Bambino testified that, as a matter of caution, he ran a Lexis search which revealed that BDO was under investigation by the IRS for involvement in tax shelter promotions involving intermediate or "midco" entities as a way of avoiding tax, information he passed along to his clients.

The next day, Bambino faxed Crosby Smith four different newspaper articles related to a federal district court order that required the accounting

---

[11] In fact, Bambino testified that Deutsche Bank expressed an interest before he was even aware that an auction was going to take place. *Id.* at 1455–56. ("Greg Grauer . . . called me in the summer and announced that he was interested and surprised me, . . . I hadn't been part of a conversation that said the company was going to be sold, but he was interested in bidding on the company . . . .").

firm, BDO Seidman, to disclose tax shelter-related documents to the IRS. *See* JX 89.  Of the four articles attached, one appeared in the Wall Street Journal, which reported: "The IRS identifies at least seven BDO transactions, touted as 'Capital Gains Eliminators,' as 'potentially abusive' because they resemble so-called basis-shifting shelters that the IRS added to its list of suspect transactions in 2001.  Such strategies artificially inflate taxpayers' reported losses so they can be used to offset gains." *Id.* at 001896.

Within a week of receiving Bambino's fax, Smith sent a memorandum to the Dillon family enclosing a copy of the confidential offering memorandum that was being given to potential bidders.  JX 92.  Smith did not name any potential bidders nor refer to BDO Seidman; he wrote, "I should say also that we are trying to be careful about whom we invite to bid as we do not want to include any entity which has a reputation for aggressive tax shelter promotion." *Id*.

On November 1, 2002, Bambino emailed Smith and Ruddy, informing them that he "spoke with Chris Allen and he agreed Humboldt should not pursue potential bidders through BDO."  JX 95.  Bambino testified that he "eliminated BDO" because "[b]ased on those articles, that was not somebody we should work with."  Tr. 1452.  And without further involvement by BDO, the list of potential bidders was in effect capped at five.

Critically, at no point was there any effort to target companies based on their holding of NOL's or any other tax attributes that might justify the assumption of liabilities.  There is no suggestion in the testimony or paper record that plaintiffs or their representatives made any search for such entities, nor was there any effort to determine whether the bidders which did show up were in a position to absorb capital gains.

  c.  *Receiving Bids and Selecting the Winning Bid*

Of the five potential bidders that were identified, three submitted offers in writing.  The first offer was submitted on November 11, 2002, by K&Z.  The actual bidder, however, was not K&Z but an entity called Diversified Group Incorporated ("DGI"): Richard Zack wrote a cover letter introducing DGI and attached a bid letter signed by James Haber, the President of DGI.  *See* JX 97.  According to that letter, DGI's offering price was 95% of the net asset value of Humboldt and Shelby.  *See id.* at 001951.

For his part, Bambino was "surprised" when he received news of DGI's bid because he had expected the bid to come from K&Z.  *See* Tr.

16

**Appx16**

1453. That day, Bambino told Greg Schultz, a legal assistant at Shearman & Sterling, to run a search for DGI. According to billing records kept at Shearman & Sterling, Schultz billed 0.6 hours on November 11 for the entry, "Research Diversified Group tax controversy disclosure per L. Bambino." JX 194 at 003834. Despite asking for the research, Bambino testified that he does not recall what the reference to "tax controversy disclosure" in that entry meant. Tr. 1450.

Although Bambino reviewed Schultz's work as a matter of practice, Schultz's 36 minute search on November 11 did not turn up anything on DGI as far as Bambino was aware. Bambino, for instance, did not become aware of the reported opinion by the Southern District of New York that identified DGI as being "engaged in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes." *Diversified Grp., Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 448 (S.D.N.Y. 2001).[12]

After DGI submitted its bid, Deutsche Bank submitted the second bid, offering around 86% of the net asset value of Humboldt and Shelby. *See* JX 103; Tr. 1737 (Malinak). TranStar then submitted the third and final bid, offering a price around 95% of the net asset value of Humboldt and Shelby. *See* JX 105. CitiBank did not submit a bid, even though Bambino had previously communicated CitiBank's proposal to Smith and Ruddy. *See* JX 84. CitiBank wanted to exchange CitiBank preferred stock for the stock of Humboldt and Shelby; such a transaction was advantageous for the Dillon family because it counted as a "tax-free reorganization" where shareholders would not pay any tax at the time of the transaction. *See* Tr. 1359 (Bambino). Bambino explained that in 2002, taxes could be deferred until the maturity of the preferred stock, which might be 20 or 30 years later; in the meanwhile, the preferred stock could be pledged at a bank for less than its face amount. *See id.* at 1360. Ruddy testified, however, that the Dillon family did not want to pursue the CitiBank option because "[t]hey didn't want that stock": "They wanted to basically have cash so they could invest it across the board in the various trusts." Tr. 602.

Of the three bids received, the Dillon family decided to invite only DGI and TranStar to offer their best and final bids, while requiring that the proposal be for payment in cash, with sources of financing to be identified. *See* JX 107; JX 108. When Gregg Grauer from Deutsche Bank heard from

---

[12] Nor did he run across the unpublished opinion in *United States v. Diversified Grp., Inc.*, No. M-18-304, 2002 WL 31947904 (S.D.N.Y. November 25, 2002).

**Appx17**

Shearman & Sterling that Deutsche Bank was being excluded from the final round of bids, he sent the following email to Bambino on November 21: "Your M&A folks advise that the sellers are going to go with the 'highest bidder' . . . . We believe that this approach is a bit simplistic and that it ignores the benefits that other sellers in the past have ascribed to Deutsche Bank's role as a buyer purchasing with its own cash as compared against a boutique buyer using thinly capitalized [special purchase vehicles] funded with principally borrowed cash to execute."  DX 62.

Bambino does not believe he passed Grauer's assessment on to his clients.  Nor did he conduct any further investigation into DGI based on Grauer's claims:

Q. Okay.  Do you know whether they were thinly capitalized?
A. I did not know that.
Q. Okay.  Did you do any investigation as to whether they were thinly capitalized?
A. I did not do that.
Q. Did you do any investigation as to whether they had to principally borrow the cash to execute?
A. I did not do that.
Q. Do you know if anyone did?
A. I don't know that.

Tr. 1474.

DGI was not an entity that the Dillon family, nor anyone at Keswick had heard of prior to receiving the bid.  Despite not having any information about DGI, neither Keswick nor the Dillon family conducted any research themselves.  Ruddy testified that he, in fact, saw no need to ask questions himself: "[Shearman & Sterling] were handling the transaction.  I had no reason to go ahead and ask anything."  Tr. 615.  Like Ruddy, Collins testified that he expected Shearman & Sterling to pursue any necessary research about bidders.  Tr. 421–22.

Bambino was asked at trial, "Q. Would I be correct that you were not asked by the Dillon family or Keswick to research DGI?"  Tr. 1447–48.  To which he replied, "A. You would be correct."  Tr. 1448.  When the final bids were received, Collins did not know anything about DGI's bid other than the fact that it was the "highest bid."  Tr. 422.

When asked why he did not enquire further of DGI as to it's plans for Humboldt and Shelby or regarding financing, Bambino responded, "We were

18

**Appx18**

told, as I recall, that they had proprietary plans, which isn't unusual, because lots of people have proprietary transactions." Tr. 1453. When asked, "Did that raise any red flags for you?" he answered, "No, because people were planning to – the transactions were proprietary." *Id.*

In short, neither the Dillons, their advisors, or Bambino did any investigation into the bona fides of DGI or Haber, despite Grauer's comments and despite their knowledge of the IRS's concern about tax avoidance scheme promoters.

At the same time, Bambino told Crosby Smith that he would not be able to provide a tax opinion with respect to any transaction other than the CitiBank transaction because he did not know those other bidders: "I said we knew Citi, so we could give an opinion with respect to the CitiBank transaction. The other potential transactions they were looking at, I – we didn't know the facts, so we weren't going to be in a position to give an opinion." Tr. 1403. He in fact had recommended the CitiBank stock swap because, in addition to its tax advantages, he did not know enough about the other bidders and their bids. CitiBank, on the other hand, had been represented by Shearman & Sterling for 140 years.

On November 26, 2002, Peter Rooney and David Kershaw, an associate at Shearman & Sterling working on the stock sale, sent Keswick a memorandum summarizing DGI's and TranStar's final bids. DGI offered $92.2 million in cash while assuming the underlying assets' value to be $97.0 million—i.e., 95% of total value. It disclosed Rabobank as the funding source. TranStar, on the other hand, offered $86.6 million in cash while assuming the underlying assets' value to be $91.1 million—or 95.14% of total value. The summary did not contain information about the bidders other than the price they were offering and what the net proceeds to each shareholder would be.

The higher price was the sole basis on which DGI was selected as the winning bid. When asked why DGI was selected over TranStar, Ruddy replied, "It was the highest bid." Tr. 612.

   d. *HSHC as the Purchaser of Humboldt and Shelby and the Borrower from Rabobank*

On November 27, 2002, Kershaw emailed clean and blackline versions of the Stock Purchase Agreement ("SPA") to individuals at DGI and Proskauer Rose ("Proskauer"), the law firm representing DGI. *See* JX 118. That same day, HSHC also filed a certificate of incorporation with the

Secretary of State of the State of Delaware, listing James Haber as the sole shareholder and president.  Stip. ¶ 55.  Within a week, Lana Yang, an associate at Proskauer Rose, informed Shearman & Sterling and Keswick that the purchaser of Humboldt and Shelby would be HSHC, not Haber or DGI.  *See* JX 121.

HSHC worked out the terms of its loans with Rabobank, which was the source of financing that DGI had identified in its final bid letter.  *See* JX 113.  On December 3, 2002, Rabobank emailed DGI and Proskauer (but not Shearman & Sterling or Keswick) initial drafts of documents related to HSHC's financing.  *See* JX 122.  Included in the email was a draft of the Promissory Note, which listed "conditions precedent" that had to be met for Utrecht-America Finance Company ("UAFC"), a wholly-owned subsidiary of Rabobank, to advance $95 million to HSHC.  The draft stated that UAFC would not make the advance until HSHC and UBS PaineWebber had "executed and delivered a purchase agreement," pursuant to which UBS PaineWebber would purchase the investment portfolios that Humboldt and Shelby owned.  *See id.* at 002459–60.  And while the Promissory Note did not list the execution of the Note Purchase Agreement as a condition precedent, the email also included a draft of the agreement which contemplated that Humboldt and Shelby will "sell, assign and transfer" to Rabobank the Dunwalke Note, the Thornton Note, and the Shelby Note.  *See id.* at 002468.

That same day, Haber emailed Kershaw and Yang with the subject line "Humboldt and Shelby notes": "Shortly after the closing, Humboldt and Shelby will be selling the notes to Rabobank.  In connection with that sale, we will need to arrange for Rabobank to become a beneficiary under the Chase and Citibank letters of credit."  JX 123.  It was also on the same day that the directors of Humboldt and Shelby agreed to "establish one or more accounts at UBS PaineWebber Incorporated for the purpose of holding certain of the Corporation's cash and securities."  JX 1.24 at 000373.

From November 27, 2002, to December 23, 2002, Shearman & Sterling and Proskauer exchanged clean and blackline versions of the SPA and negotiated terms.  On November 27, 2002, plaintiffs proposed adding the following clauses:

- Section 6.04(c): "The Purchaser and each Company shall file, or be included in, a consolidated federal income tax return immediately after the Closing Date and the Purchaser and the Sellers agree that for federal income tax

20

purposes, the tax year of each Company shall end on the Closing Date pursuant to applicable Treasury regulations."

- Section 7.04, 7.05: Exceptions added for "any fraudulent misrepresentation or intentional breaches of the covenants or agreements set forth in this Agreement"

JX 118 at 002332, 002336–37.

In earlier draft Escrow Agreements, the Bank of New York was listed as the escrow agent with respect to funds held to ensure environmental remediation. Sometime after December 2, Bank of New York was replaced by State Street Bank.

On December 4, 2002, James Ruddy emailed Terri Holbrook, an acquaintance at an investment firm, explaining the decision that was made regarding Humboldt and Shelby:

We offered to sell the stock of both Humboldt and Shelby Corporations to 5 bidders out of a group of 8 potential purchasers. We ended up with 2 very high and substantially identical bids. They were each given 48 hours to change their bids and agree to certain timing issues and an escrow agreement. . . . A sale of the stock for all cash of around $90 million was very attractive. The risk of the war in Iraq was a catalyst in trying to close the deal as soon as possible. We have an agreement in principle and will try to accomplish this ASAP.

JX 126.

On December 5, 2002, Humboldt and Shelby transferred their portfolio of securities to the account established at UBS PaineWebber. Stip. ¶¶ 58–59. Mr. Bambino's timesheet for the day includes: "Review Notes, Sales Contract regarding Tax Issues; Meeting with Mr. Kershaw regarding same; Legal research of Consolidated Return Rules regarding Tax-Year Closing." JX 194 at 003843.

On December 9, 2002, Lana Yang from Proskauer sent David Kershaw a fax with a marked-up copy of the SPA. Yang changed "each Company will retain a substantial portion of its assets" to "each Company will retain substantial assets." JX 130 at 002670.

21

**Appx21**

On December 11, 2002, David Kershaw emailed Proskauer and DGI under the subject line, "Revised Agreements."  The email attached clean and blackline versions of the SPA, as well as clean and blackline versions of the Humboldt Escrow Agreement.  Plaintiffs accepted Yang's revision from retaining a "substantial portion" of assets to "substantial assets."  Plaintiffs also added the underlined language: "Humboldt will retain ownership of the Humboldt Notes for a period of at least one year from their respective issue dates and Shelby will retain ownership of the Shelby Note for a period of at least one year from its issue date."  JX 133 at 002798.  And, "The Purchaser shall be responsible for . . . Taxes attributable to the sale, exchange or disposition of the Notes after Closing."  Id. at 002800.

On December 12, 2002, Yang emailed Kershaw and Rooney at Sherman and Sterling with the subject line, "Amended and restated notes."  She wrote: "Per Rabobank's request, please forward the drafts of the proposed amended and restated notes for Thornton, Dunwalke and Shelby as soon as possible."  DX 82.  Later that day, David Kershaw sent Proskauer and DGI draft amendments to the three notes, leaving a blank for an additional eligible assignee.  DX 84.  Haber replied to Kershaw's email the next morning with the instruction that the name to put in the Eligible Assignee blank was Rabobank International.  DX 86.

On December 16, 2002, Lana Yang faxed David Kershaw a copy of the marked-up SPA.  Next to plaintiffs' latest addition of retaining ownership of Humboldt notes for a period of at least one year from their issuance dates, Yang wrote: "No—deal is Humboldt will retain Thornton Note until Jan 1, '03 and Dunwalke until July 1, '03 and Shelby will retain its note until July 1, '03."  JX 139 at 002934.  Yang also struck out plaintiffs' addition of "The Purchaser shall be responsible for . . . Taxes attributable to the sale, exchange or disposition of the Notes after closing."  Id. at 002935.

On December 18, 2002, David Kershaw emailed Proskauer and DGI with the subject line, "Disclosure Schedules."  The email attached clean and blackline versions of the SPA.  Plaintiffs adopted the dates that Yang provided in JX 139 regarding retention of the three installment notes under section 5.02: "[T]he Purchaser shall cause (i) Humboldt to retain ownership for U.S. federal income tax purposes of the Thornton Note until after January 1, 2003 and of the Dunwalke Note until after July 1, 2003 and (ii) Shelby to retain ownership for U.S. federal income tax purpose of the Shelby Note until after July 1, 2003."  JX 142 at 003120.  Plaintiffs added the following underlined language under section 6.01: "The Purchaser shall be responsible for, and indemnify the Sellers against . . . Taxes of the Companies (for any Tax Period before or after Closing) attributable to the breach of any covenant

set forth in Section 5.02 (including, <u>without limitation</u>, the sale, exchange or <u>other</u> disposition of the Notes after Closing (including a pledge treated as such for U.S. federal income tax purposes.))." *Id.* at 003123.

The stock sale closed on December 23, 2002. As part of the closing, HSHC's account at Rabobank reflected a wire transfer of $86.33 million, representing the payment for Humboldt and Shelby stock. Stip. ¶ 66. In order to finance the purchase, Haber, as president of HSHC, signed a promissory note to Rabobank, agreeing to repay the principal amount of a loan up to $95 million, with interest ("HSHC Loan"). Stip. ¶ 62; JX 2.27. He also pledged the stock in Humboldt and Shelby. JX 2.30. Separately, Haber, as president of Humboldt, signed an additional promissory note to Rabobank, agreeing to repay the principal amount of $28.7 million, with interest ("Humboldt Loan"). Stip. ¶ 63; JX 2.36. He pledged the Thornton Note and the Dunwalke Note as collateral. JX 2.30. In addition, as president of Shelby, Haber signed a third promissory note to Rabobank, agreeing to repay the principal amount of $5.1 million, with interest ("Shelby Loan"). Stip. ¶ 64; JX 2.40. He pledged the Shelby Note as collateral. JX 2.30. HSHC's account at Rabobank was then credited with $90 million, $28.6 million, and $5 million. Stip. ¶ 65.

To fund the repayment of the initial loan, on December 23, 2002, HSHC sold the portfolio of stocks held by Humboldt and Shelby to UBS PaineWebber for about $50.5 million. On December 24, 2002, Shelby transferred $6 million from its UBS PaineWebber account to HSHC's Rabobank account. On December 27, 2002, the proceeds from the sale of Humboldt and Shelby's portfolio of securities were credited to Humboldt and Shelby's UBS PaineWebber accounts. On December 24, HSHC repaid the $90 million loan to Rabobank.

Although the plaintiffs refused to allow prepayment of the Shelby and Dunwalke installment notes, Stip. ¶¶ 75–76; JX 184, they were aware that the SPA allowed HSHC to pay the two notes early, on or after July 1, 2003, *see* JX 184 (Barclay email to John Haber of May 1, 2002). In fact, on July 21, 2003, Shelby Farms LLC was notified that the Shelby Note payable to Shelby, due September 19, 2005, was assigned to UAFC. Stip. ¶ 77. On July 29, 2003, Dunwalke Farm Property LLC was notified that the Dunwalke Note payable to Humboldt, due August 9, 2005, was assigned to UAFC. Stip. ¶ 78.

The parties do not dispute that, between December 24, 2002, and May 5, 2003, James Haber caused Humboldt and Shelby to engage in abusive "Son-of-BOSS transactions" designed to generate fictitious losses of $74.1

23

**Appx23**

million.  Stip. ¶ 79.  Defendant does not contend that plaintiffs were involved in those transactions.

On August 14, 2004, HSHC filed a consolidated income tax return for the tax year beginning December 23, 2002, and ending November 30, 2003. The return reported a capital gain of $42.86 million from the sale of Humboldt and Shelby's investment portfolios.  It also reported capital gains of $15.36 million, $3.96 million, and $11.0 million from the sales of the Thornton, Shelby, and Dunwalke Notes.  The total gains were $73.2 million. It simultaneously reported $74.1 million in losses, which theoretically offset any liability for the gains.

On August 14, 2007, the IRS issued a statutory notice of deficiency to HSHC.  The IRS determined that the losses claimed were artificial and that HSHC owed $25.6 million in income tax and $10.2 million in gross valuation misstatement penalty, along with underpayment interest.  The U.S. Tax Court upheld the Commissioner's decision and the Second Circuit affirmed, as noted earlier.

On October 25, 2016, the IRS issued notices of transferee liability to the Dillon trusts that were parties to the Stock Sale.[13]  The Dillon trusts paid the assessed transferee liabilities in full, around $79.9 million, in October 2017.  In December 2017, the Dillon trusts filed suit in this court, seeking a refund of all taxes, penalties, and interest paid as transferees of HSHC.

DISCUSSION

Under I.R.C. § 6901, the IRS may collect any deficiency or underpayment of income tax from a party other than the originally liable taxpayer if they are "transferees" of the taxpayer's property, who have a "liability, at law or in equity."  Section 6901(a) provides that "[t]he liability, at law or in equity, of a transferee of property [of a taxpayer]" shall be "assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the cases of the taxes with respect to which the liabilities were incurred."  The provision, however, merely establishes a

---

[13] The IRS issued notices of transferee liabilities to the nine Dillon trusts that had received the payment of $86.8 million from HSHC.  But in the case of six of those trusts, successor trusts had to make payments to the IRS because the original trusts no longer existed.  According to the letter that the Dillon Trust Company sent the IRS, six of the nine Dillon trusts that were parties to the Stock Sale terminated between 2007 and 2012 and distributed their assets to multiple successor trusts.  Stip. ¶ 93.

procedure by which the federal government may collect taxes from transferees and does not by itself create nor does it define the substantive liability of transferees, which is determined pursuant to state law, in this case, that of New York. *Comm'r v. Stern*, 357 U.S. 39, 42 (1958) (analyzing I.R.C. § 311, the predecessor to § 6901 with nearly identical language). The Eighth Circuit has reasoned that, because state law governs § 6901 under *Stern*, "the Commissioner may proceed under § 6901 against any 'transferee' who is liable under state law for the debts of the transferor/taxpayer." *Stanko v. Comm'r*, 209 F.3d 1082, 1085 n.2 (8th Cir. 2000). To the same effect is *First National Bank of Chicago v. Commissioner*, where the Seventh Circuit held that a "transferee" under § 6901 includes "one who takes the property of another without full, fair and adequate consideration to the prejudice of creditors." 255 F.2d 759, 762 (7th Cir. 1958).

In the absence of a Federal Circuit precedent, we find the Seventh and Eighth Circuits' approach to be persuasive and apply it here. The IRS can proceed under § 6901 against transferees as understood in that provision, which involves a two-part test. First, the putative transferees (the Dillons in this case) must meet the definition of a "transferee" under federal law. Beginning with the I.R.C., § 6901(h) defines "transferee" to include a "donee, heir, legatee, devisee, and distributee . . . ." Treasury regulations supplement this definition by further providing that the term "transferee" includes "the shareholder of a dissolved corporation, . . . the successor of a corporation, . . . and all other classes of distributees." 26 C.F.R. § 301.6901-1(b). These definitions are both broad and nonexclusive, thus a party may be a "transferee" under § 6901 even if it does not fall squarely into an enumerated category. *See Alterman v. Comm'r*, 110 T.C.M. (CCH) 507, *45 (2015). We have no difficulty finding that plaintiffs are transferees under § 6901 by virtue of their receipt of the proceeds of the Stock Sale.

The second step in the analysis is whether the Dillons are liable under the applicable state law, which in this case, is the Uniform Fraudulent Conveyance Act of the New York Debtor and Creditor Law ("NYUFCA"), codified at N.Y. Debt. & Cred. §§ 270–81 (McKinney 2000), as it existed in 2000 and our references will be to that version.[14] Sections 273 and 276 provide a means for finding a transaction fraudulent.

The provision on which the government places primary reliance is § 273, which recognizes that a conveyance may be constructively fraudulent, such as when a conveyance is made without fair consideration and results in

---

[14] The statute was extensively rewritten in 2020, although in ways which would not affect our substantive analysis.

the insolvency of the party that made the conveyance.  That section provides as follows:

> *§ 273. Conveyances by insolvent.*
>
> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Insolvency is defined in § 271 as when the present value of assets "is less than the amount that will be required to pay [the transferor's] probably liability on his existing debts as they become absolute and matured."

Fair consideration is defined in the following section:

> *§ 272. Fair consideration.*
>
> Fair consideration is given for property, or obligation,
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Fair consideration thus includes an equivalent exchange *and* good faith.  As the government points out, the absence of either an equivalent exchange or good faith on the part of either party to the transaction precludes fair consideration.  Actual intent to commit fraud is not required under § 272 or § 273, and, as we explain below, constructive fraud on the part of either transferee or transferor is sufficient to vitiate good faith.

Section 276 on the other hand requires proof of actual intent to commit fraud.  In this case, the government's only assertions of actual intent are directed at the actions of Haber, not plaintiffs.  Under § 276, however, Haber's fraud, which plaintiffs do not question, is sufficient to entitle the government to relief under the statute.

If fraud is proved pursuant to either § 273 or § 276, the government's remedy is set out in § 278:

26

**Appx26**

*§ 278 Rights of creditors whose claims have matured*

1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
b. Disregard the conveyance and attach or levy execution upon the property conveyed.

As can be seen, paragraph 1. provides a comprehensive good faith defense to the transferee, assuming it can show both fair consideration and lack of knowledge.  In addition, paragraph 2 offers a partial defense in the form of a cap on liability:

2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

Apparently it is for this reason that the government does not rely on actual fraud under § 276 to establish liability.  Although it seems clear that the Tax Court's findings about Haber's actions would seem to satisfy that test, presumably the government focuses on § 273 because plaintiffs might have an affirmative defense under § 276 if they acted in good faith.

Read together, these provisions, insofar as relevant here, mean that, if the result of the Stock Sale by itself, or the Stock Sale and subsequent asset sales, was that HSHC was left insolvent and thus unable to pay its tax liabilities, or, if the consideration received by HSHC was not a fair equivalent for what the plaintiffs received, and if the Dillons were not acting in good faith, i.e., had constructive knowledge of HSHC's plans, the IRS becomes a creditor of the plaintiffs.  Or in the words of the statute, plaintiffs become liable as transferees.  As we will see below, the initial question of insolvency will turn on whether the asset sale and Stock Sale can be viewed as part of a single transaction.

The parties disagree about which of them has the burden of proving or disproving constructive fraud.  The government argues that plaintiffs bear the burden of disproving fraud because, as a general rule, taxpayers bear the

27

**Appx27**

burden of proof in a refund suit.[15]  *See Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998) ("[T]he taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination.").  Neither this court nor the Federal Circuit has previously decided the issue in the context of a fraudulent conveyance.  *See, e.g.*, *Drew v. United States,* 177 Ct. Cl. 458, 463 (1966) ("In my view of this case, it is unnecessary to decide the burden of proof issue, since the evidence fully warrants the conclusion that the taxpayers are liable as transferees for the corporation's unpaid taxes.").

As plaintiffs point out, however, state law determines the burden of proof when federal courts apply state law to the merits of an action.  *See Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959).  Although plaintiffs may be seeking a refund, their entitlement depends on whether the government is successful in establishing, under New York law, that they were transferees, which in turn depends on whether or not there was some species of fraud.  The fact that the pending action is in the posture of a refund suit thus does not change the analytical framework of I.R.C. § 6901 and its reliance on state law to determine substantive liability.

New York law plainly holds that the party seeking to set aside a conveyance under the NYUFCA bears the burden to show that it was actually or constructively fraudulent.[16]  *Kreisler Borg Florman Gen. Constr. Co., Inc. v. Tower 56, LLC*, 872 N.Y.S.2d 469, 471 (N.Y. App. Div. 2009) ("The burden of proof to establish actual fraud under Debtor and Creditor Law § 276 is upon the creditor who seeks to have the conveyance set aside."); *In re Am. Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 595 N.Y.S.2d 537, 538 (N.Y. App. Div. 1993) ("The burden of proving both insolvency and the lack of fair consideration is upon the party challenging the conveyance.").  This judicial precedent has since been codified in the 2020 version of the NYUFCA.  N.Y. Debt. & Cred. § 273(c) (McKinney 2020) ("A creditor making a claim for relief under subdivision (a) of this section has the burden of proving the elements of the claim for relief by a preponderance of the

---

[15] Although I.R.C. § 6902(a) places the burden on the government to show transferee liability under § 6901, it refers specifically to "proceedings before the Tax Court."  It thus does not provide for the burden of proof in this court.

[16] The standard for such proof is clear and convincing evidence. *See In re U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*, 950 N.Y.S.2d 767, 770 (N.Y. App. Div. 2012); *Farkas v. D'Oca*, 761 N.Y.S.2d 15, 15 (N.Y. App. Div. 2003).  The standard appears to have changed in the recent codification to one of preponderance.

evidence.") Accordingly, the government here bears the burden to show a fraudulent conveyance that may be set aside to satisfy the IRS's claim.

A distinction may be drawn, however, when it comes to a possible defense under § 278. There, it would appear, at least in the abstract, that plaintiffs have the burden of proof with respect either to a comprehensive defense based on giving fair consideration and not otherwise being involved in fraud, or, under paragraph 2, establishing a partial cap on liability. Given the fact that the government is proceeding under § 273, it becomes a moot point, as we will see, because the government has proved by clear and convincing evidence that the Stock Sale and asset sales should be viewed as a single transaction based on plaintiffs' constructive fraud.

## I.        Transferee Liability Analysis under NYUFCA

Section 273 begins with the assumption that there has been a "conveyance." When a creditor attempts to demonstrate that a transfer was fraudulent because the putative transferees did not give fair consideration, the question arises as to whether that single transaction between the buyer and seller is sufficient to establish a conveyance within the contemplation of the statute.

"Midco" transactions are designed to take advantage of this problem by inserting an entity in between the sellers of the target corporation which owns the assets and the ultimate purchasers of the assets. Here, for example, there was not a direct conveyance between the Dillons on the one hand and, on the other hand, Rabobank or UBS PaineWebber, the entities which ended up with the stock portfolios and notes. Rather, the Dillons sold Humboldt and Shelby to HSHC, and then Humboldt and Shelby in turn sold the assets to others. From plaintiffs' perspective, the one single conveyance between them and HSHC is insufficient to demonstrate fraud.

The government offers a couple of alternate theories to get around this problem.[17] The first we reject. It argues that because, under federal tax law,

---

[17] It argues that, because HSHC and Humboldt and Shelby corporations were a consolidated group for tax filing purposes, and because the IRS was a contingent creditor of Humboldt and Shelby and HSHC at the time of the stock sale, then the IRS can recover from plaintiffs if it can show that the Stock Sale left HSHC without sufficient assets to pay the IRS as creditor. Because the subsequent asset sale triggered an unpayable tax liability, and that inability then could be attributed back to HSHC as part of the consolidated group, *ipso facto*, the IRS can collect from the other party to the

29

HSHC and Humboldt and Shelby were all part of the same consolidated tax group for the tax year beginning on December 23, 2002, HSHC is severally liable along with Humboldt and Shelby for those corporations' capital gains tax liabilities. The theory is that because the government was a creditor of Humboldt and Shelby it was also a creditor of HSHC, the Dillon's opposite party in the Stock Sale. What the government ignores, however, as plaintiffs point out, is that the Humboldt and Shelby were not part of the HSHC tax group at the moment of the Stock Sale and the monies used to make the payment were present before the acquisition. In addition, the government is using procedural concepts drawn from federal tax law to make a substantive point under state fraud law. We believe that violates the fundamental separation between liability under the NYUFCA and I.R.C. § 6901.

Fortunately for the government, however, it is also able to rely on a well-trod theory in which plaintiffs are liable as transferees if there are grounds to collapse the Stock Sale and the subsequent asset sales into a single transaction. Then, when we ask the question whether, under § 273, the conveyance was made without fair consideration because it rendered HSHC insolvent, the conveyance in question includes both the Stock Sale and Humboldt and Shelby's subsequent asset sales.

The most useful case for analyzing our facts is *Diebold Foundation, Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013). As here, the plaintiff shareholders in *Diebold* owned stock in a corporation which in turn held appreciated assets. Because the court in *Diebold* so elegantly and economically sets out the dynamics which follow from those basic circumstances, we quote the opinion at length.

> When shareholders who own stock in a C Corp that in turn holds appreciated property wish to dispose of the C Corp, they can do so through one of two transactions: an asset sale or a stock sale. In an asset sale, the shareholders cause the C Corp to sell the appreciated property (triggering the built-in gain tax), and then distribute the remaining proceeds to the shareholders. In a stock sale, the shareholders sell the C Corp stock to a third party. The C Corp continues to own the appreciated assets and the built-in gain tax is not triggered. In other words, in an asset sale, because C Corps are treated as separate legal entities for tax purposes, subject to corporate tax (independent of any capital gain taxes assessed against the earning shareholders), a C Corp's sale of its assets imposes an

---

Stock Sale, the plaintiffs.

30

**Appx30**

additional tax liability. While the C Corp, and not the shareholders, pays this tax liability, such payment nonetheless reduces the amount of cash available for distribution to those shareholders.

In the case of a stock sale, the assets remain owned by the C Corp and the tax on the built-in gain is not triggered. Buyers would generally prefer to purchase the assets directly and receive a new basis equal to the purchase price, thus eliminating the built-in gain. Sellers generally disfavor the sale of assets because of the attendant tax liability and would prefer to sell the stock and move the tax liability on to the purchaser. However, the seller's preferred transaction merely pushes the tax liability down the line; at any point when the shareholders of the C Corp—including new owners who purchased the shares in a stock sale—wish to sell the assets, the built-in gain tax will be triggered. Because of this accompanying tax liability, a stock sale will generally merit a lower sale price than an asset sale.

"Midco transactions" or "intermediary transactions" are structured to allow the parties to have it both ways: letting the seller engage in a stock sale and the buyer engage in an asset purchase. In such a transaction, the selling shareholders sell their C Corp stock to an intermediary entity (or "Midco") at a purchase price that does not discount for the built-in gain tax liability, as a stock sale to the ultimate purchaser would. The Midco then sells the assets of the C Corp to the buyer, who gets a purchase price basis in the assets. The Midco keeps the difference between the asset sale price and the stock purchase price as its fee. The Midco's willingness to allow both buyer and seller to avoid the tax consequences inherent in holding appreciated assets in a C Corp is based on a claimed tax-exempt status or supposed tax attributes, such as losses, that allow it to absorb the built-in gain tax liability. If these tax attributes of the Midco prove to be artificial, then the tax liability created by the built-in gain on the sold assets still needs to be paid. In many instances, the Midco is a newly formed entity created for the sole purpose of facilitating such a transaction, without other income or assets and thus likely to be judgment-proof. The IRS must then seek payment from the other parties involved in the transaction in order to satisfy the tax liability the transaction was created to avoid.

**Appx31**

*Diebold*, 736 F.3d at 175–76 (footnote and internal citations omitted).

The IRS may reach back to the selling parties, however, only if the multiple transactions are collapsed into one. As further explained in *Diebold*, this requires proof of two elements: 1) lack of a fair exchange and 2) actual or constructive knowledge of the scheme on the part of the sellers, i.e., no good faith. *Id.* at 184. The court drew much of its support from *HBE Leasing Corporation v. Frank*, 48 F.3d 623 (2d Cir. 1995), wherein the Second Circuit stated: "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [statute]." 48 F.3d at 635 (citing *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35–36 (2d Cir.1993)). *HBE Leasing* describes a "paradigmatic scheme" under this collapsing doctrine as one in which one transferee gives value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. *Id.* The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing. *Id.*

Such a transaction can be collapsed if two elements are met. "First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the [party owing the liability] for less than fair consideration or with an actual intent to defraud creditors." *Id.* "Second, . . . the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent." *Id.*

As in our circumstances, the purchaser in *Diebold*, Sentinel, intended to use a newly formed intermediate entity, Shap Acquisition Corporation II ("Shap II"), to carry out the transaction. Sentinel, using Shap II, would buy all of the shares of the target corporation, Double D Ranch, from the shareholders of Double D for a price that worked out to be 97% of the market value of the Corporation's assets. "Had the Shareholders sold the assets directly, the tax liability would have caused the Shareholders to realize an amount that worked out to approximately 74.5% of the assets' market value . . . ." *Diebold*, 736 F.3d at 178.

If the transactions in *Diebold* were collapsed, the two sales would be seen for what they really were. It would be as if Double D, the target corporation, sold all of its assets to a third party and made a liquidating distribution to the plaintiff shareholders, receiving insufficient consideration with which to pay taxes.

32

**Appx32**

Also, as in the present case, Rabobank makes an appearance:

> Sentinel intended to purchase the Double D stock through Shap II with financing from Rabobank.  Even prior to taking ownership of the Double D stock, Sentinel planned on having Shap II immediately sell Double D's securities portfolio, as it intended to use the proceeds of that sale to repay the loan from Rabobank.

*Id.*

In general terms, the transaction there unfolded in much the same way as the sales here did.  Shap II purchased the stock of Double D using loans from Rabobank.  Immediately thereafter, Shap II sold the assets of Double D and used the proceeds to repay the loan, keeping a $10 million profit.  When it filed a tax return, Shap II claimed losses to offset all the gain.

The court in *Diebold* collapsed the two transactions and found the sellers liable for unpaid taxes.  Constructive knowledge of the sellers did "not require a showing that the party had actual knowledge of [the] scheme; rather, it is sufficient if, based upon the surrounding circumstances, [the owners of Double D] 'should have known' about the entire scheme." *Id.* at 187.  The Second Circuit had no difficulty finding the first prong of *HBE* was satisfied applying the law of New York: one transferee (a third party) ended up with Double D's assets and another transferee (the Shareholders) received 97% of the fair market value for these assets, and Double D (the putative taxpayer) was left without funds to pay the IRS as creditor.  In other words, there was not fair consideration because the sellers received virtually full market value for assets which, when sold, triggered a massive, embedded, tax liability.  In effect, the tax liability made the intermediate buyer, which had borrowed the funds advanced to the shareholders, insolvent.

The remaining question was whether the Shareholders had actual or constructive knowledge of the entire scheme such that the exchange with Double D was fraudulent:

> Constructive knowledge in this context also includes "inquiry knowledge"—that is, where transferees "were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but . . . failed to make such inquiry." *Id.*  As we noted in *HBE Leasing*, "[t]here is some ambiguity as to the precise test for constructive knowledge," *id.* at 636, in that some cases require "the

33

**Appx33**

knowledge that ordinary diligence would have elicited," *see United States v. Orozco-Prada*, 636 F. Supp. 1537, 1543 (S.D.N.Y. 1986), *aff'd*, 847 F.2d 836 (table) (2d Cir.1988), and other cases have required a "more active avoidance of the truth." *HBE Leasing*, 48 F.3d at 636. However, even as we acknowledge this ambiguity in New York law, we need not reach the issue of which test to apply, because the facts here demonstrate both a failure of ordinary diligence and active avoidance of the truth.

*Diebold,* 736 F.3d at 187 (internal citations omitted).

Our reading of *Diebold* is that the requirement of constructive knowledge can be satisfied if the government shows that the sellers actively avoided informing themselves of the truth. Plaintiffs appear to agree that such proof would satisfy the government's burden. Their understanding of this inquiry, however, we find problematic. Plaintiffs characterize this test as follows: "In order to show 'active avoidance,' the government must show that once Plaintiffs learned something that indicated Haber's fraud, the Plaintiff took affirmative steps to shield themselves or consciously turn away from knowledge of Haber's fraud." Pls.' Post-Trial Resp. Br. at 4, ECF No. 174. That gilding makes no sense. If someone learns of another person's fraud, they are already tainted by "actual knowledge" and it would be unnecessary to go further to show avoidance. One cannot "turn away" from knowledge already possessed. Pretending ignorance of known fraud is different than deliberately avoiding becoming informed. Either would be sufficient for the government's purposes, but the inquiries are different. In our view, active avoidance means an individual suspects that the truth would be unfavorable so they take active steps to keep from finding it out.

In applying the test it described, the court in *Diebold* reached the conclusion that there was liability in the sellers based on the presence of seven factors. First, and of "great import" to the court was that the Shareholders recognized the "problem" of the tax liability arising from the built-in gains on the assets held by Double D and sought out parties that could help them avoid the tax liability inherent in a corporation holding appreciated assets.[18]  736 F.3d at 188.  Second, the "parties to this transaction were

---

[18] The circuit court recognized that the knowledge, constructive or otherwise, of the problem was not limited to the eventual agreement between Double D and Shap II. It was the tax payers' knowledge of the potential tax liability inherent in the underlying assets, the so called "built-in gains," that were relevant, as here, in finding the taxpayer liable as a transferee. 736 F.3d at

34

**Appx34**

extremely sophisticated actors, deploying a stable of tax attorneys." *Id.* Third, the shareholder representatives had a "sophisticated understanding" of the structure of the entire transaction. *Id.* Fourth, they knew that the buyer was a "brand new entity that was created for the sole purpose of purchasing Double D stock." *Id.* Fifth, they knew that the new entity was going to promptly sell the assets. Sixth, language was stricken from the stock purchase agreement concerning one of the purchasers. *Id.* at 189. Seventh, the sellers actively pushed for the closing date to be moved one day to accommodate sale of the assets. *Id.*

All of this was "more than sufficient to demonstrate that Shap II was a shell that did not have legitimate offsetting losses or deductions to cancel out the huge built-in gain it would incur upon sale of the Double D securities." *Id.* "Taken together, these circumstances should have caused the Shareholder representatives to inquire further into the supposed tax attributes that allegedly would have allowed Shap II to absorb the tax liability of which the Shareholders had intimate knowledge." *Id.* And, "Based on the myriad circumstances . . . of which they were aware, the Shareholders had a duty to inquire further into the circumstances of the transaction." *Id.*

As the court noted, when sellers undertake an exercise which begins with how to deal with a large, built-in tax liability, "it would be the very rare case indeed where a purchasing party would assume such liability without an appropriate discount in the sale price." *Id.* at 190. Being aware of those factors heightens the sellers' obligation to do diligent inquiry. *Diebold* concluded that there was constructive knowledge on the part of the sellers there because they deliberately chose not to inquire into the buyer's plan, despite the existence of a number of red flags.

*Diebold* thus gives us the basic legal framework to apply. Was there a conveyance for less than fair consideration in which HSHC or Humboldt and Shelby were left insolvent, leaving the IRS an unpaid creditor of the Dillon transferees? Whether there was a conveyance depends on collapsing the Stock Sale and subsequent asset sales into a single transaction, which, in turn, depends on whether the Dillons knew or should have known of DGI's plans, or willfully chose to remain ignorant of the facts in that respect. If the transactions can be collapsed, then, in effect, the Dillons received the proceeds of the sale of the Humboldt and Shelby assets as if they had liquidated the companies and distributed the proceeds to themselves directly, without bothering to pay the resulting capital gains tax. By virtue of collapsing the two transactions into one, it becomes apparent, under the facts

---

188.

here, that the exchange was not for fair consideration because the plaintiffs received more value than they gave, in view of the virtually simultaneous triggering of tax liability on the embedded assets.

Plaintiffs agree that, under *Diebold*, the court may collapse the Stock Sale with the rest of Haber's fraudulent scheme if the government "can show Plaintiffs had actual or constructive knowledge of Haber's *entire* fraudulent scheme." Pls.' Post-Trial Resp. Br. at 1 (emphasis added). We do not think, however, that the law requires a completely comprehensive understanding of what Haber had in mind. As in *Diebold*, we conclude that it is sufficient if either of two scenarios are proved by defendant: 1) the plaintiffs were on inquiry notice of the general outline of Haber's scheme—buy the corporate stock, sell the assets of the companies and then not pay the taxes—and yet they proceeded with the sale, or, 2) there were indicators of the potential for fraud and yet they deliberately chose to remain ignorant of what further inquiry might reveal.

There is one additional point as to which we are not entirely in agreement with plaintiffs. Under the scenario in which there is liability for willful ignorance, plaintiffs contend that the government must prove that further inquiry would have revealed Haber's fraudulent scheme. We disagree. We believe it is sufficient to show that there were indicators of potential fraud and a refusal to ask further questions, irrespective of whether Haber would have admitted his plans in detail.

## II.     Expert Testimony

With the legal framework established, we now turn to the testimony of the three experts. Defendant offered R. Jeffrey Malinak, an expert witness in corporate finance, corporate valuation, and corporate solvency. The primary purpose of his presentation was to demonstrate that HSHC was insolvent immediately after the Stock Sale. Defendant also offered the testimony of Professor Jennifer Blouin, of the University of Pennsylvania Wharton School of Business, who was qualified as an expert witness in accounting, public economics, and the taxation aspects of business decision making. She testified that there were no non-tax motivations or foreseeable economic benefits from the Stock Sale and that the existence of certain "red flags" should have alerted plaintiffs that HSHC's purchase was motivated by possible tax fraud.

Plaintiffs offered no one to rebut Mr. Malinak directly, but presented the testimony of Professor Guhan Subramanian, who holds joint appointments to Harvard's Business and Law Schools. He testified

36

**Appx36**

concerning the adequacy of plaintiffs' due diligence, about the appropriateness of the auction used, and responded to Professor Blouin's catalog of "red flags."

We will begin with Professor Subramanian's presentation. He teaches courses in Corporate Law, Executive Education, Negotiations, Mergers & Acquisitions, and Corporate Deals. Professor Subramanian's research focuses on corporate deals, mergers & acquisitions, corporate law, negotiations, and on auction theory, which is a subfield of economics that evaluates the competitive bidding process whereby potential buyers push up the prices offered in an auction. He has co-written two corporate law case books, which contain material on mergers and acquisitions and due diligence, as well as several academic articles on particular areas of mergers and acquisitions, such as the deal process and the use of auctions. Professor Subramanian also has published books for practitioners on negotiations, auctions, deals, and structuring business transactions. As a frequent expert witness, he has testified concerning negotiations and corporate deals with a focus on mergers and acquisitions. He does not purport to have any expertise in tax matters.

Professor Subramanian was asked to offer opinions about the custom and practice that sellers would engage in regarding due diligence in a cash sale, and he then compared that practice with what the sellers did here. He testified that an auction was the logical method for plaintiffs to select a purchaser. He also testified that it is both customary and appropriate in cash sales, like those here, for the seller to perform limited, if any, due diligence, particularly given the representations and warranties ("reps and warranties") plaintiffs received from Haber. Representations are promises about existing conditions and warranties are promises about future conditions. They typically are a part of all merger and acquisition transactions.

Professor Subramanian also testified that representations and warranties secured through good faith negotiations between reputable law firms are an appropriate and reasonable substitute for additional due diligence. Based on his experience, if a party secures a representation, it will not—and need not—engage in additional diligence to verify that representation. In connection with warranties, which relate to a party's future conduct, in his view, the written warranty is the only assurance a party can secure. As Professor Subramanian explained, "[y]ou can't possibly get in the buyer's head and know whether they believe they're going to fulfill that commitment or not." Tr. 1571. Warranties, therefore, are better than due diligence because due diligence can only discover past conduct and cannot govern future conduct. Warranties are difficult to secure because buyers

37

**Appx37**

typically do not want constraints on their future actions when they acquire a business.  Most warranties therefore have time limits.

Plaintiff also used Professor Subramanian to respond to the numerous "red flags" which defense expert Professor Blouin argues were present to warn plaintiffs of the possibility they were dealing with a fraudster.  For example, Subramanian said that it is entirely routine for merger and acquisition transactions to include a special-purpose vehicle; in his research, about 90–95% of the deals he analyzed involved some kind of special purpose vehicle ("SPV").  He also found nothing problematic with the last-minute substitution for Bank of New York with State Street Bank as the SPA escrow agent.  He agreed with Mr. Rooney that, in auctions for cash stock sales, the sellers did not typically request the buyer's financing documents.  Finally, Professor Subramanian concluded that the very fact that DGI and its law firm pushed back hard against plaintiffs in negotiating the SPA suggests, as a matter of transactional practice, that the buyer was negotiating in good faith.

Professor Subramanian's conclusions are not based on any assumptions that the plaintiffs actually did any due diligence on Haber and DGI; he testified he was not aware of what they did.  His argument is that no due diligence was required other than what was implicit in the cash sale/auction, i.e., none.

He further explained:

> I do remember that K&Z was a well known entity to the sellers, and so you've got a representative of the buyer who you've encountered in the past.  That would be highly relevant.  I suppose you could call around and find out more, but – it wouldn't be normal, but you could do that in theory if you felt that there was some red flag that would warrant you to do that kind of investigation."

Tr. 1633.  We view his comment that K&Z as a well known entity to the sellers to be over-generous.  In any event, Subramanian did not testify about the market conditions in 2002 and whether there would have been an influx of buyers with NOLs at the time nor did he explain why it was reasonable for plaintiffs and their agents to have believed that there would have been such buyers.

Although Professor Subramanian also testified that it was reasonable for Bambino and others to conclude that higher bids were the result of

38

**Appx38**

bidders' tax attributes, we find that part of his testimony is beyond his expertise. More importantly, we find it unpersuasive. The only factual fig leaf that plaintiffs can point to was their testimony that NOLs would have been abundant in buyers of assets at the time of sale, a belief that was not otherwise supported by Professor Subramanian, or anywhere else in the record, and which was soundly undercut by defendant's experts' more direct testimony on the point.

Professor Subramanian acknowledged that if a buyer refuses to agree to a certain representation that is important to the seller, "the seller will typically probe further in its due diligence." Tr. 1588. Professor Subramanian also acknowledged that, in certain cases, a seller will research the buyer, particularly in circumstances in which the buyer has a continuing relationship with the seller and where the buyer had a negative reputation. He agreed that both circumstances are present here, based on 1) HSHC's ongoing covenants to remain in business and retain substantial assets for one year and 2) the existence of negative press about DGI contemporaneous to the Stock Sale (without regard as to whether Shearman discovered it or not).

Defendant's first witness, Mr. Malinak is a managing principal at an economics consulting firm. He has extensive experience in corporate finance and financial economics, with a particular focus on damages estimation, applied finance theory, and business and asset valuation. Mr. Malinak prepared testimony in three areas. His first conclusion was that the auction bids "would not have been economically rational unless the buyers believed that they could avoid most or all of the embedded tax liability." Tr. 1709. His second conclusion was that Humboldt and Shelby corporations, just prior to the stock sale, were solvent but that, immediately after the stock sale, the buyer, HSHC, was insolvent, and its insolvency was maintained through the following relevant period of time. The third aspect of his testimony was to respond to the report of Professor Subramanian.[19]

The premise behind the first part of his presentation is that the appropriate place to begin an analysis of the Stock Sale is to determine the fair market value of the Humboldt and Shelby stock. Applying a willing buyer/willing seller test, any willing buyer looking at this portfolio, which was common stock and the high quality/easy to value notes, would have taken into account the embedded tax liability. Whoever bought the corporate stock would assume that liability and have to account for it in its pricing

---

[19] He also prepared an analysis in response to someone who was listed in advance of trial as another expert witness for plaintiff, Ms. Yvette Austin-Smith. She was not, however, called to testify.

evaluation.  He concludes, therefore, that no willing buyer would have paid more than the after-tax value of those assets.  Only a highly idiosyncratic buyer would have been able to absorb that liability in such a way as to be able to pay market value for the assets.  In the absence of any evidence that a meaningful number of potential buyers would fall into that category, the fair market value of the portfolio should be reduced by $25.6 million, the tax liability embedded within the assets.

Because the bids received were well in excess of fair market value measured in this way, Malinak concluded that they were not economically rational unless the bidders believed that they could avoid, for a relatively low cost, all of the assumed tax liability.  In response to plaintiffs' suggestion that companies with accumulated NOL's might be in a position to offer more than fair market value, he opined that:

> [U]nless they were at risk of losing those – the access to those losses very soon, . . . they wouldn't give any to the seller here, because they could just go buy the stock or a fixed-income investment, like the notes, and then if those went up in value, they could use those losses to offset all of the gain . . . of the portfolio, that new portfolio they bought.

Tr. 1729.  In other words, there would be no incentive for a rational buyer to use accumulated NOLs as part of the purchase price to offset embedded gain.  That buyer could go into the marketplace and purchase identical assets at the same market value *without* giving up an asset of their own (its accumulated NOLs).  As he explained, on average, over time, stocks go up in value; so the purchaser could be assured of the opportunity to use the NOLs more effectively later.  Theoretically then, bidders would expect to compete only with bona fide purchasers who would approach the purchase from the same perspective, i.e., they could all be expected to discount the stock to account for the inherited tax liability.  As he and Professor Blouin both emphasized, it would be a highly idiosyncratic purchaser who could ignore the tax liability, and then it would have required the presence of at least two such highly idiosyncratic buyers to create a fair market value which did not include the tax discount because one such bidder would not bid against itself.

He went on to puncture Professor Subramanian's gauzy picture of a vast number of potential bidders seeking to bid up the price.  As a non-operating holding company, HSHC could not be expected to have any operating losses.  Further, as a newly formed entity, HSHC could not be expected to have any capital losses.  Nor was there a parent entity of HSHC that could be expected to have NOLs.  Mr. Malinak also testified that there

40

**Appx40**

were no changes in the tax law in 2002 that would have created a market of companies with expiring NOLs, which would have to be used quickly before they became worthless.

Nor could additional value be ascribed to a desire to obtain operating control of the companies. Neither the targets, Humboldt and Shelby, nor HSHC, were operating companies such that synergies would have been expected due to the presence of goodwill. Thus no premium can be explained in that way. Neither Humboldt nor Shelby would have had value in that sense because they had no real operations.

He thus opined that the bidders were paying a substantial premium in excess of fair market value that had no rational basis given the unlikelihood of any legitimate way to absorb the tax liability or to generate additional value. Those justifications were "not present here." Tr. 1743. Malinak concluded that the alternative and only logical explanation for the two excessively high and similar bids is that both bidders anticipated a tax avoidance strategy that would allow them to escape paying most or all of the embedded tax liability on the underlying assets.

Malinak's second conclusion is that Humboldt and Shelby corporations were solvent immediately prior to the Stock Sale; something that is uncontested. His valuation of the companies is different from plaintiffs' approach, however. The companies were solvent, but on a fair market basis, the value of their highly saleable assets had to be adjusted to account for the embedded tax liability:

> [A]ny willing buyer looking at this portfolio, which is common stocks and just notes, which are very . . . easy to value, could have gone out in the open market and bought the same portfolio . . . without the embedded tax liability, and, therefore, no willing buyer would have paid more than the after-tax value of those assets.

Tr. 1711. Taking the approximately $26 million in tax liability out of the approximately $91 million in asset value would leave a fair market value of $65 million.

The second part of his solvency inquiry was a conclusion that, immediately after the Stock Sale on December 23, 2002, HSHC was insolvent. That same day it sold the securities it acquired to UBS PaineWebber for approximately $51 million, giving it $93 million in cash (including borrowings plus $6 million in cash from the corporations).

41

**Appx41**

Together with the installment notes, that gave HSHC over $127 million in assets.  It had borrowed nearly $124 million, however, and, because of the $15 million in federal tax on the *realized* gains associated with the stocks and the $10 million in federal tax on the *unrealized* gains associated with the notes, on the day of the sale, it was actually insolvent by nearly $23 million. Four days later, after paying $90 million of its borrowings back with cash, it was still effectively insolvent.

> Insolvency, moreover, was readily predictable, as Malinak explained:
>
> They funded this acquisition of that stock portfolio with 100 percent debt. You could predict . . . that's an untenable situation and that the lender is going to require you to sell the portfolio, and that's, in fact, what we see. . . . Rabobank . . . required the immediate sale of the stock portfolio, because they don't want to take that risk. You know, they're only earning 4 percent. They don't want to take a risk that that stock value is going to fall off the table.  So you didn't need that Rabobank agreement to know that this was an untenable situation.

Tr. 1761.[20]  In other words, the mere fact that this was a new entity, operating entirely with borrowed funds, should have been sufficient to put the stock sellers on notice that the Stock Sale would have to be followed virtually immediately by an asset sale, triggering all or part of the tax liability.

It is also for that reason, as Malinak explained, that from an economic standpoint, the Stock Sale and the asset sales should be viewed as one transaction:

> From an economic perspective, those two transactions were joined at the hip. As I – we discussed earlier, the – especially the sale of the stock portfolio had to be – had to happen immediately as part of – just from an economic perspective, based on the fact that debt can't fund 100 percent of an equity investment in – you know, basic finance principles – but also the Rabobank agreement required the immediate sale of the portfolio.

---

[20] Using a somewhat different test of solvency, the capital adequacy solvency test, he concluded that as of the date of closing, HSHC had a 100 percent chance of default by July 2023.

> So as soon as the transaction was completed, you had HSHC – you know, it was really set up to be unwound, okay, beginning with the sale of the stock portfolio, and then there is evidence or documentary support for the – for the intention of the parties to sell the notes off in short order. So the transactions were joined at the hip economically.

Tr. 1781–82.

The governments' second expert, Professor Blouin, presented a full scale assault on the bona fides of the stock sale and Professor Subramanian's attempted benign explanation for it. Like Mr. Malinak, her first task was to determine if there was any reason not related to taxes why a premium would have been paid on the shares of the stock. She concluded that there was none. In other words, the premium paid by HSHC made no economic sense:

> [In] order to create these types of nontax, . . . economic benefits, . . . you're looking for synergies that typically come up in situations where there's a trade or business, and so in this particular setting there wasn't a trade or business that was being sold.
>
> So . . . the buyer was a brand new entity that just came into being, so it didn't have any current trade or business with which to create synergies.

Tr. 2214. There was no obvious economic explanation for the premium.

She agrees with Malinak that the auction process yielded a bid that was uneconomic for a bona fide buyer; that there existed simpler alternatives with lower transaction costs to the sellers for disposing of Humboldt and Shelby; and that the stock sale resulted in a circular flow of funds, with the result that the transaction was effectively a liquidation of Humboldt and Shelby.

She thus supported Mr. Malinak's testimony that, even if there had been companies that suffered significant losses in 2002, those NOLs would have been eligible to be carried forward for twenty years. Thus there was no reason for buyers to give up NOLs in order to buy fungible assets. As she explained: "It would be a very, very, very unusual circumstance in that you have a pot of losses that are getting ready to expire, right? So the reason is there's no expectation that this buyer could use them in the future." Tr. 2243.

43

**Appx43**

Professor Blouin explained why Professor Subramanian's suggestion that there could be tax synergies or tax attributes associated with two companies joining, while true in the abstract, was an unsupported speculation and not a possibility here. At most, plaintiffs could hope for HSHC to merge with an operating company that had NOLs in the future. *See* Tr. 2348 (Subramanian). But there are no facts to support a reasonable inference that HSHC was going to do so or that plaintiffs thought it might.

Moreover, Professor Bouin agreed with Mr. Malinak that it would take not just one, but more than one such 'unique,' bidder in order for the seller to achieve a sales price approaching fair market value without considering the embedded tax liability. If there were only one such bidder, it would have no incentive to use its NOLs unnecessarily. It would require competition between two such entities to create upward pressure on the price.

The use of an auction was also a mystery to Professor Blouin. It is Professor Blouin's understanding that auctions make sense for hard-to-value assets, where there could be disagreement about value. Here, however, it would be simple to calculate the precise value of the assets inside Humboldt and Shelby because they consisted of cash, high quality notes and stocks. Although, unlike Professor Subramanian, Professor Blouin did not profess to be expert on the use of auctions, her analysis makes sense to the court. The utility of the auction in this case was not to get a better understanding of the true market value of the assets (less the known tax liability), but to hope to find a buyer able, or at least willing, to ignore the true fair market value of the companies.

A straightforward sale on the open market of the assets would come, according to Professor Blouin, with far less friction costs and fees than the elaborate activities surrounding the auction, the escrows, and the SPA and the stock closing. This suggests another reason that the transaction was economically dubious. Of course, the additional cost attendant upon such a transparent direct sale would be the triggering of immediate tax liability, something the plaintiffs hoped to avoid.

From Malinak and Blouin we therefore conclude that there was no legitimate economically rational explanation for the DGI and TranStar bids. We reject Subramanian's efforts to persuade us to the contrary.

Professor Blouin also took issue with the narrative from plaintiffs and Professor Subramanian that "cash is cash" and therefore plaintiffs need not have been too fussy about their buyer. We agree with her analysis. Plaintiffs knew that a sword of Damocles always hung over their heads and that the

44

**Appx44**

IRS had the ability and the incentive to unravel a sale if the buyers engaged in tax fraud. Plaintiffs thus had every reason to be concerned about events after the Stock Sale, and indeed had been warned by Bambino about that possibility. Moreover, the SPA was written in such a way that DGI made representations and warranties as to its future behavior which created an ongoing connection to plaintiffs.

Professor Blouin presents a series of circumstances surrounding the transaction which she is persuaded were "red flags" that should have tipped off the Dillons that the DGI offer was too good to be true. We will ignore two factors on which Blouin relied. One was the substitution of State Street Bank for the Bank of New York as escrow agent for environmental remediation funds, which she alleges was due to the bank's concern about HSHC's lack of capital. Another was Blouin's reference to an article about DGI in Forbes magazine which called DGI a "tax shelter promoter." We will ignore these latter two indicia because the government offered no evidentiary support for them. Their inclusion in Blouin's report is not a substitute for facts.

The first and most important red flag we have discussed: the total absence of any economic validity to the bids. It made no economic sense for two bidders to show up offering prices at virtually full value of the underlying assets. There was no mystery here in this regard other than that created by plaintiffs' own desire to remain ignorant, or to feign ignorance. The taxpayers are sophisticated entities advised on tax matters by an in-house firm, Keswick, and a prestigious international law firm. In fact, the record shows that Bambino warned of the consequences of selling to certain tax aggressive entities several times. In addition, there were other circumstances which Professor Blouin thought were caution signals. One was the general pushback by DGI on making any promises to hold assets for a lengthy period. DGI would not agree to hold a "substantial proportion" of assets for one year, substituting instead "substantial assets," which Blouin views as a less meaningful commitment. We agree. 'Substantial assets' is flabbier language than 'substantial proportion.' And DGI insisted on the right to immediately sell one of the notes and the others within seven months. She also finds the use of an auction unnecessary and therefore indicative of unusual circumstances.

Professor Subramanian attempted to minimize the relevance of Blouin's red flags. As to the first factor—the lack of economic credibility in the bids—we have already expressed our view that Subramanian's effort to rationalize the bids was totally unconvincing. In response to DGI's insistence on toning down the language on asset retention, he contends that

45

**Appx45**

a true fraudster would not have pushed back at all; that Proskauer's repeated modifications to the SPA are indicative of a bona fide purchaser. We understand his explanation and are content to view DGI's insistence only as an indicator that DGI was reluctant to promise anything regarding retention of assets, which nevertheless should have alerted plaintiffs that the assets would be sold quickly, promptly triggering tax consequences.

Subramanian also finds that use of an auction was routine and not a cause for concern. We are persuaded, however, that his response does not meet the substance of Blouin's point—that an auction was unnecessary because of the liquidity of the assets and that it therefore added unnecessary complexity and cost. We view it much more likely that an auction merely offered a useful ambiguity about the sellers' motivations.

While we will not rely on Professor Blouin's reference to the Forbes article and the switch of escrow banks, we note that there were at least two publicly reported opinions which a search for Diversified Group, Inc. (DGI), or for James Haber would have turned up. One was *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001). The issues in that case had nothing to do with an IRS challenge to a midco transaction, but the factual background is relevant. As the District Court recited:

> DGI [wa]s engaged in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes. DGI [wa]s not a licensed accounting firm nor d[id] it engage in the practice of law. DGI's business include[d] 'developing tax strategies and using them in transactions meeting clients' particular business and investment objectives.'

*Id.* at 448 (citations omitted). Bambino was unaware of this case.

A second publicly available opinion was *United States v. Diversified Group, Inc.*, No. M-18-304, 2002 WL 31947904 (S.D.N.Y. Nov. 25, 2002). That case involved an effort by the IRS to enforce a subpoena against DGI. The court notes in its decision that "[t]he IRS is currently investigating whether DGI has violated the tax laws regarding the registration and maintenance of records concerning tax shelters." *Id.* at *1.

Professor Blouin believes that the information she cites was contemporaneous and available to plaintiffs and their agents and would have signaled the lack of bona fides of the transaction. We find her experience and training to be particularly relevant because the focus of her work is on

how taxes affect business decision-making and how tax considerations can be distinct from other economic considerations.  That is in distinction from Professor Subramanian, who declined to apply any tax considerations to his opinions.[21]

There can be no doubt that the accumulated tax liability was both known to a high degree of precision by plaintiffs (nearly $26 million), and was a driving consideration for the "tax guys."  This is the same factor the court in *Diebold* found to be of "great import."  There is no question that, at a minimum, Bambino, Ruddy and Allen were actually aware that, if the stock sale attracted a company which sold the appreciated assets, the stock sale and subsequent asset sales would trigger scrutiny by the IRS and that the agency might treat the transactions as a de facto asset sale by plaintiffs.  We need go no further than Bambino's memos to his clients warning them of that possibility and trying to steer them in a direction away from the even more problematic schemes generated by Ruddy and his contacts.

Bambino and his clients knew plenty about the potential buyers, enough, in our opinion, to generate "red flags" that ought to have resulted in further inquiry.  They knew that their clients were marketing assets with a built-in tax liability of $26 million.  As tax professionals they knew that only a highly unique purchaser would not price its bid accordingly.  They had been warned that there were unscrupulous bidders searching for fattened milch cows like Humboldt and Shelby to plunder through fraudulent tax schemes.  They knew or had reason to know that HSHC was a newly formed entity under the control of James Haber, with *de minimis* assets, which borrowed substantially all of the purchase price using the assets of Humboldt and Shelby as collateral, and that the loans which would trigger a need to sell assets and thereby trigger tax liability in Humboldt and Shelby.  Even the most rudimentary inquiry would have revealed the unlikelihood that HSHC itself had any useable NOLs because it was not and had never been an operating company.  They knew that DGI would not disclose its plans for the assets of Humboldt and Shelby.  Their acceptance of its explanation of "proprietary" concerns was either monumental naivete, gross negligence, or a useful fig leaf.  We find the latter to be the truth.  They knew that some of the notes would be pledged for cash immediately and that all the notes could be redeemed by the end of July 2003, well in advance of their maturity dates.[22]

---

[21] Unlike Professor Subramanian, however, she was not asked to opine on the level of due diligence done by the plaintiffs.

[22] *See Weintraut v. Comm'r*, 2016 WL 4040793, at *74 (U.S. Tax Ct. 2016)

47

**Appx47**

They knew that the negotiations over the terms of the SPA left DGI with permission to sell virtually whatever it wanted of the assets transferred. Retaining a "substantial" amount is a toothless restriction. They knew that the Thornton note would be turned into cash immediately by being pledged to Rabobank and that the remaining notes could be pledged before the end of July, in advance of their maturity dates. Any such event would mean that HSHC, a "thinly capitalized" SPV would immediately become obligated to deal with the tax consequences of those sales.

In addition, what *should* Bambino have known? That Haber and DGI were being investigated by the IRS for potential violation of tax laws regarding the registration and maintenance of records concerning tax shelters.

In sum, Blouin and Malinak persuade us that there was nothing routine about the Stock Sale. It gave off more than enough warning signals that HSHC was not a good faith buyer and that its ability to pay virtually full value for the corporations' assets was based on a plan to sell the assets quickly to pay for the funds borrowed to buy the stock, thereby triggering an obligation to pay the embedded tax liability, something plaintiffs were eager to avoid having to do themselves. At a bare minimum, there were plenty of indicators of the possibility of fraud that plaintiffs were on inquiry notice to go further and attempt to assure themselves that Haber was not planning to sell the assets quickly and that he had the means to absorb the tax liability if he did. It is no answer to say, "Haber would not have revealed his plans to us." That is no doubt true, but, under the circumstances, that would be further proof that plaintiffs could not deal with him in presumed innocence, or in good faith.

Plaintiffs clearly did not want to know the facts about HSHC because that would have jeopardized their ability to accept an unrealistic bid for the corporate stock. Bambino was remarkably uninterested in performing any serious due diligence on DGI, Haber or TranStar. He never spoke to Zack, Haber, Huber, or anyone at DGI. Nor do we have any basis for finding that his clients did any such investigation. It is fair to conclude that this approach was not because they knew it would have been pointless due to the bona fides of the bidders, but rather that plaintiffs and their counsel did not want to know what an investigation would reveal, because then they would be accountable

(not accepting the explanation that stockholders did not make inquiries because the buyer's business strategy was proprietary and they assumed buyer would not share any details about its plans with them.)

48

**Appx48**

for dealing with the results.  We find that plaintiffs and Bambino wanted to make a virtue of willful ignorance so that they could profess to be innocent sellers.

Plaintiffs rely on Professor Subramanian's testimony to create an inky cloud of innocent possibilities in an attempt to camouflage their willful ignorance.  His view that "I don't think it's possible to do due diligence to prevent fraud," Tr. at 1632, would read out of the law any obligation to investigate a purchaser.

Plaintiffs' willful ignorance is sufficient to demonstrate constructive knowledge of fraud.  Once having found constructive knowledge, we can collapse the Stock Sale with the subsequent Asset Sales.  We then have a conveyance (the transfer of money to plaintiffs), an absence of fair consideration, because the plaintiffs were receiving more than the property was worth when taxes are accounted for, and because there was no good faith on the part of the transferees, and we have an insolvent transferor (HSHC and its subsidiaries).  The government has thus met its burden of showing by clear and convincing evidence that: 1) the IRS was a creditor at the time of the conveyance; 2) the conveyance lacked fair consideration, because $86.8 million was not a fair equivalent for corporations with a net value of $65 million and because plaintiffs lacked good faith; and (3) the conveyance resulted in HSHC's insolvency, leaving the IRS unpaid.  We thus find the Dillon trusts liable as transferees under New York law and I.R.C. § 6901.

## AMOUNT OF RECOVERY

The IRS issued a statutory notice of deficiency to HSHC for the 2003 tax year in the amount of $25,617,887.  It also assessed a gross valuation misstatement penalty under I.R.C. § 6662(h) of $10,247,155, along with statutory interest.  Having recovered nothing from HSHC, it seeks to impose that entire amount against plaintiffs.  Plaintiffs argue that, even if the government establishes that they were transferees of Haber under state law, that they are not liable for 100% of the taxes, interest, and penalties which Haber left unpaid.  In this regard they point to the final provision of § 278 of the NYUFCA:

> *§ 278 Rights of creditors whose claims have matured.*
>
> 2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

49

**Appx49**

It is true that liability under §§ 273 or 276 can potentially attach without regard to the intent of the transferees.  There may be fraud due to the fact of insolvency and the lack of good faith of the transferor.  In that circumstance, the good faith of the transferee can eliminate or limit liability under § 278(1) and (2).

Plaintiffs go further, however, and contend that there is a distinction between the "constructive" fraud which triggers § 273 and the words of § 278, which refers to "actual fraudulent intent."  In other words, even if the court has found that plaintiffs are transferees by collapsing the transactions due to constructive fraud on their part, they contend that, if they did not engage in "actual fraudulent intent," the most for which they can be liable is the difference between what they gave, $91 million in stock, less $26 million in tax liability, i.e., $65.8 million, and what they received, namely, $86.33 million.  Thus their liability would be capped at $21 million.  As a separate point, plaintiffs argue that if the court finds, pursuant to § 278(2), that the plaintiffs acted without "actual fraudulent intent," then the penalties applied against HSHC cannot be asserted against plaintiffs, irrespective of the cap.

Defendant argues that the cap has no application.  That, having collapsed the transactions here, the court necessarily has found constructive fraud on the part of the plaintiffs, and therefore we cannot also find that plaintiffs acted without actual fraudulent intent.

The statute is unclear on whether the constructive fraud assumed under § 273 and actual fraudulent intent under § 278(2) are different from each other.  Some of the cases cited by defendant suggest that a lack of "good faith" implies "actual fraudulent intent."  *See In re Allou Distribs., Inc.*, 446 B.R. 32, 69 (Bankr. E.D.N.Y. 2011); *In re Foxmeyer Corp.*, 286 B.R. 546, 581 (Bankr. D. Del. 2002).  We note as well that the Second Circuit seems to have addressed the question directly, albeit without citation, in *Ruderman v. United States,* 355 F.2d 995, 998 (2d Cir. 1966): "[A]ctual fraud is not limited to fraudulent conveyances which fall within the definitions of § 276 . . . but may include transfers which are denoted as 'constructively fraudulent' and which fall, for example within § 273 . . . ."

If *Ruderman* controls, then the government is correct.  The court having found constructive fraud, plaintiffs cannot rely on § 278(2).  Even if it took less evidence to find constructive fraud than to show actual fraudulent intent, however, the relevant evidence is obviously similar.  What is clear, in any event, is that even if such a defense is available to plaintiffs here, they bear the burden of proof in establishing that they acted without actual fraudulent intent.  *See In re Jacobs*, 394 B.R. 646, 659 (Bankr. E.D.N.Y.

50

**Appx50**

2008) (an innocent purchaser must affirmatively show good faith under § 278(2)).

As explained in *In re Jacobs*, "actual fraudulent intent is rarely susceptible to direct evidence and may be inferred from the circumstances surrounding the transaction." *Id.* The "badges of fraud" pointed to there include inadequate consideration, the financial condition (solvency) of the party sought to be charged (HSHC in this case), or a pattern or series of transactions after the debt is incurred suggestive of fraud. *Id.*; *see also DeWest Realty Corp. v. IRS*, 418 F. Supp. 1274, 1279 (S.D.N.Y. 1976); *Buckrey v. Comm'r*, 2017 WL 2964716, at *14–15 (U.S. Tax Ct. 2017). Admittedly these indicia are most telling here in proving that HSHC intended to commit fraud, but we cannot ignore them, and indeed have not ignored them, in determining plaintiffs' level of culpability. They had every reason to know they were receiving too much consideration, and they knew or should have known that HSHC would be insolvent after the Stock Sale. We have also found that plaintiffs did virtually no due diligence about HSHC, despite warning signs that Haber might be a tax shelter promoter, and that HSHC was created solely for the transaction and had no real way to absorb the built in tax liabilities. The principals of plaintiffs and their advisors were well acquainted with tax law, as well as the burden of the built-in gains, and were clearly looking for a way to minimize the impact of those gains. Their principal adviser, Bambino, declined to give a tax opinion about the bona fides of the transaction. In the face of this negative evidence, the "affirmative" evidence plaintiffs point to of their lack of fraudulent intent is minimal. The impressive family history of public service and the use of an auction for example do nothing to diminish the negative import of the other indicia. We cannot find that plaintiffs have carried their burden to prove a lack of actual fraudulent intent.

In short, the $26 million "cap" does not exist. Nor are the plaintiffs immune from liability for penalties and interest. The amount HSHC owed and whether that amount can be collected from a transferee under § 6901 is subject to federal law. *See Tricarichi v. Comm'r*, 908 F.3d 588, 593 (9th Cir. 2018) (I.R.C. determines the amount of creditor's underlying claim); *Buckrey*, 2017 WL 2964716 at *19–20; *Kreps v. Comm'r*, 42 T.C. 660, 670 (U.S. Tax Ct. 1964). It is clear that if the assets received by the transferee exceed the total tax liability of the transferor, as they do here, then all the pre-notice interest and penalties owed by HSHC can be asserted against plaintiffs. *Tricarichi*, 908 F.3d at 591; *Buckrey*, 2017 WL 2964716 at *19–20.

Finally, plaintiffs contend that under the doctrine of equitable

51

**Appx51**

recoupment, they are entitled to a $4.2 million credit against any liability for having overpaid on their capital gains tax on the Stock Sale. The theory is that if the stock was actually worth $21 million less than HSHC paid for it, then plaintiffs should only have received $65 million, and by reporting income of $86 million they paid $4.2 million too much in tax. We decline to accept that argument because it is too late. It appears nowhere in the complaint or pretrial materials and so therefore was not tried. Collapsing the Stock Sale to determine whether there was fraud does no violence to the logistics of the tax filings. Unraveling the plaintiffs' tax returns would, however. That would involve amended tax returns and would have triggered other potential calculation questions. The government was not on notice of the potential adjustment and it is fundamentally unfair to ask the court to make the adjustments on the fly after trial.

CONCLUSION

The court has determined that the Stock Sale and subsequent asset sales should be viewed contemporaneously and that therefore the government has demonstrated under New York law that plaintiffs were transferees of HSHC and therefore liable pursuant to § 6901 for HSHC's unpaid taxes, penalties, and interest. Other than arguments previously disposed of, plaintiffs have made no assertion that they overpaid the amounts HSHC left owing, and the government has not filed a counterclaim seeking to assert claims for any additional unpaid amounts. Accordingly, judgment is entered on behalf of the United States and plaintiffs' complaint will be dismissed. The clerk is directed to enter judgment accordingly in this docket and the consolidated dockets: Nos. 17-1898T, 17-2022T, 17-2023T. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

# In the United States Court of Federal Claims

## Nos. 17-1898 T, 17-2022 T and 17-2023 T
### (consolidated)
### Filed: October 31, 2023

DILLON TRUST COMPANY,
LLC, et al.
      **Plaintiffs**

       **v.**                                      **JUDGMENT**

   **THE UNITED STATES**
      **Defendant**

Pursuant to the court's Opinion, filed October 31, 2023,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered on behalf of the defendant, and plaintiffs' complaints are dismissed.  No costs.

                                    Lisa L. Reyes
                                    Clerk of Court

                  By:    s/ Debra L. Samler

                                    Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

**Appx53**

# In the United States Court of Federal Claims

No. 17-1898T, 17-2022T, 17-2023T
(Decided: November 10, 2022)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DILLON TRUST COMPANY LLC, et al.,

                       *Plaintiffs,*

v.

THE UNITED STATES,

                       *Defendant.*

|  |
|---|
| Keywords: federal income tax; I.R.C. § 6603 deposits; underpayment interest; interest on deposits; jurisdiction; illegal exaction |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Lawrence M. Hill,* Steptoe & Johnson LLP, Washington, DC, with whom were *Richard A. Nessler*, *Steven R. Dixon*, *Caitlin R. Tharp*, for plaintiffs.

*Joseph A. Sergi*, Attorney of Record, United States Department of Justice, Tax Division, Court of Federal Claims Section, Washington, DC, with whom were *David A. Hubbert*, Deputy Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, *Dara B. Oliphant*, Assistant Chief, Civil Trial Section – Central, *Margaret E. Sheer*, Trial Attorney, *Jeffrey N. Nunez*, Trial Attorney, *Ryan O. McMonagle*, Trial Attorney, *Emily K. Miller*, Trial Attorney, for defendant.

OPINION

BRUGGINK, *Judge.*

    This is a consolidated case of actions brought by Dillon Trust Company LLC, as trustee for three Dillon family trusts ("Trust 709204," "Trust 709210," and "Trust 8545").[1] Plaintiffs seek in these actions a refund of the taxes, penalties, and interest

---

[1] Plaintiffs are three of the nine original Dillon family trusts ("Original Trusts") against which the IRS asserted transferee liabilities under I.R.C. § 6901 (2018). The other six Original Trusts were terminated by 2012 and assets distributed to

1

**Appx54**

that the Internal Revenue Service ("IRS") collected pursuant to its determination that plaintiffs were liable under I.R.C. § 6901 (2018) as transferees of Humboldt Shelby Holding Corporation ("HSHC").[2]

Plaintiffs raise several arguments in these consolidated refund suits. Most importantly, plaintiffs assert that they are entitled to a refund of all taxes, penalties, and interest paid because they are not liable as transferees under § 6901. Even if they were liable as transferees, however, plaintiffs contend they are still entitled to certain refunds. Specifically, plaintiffs argue that their transferee liabilities cannot include HSHC's gross valuation misstatement penalty, because they lacked knowledge of HSHC's plan to carry out the tax shelter scheme that formed the basis of the I.R.C. § 6662 penalty. Plaintiffs also argue that underpayment interest on HSHC's tax deficiency should not have accrued beyond May 8, 2015, the date when the IRS posted plaintiffs' I.R.C. § 6603 deposits. (As will be discussed below, § 6603(b) provides for the suspension of underpayment interest from the date a deposit is made, "to the extent such deposit is used by the Secretary to pay tax.")  It is this last interest-related claim which is the subject of defendant's pending dispositive motion.

With trial set for January 2023, defendant has moved for partial dismissal for lack of subjection matter jurisdiction, or in the alternative, for partial summary judgment,[3] solely with respect to plaintiffs' interest-related claim. For this claim, plaintiffs argue that § 6603 bars the continued running of underpayment interest when taxpayers make deposits and later request that the IRS use those deposits for

---

Successor Trusts. The parties agree that the liabilities of the terminated Original Trusts and their Successor Trusts will be determined as if they were also parties to this action. Appendix to Plaintiffs' Response ("App") 315. The Original and Successor Trusts together will be referred to as the Dillon Family Trusts.

[2] Plaintiffs filed separate complaints in December 2017, and defendant answered each in March 2018. The three cases were consolidated in August 2018.

[3] Although defendant has moved for partial dismissal under both RCFC 12(b)(1) and 12(b)(6), a 12(b)(6) motion for failure to state a claim is inappropriate when the court is presented with matters outside the pleading and the court has not excluded them. *See* RCFC 12(d) ("If, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56."). Because plaintiffs have presented matters outside the pleadings, we consider this motion to be for partial dismissal for lack of subject matter jurisdiction, or in the alternative, for partial summary judgment.

2

**Appx55**

tax payments. Plaintiffs thus seek a refund of the underpayment interest that they paid for the period *after* they made their § 6603 deposits, alleging that IRS's collection of interest violated § 6603. Defendant, however, seeks dismissal of this claim on the ground that the United States has not waived sovereign immunity for the relief plaintiffs seek. Defendant further argues that plaintiffs are not entitled to a refund as a matter of law, because the IRS returned their deposits without using them as payments for tax and § 6603 mandates suspension of interest only when the IRS uses a deposit for tax payment.

Defendant filed its motion on October 6, 2022, and plaintiffs filed their response on October 21, 2022. Oral argument was heard on November 2, 2022. For the foregoing reasons, we DENY the motion for partial dismissal for lack of subject matter jurisdiction and GRANT the motion for partial summary judgment.

BACKGROUND[4]

### I.      Notice of Potential Transferee Liabilities and Making of § 6603 Deposits

By the end of August 2014, HSHC was subject to a federal income tax deficiency of $25,617,887 and a gross valuation misstatement penalty of $10,247,155, plus interest, which remained unpaid.[5] Stip. ¶ 89. In letters dated November 20, 2014, the IRS notified each of the nine original Dillon family trusts ("Original Trusts") that they might be held liable as transferees under § 6901 for HSHC's unpaid liabilities. Appendix to Plaintiffs' Response ("App") 1-86. Acting on behalf of all Dillon Family Trusts, Dillon Trust Company informed the IRS that six of the Original Trusts had terminated and provided a list of Successor Trusts that

---

[4] The facts are taken as alleged from the following: (1) plaintiffs' complaints ("Compl. 709204," "Compl. 709210," "Compl. 8545"); (2) the complaint filed in *Dillon Tr. Co. LLC v. Koskinen*, No. 1:17-CV-01571 (D. Colo. June 27, 2017) ("Mand. Compl."); (3) the parties' stipulation of facts ("Stip."); (4) plaintiffs' pretrial memorandum of fact and law ("Mem."); (5) the appendix to plaintiffs' response to the pending motion ("App.").

[5] The IRS first issued a statutory notice of deficiency to HSHC on August 14, 2007, having determined the deficiency and penalty as stated for the tax year ending on November 30, 2003. A Tax Court proceeding followed in which HSHC contested its liability, and the Tax Court upheld the Commissioner's decision. *See Humboldt Shelby Holding Corp., v. Comm'r*, T.C. Memo, 2014-47 (2014), *aff'd, Humboldt Shelby Holding Corp. & Subsidiaries v. Comm'r*, 606 Fed. Appx. 20 (2d Cir. 2015).

3

**Appx56**

would be liable for any assessments made against the terminated trusts. *See* App. 95.

On May 4, 2015, while the IRS examination was still ongoing, Dillon Trust Company sent the IRS a single check for $71,741,583.28, which was marked as a "deposit." *See* App. 98. The letter enclosed with the check reiterated that the check is "designated a deposit and is not intended as a payment of tax." *Id*. at 95 The stated purpose in "enclosing a deposit as provided under IRC Section 6603 and Rev. Proc. 2005-18" was to "stop the accrual of interest" on HSHC's underlying liabilities in the event that the Original Trusts were held liable as transferees. *Id*.

Given the Successor Trusts' assumption of liabilities for the terminated Original Trusts, Dillon Trust Company intended the $71.7 million to be posted as separate deposits for thirty different taxpayer accounts (two Original and twenty-eight Successor Trusts) to cover each of their potential liabilities. The same letter dated May 4, 2015, therefore instructed the IRS to distribute the $71.7 million according to an attached allocation schedule. App. 95, 97. According to the deposition testimony of IRS Agent Timothy Stern, however, the $71.7 million in deposit was ultimately "posted to the general ledger account and not the [individual] taxpayer's account [for each trust]" on May 8, 2015. *See id*. at 324; Compl. 709204 ¶ 82.

## II.     Requesting Use of § 6603 Deposits as Payments for Transferee Liabilities

On October 25, 2016, the IRS issued statutory notices of liability to each Original Trust, whereby each trust was assessed with a portion of HSHC's income tax deficiency, penalty, and underpayment interest that was still running. *See* App. 157-160. For terminated trusts, notices were issued to the Original Trust rather than its Successor Trusts. *See id*. HSHC's underlying liabilities totaled $68,511,826.68 by then, $32,646,784.68 of which was in interest accrued as of October 17, 2016. *Id*. at 166.

In addition to filing protests seeking a hearing with IRS Appeals, Dillon Trust Company requested on behalf of all Dillon Family Trusts that the IRS use portions of the § 6603 deposits as payments for some of the assessed liabilities. *See id*. at 207. Relying on the allocation schedule previously provided to the IRS, Dillon Trust Company requested in writing on January 20, 2017, that: (1) $19,707,494 be paid for Trust 8454, taken from four Successor Trusts' deposits; (2) $248,655 be paid for Trust 709204, taken from a Successor Trust's deposit as well as its own; (3) $249,655 be paid for Trust 709210, taken from a Successor Trust's deposit as well as its own. *Id*. at 208. The letter also clarified that the "remaining amount of the Dillon deposit, $52,168,338 should remain as a deposit." *Id*. at 209.

4

**Appx57**

The IRS, however, had not applied any of the deposits as payments for the Original Trusts' liabilities by March 2017. *See* App. 211. Upon Dillon Trust Company's query, IRS Agent Timothy Stern addressed the discrepancies between the trusts that owed the liabilities and the trusts making the deposits, and explained orally that "the Service's procedures do not authorize a person to direct the Service to apply a deposit to pay another person's liability." *See id.* at 218. He also advised Dillon Trust Company to make a request in writing for the return of the deposits so that plaintiffs could make payments with the returned money. *See id.*; Mand. Compl. ¶ 31.

### III.   Requesting Return of § 6603 Deposits

On March 16, 2017, Dillon Trust Company requested in writing that the IRS return $19,770,229.68 of deposits, which represented the sum of just four Successor Trusts' deposits. App. 218. Dillon Trust Company also filed an IRS Form 911 on April 6, 2017, seeking the assistance of the Taxpayer Advocate for the immediate return of those deposits and stay of any collection action. Mand. Compl. ¶ 35; *see also* App. 245.

By the end of May 2017, the IRS had not returned the requested deposits. It notified plaintiffs on May 29, 2017, however, that deposits for Trust 709204 and Trust 709210 had been applied as payments for their respective liabilities as of May 13, 2017—but no other deposits were applied as payments. *See* Compl. 709204 ¶ 63; Compl. 709210 ¶ 60; App. 245. Despite its letter on January 20, 2017, that had requested such use of the deposits for payments, Dillon Trust Company considered the IRS's use as "erroneous[]" at this time, because the 911 form it filed "should have stayed all collection action." App. 245; *see also* Mand. Compl. ¶ 38. Faced with the "threat of collections actions," Pls' Resp. 8, Dillon Trust Company filed a mandamus action against the IRS on June 27, 2017, seeking the return of the four Successor Trusts' deposits it had already requested. Mand. Compl. ¶ 11.

On July 31, 2017, the mandamus action was voluntarily dismissed without prejudice after the IRS agreed to return the deposits. Four days later, on August 4, 2017, the IRS returned the requested $19.8 million in deposits. *See* App. 279. Then, on August 28, 2017, Dillon Trust Company requested in writing that the IRS return the remaining deposits of $51,536,779.28.[6] *Id.* The IRS returned the remaining deposits on October 6, 2017, in addition to paying $1,056,892.98 in interest. *See*

---

[6] Plaintiffs' calculations of the remaining deposits did not include the two deposits of $217,287.16 that the IRS had already used as payments for Trust 709204 and 709210. *See* App. 280.

**Appx58**

Pls' Resp. 9; Mem. 39.

### IV. Payment of Transferee Liabilities, Including Underpayment Interest

Once the requested deposits were returned, Dillon Trust Company paid in full for transferee liabilities assessed against the Original Trusts. Over $18 million was paid on August 9, 2017, and over $ 61 million was paid on October 13, 2017, with an additional $4 million paid later. *See* App. 263, 292, 294.

Because the IRS did not stop underpayment interest on HSHC's underlying liabilities as of May 8, 2015, the date plaintiffs' § 6603 deposits were posted, plaintiffs allege that they paid $11,306,496 in interest that they did not owe. *See* Mem. 40. Allowing for the interest the IRS paid on the returned deposits, plaintiffs now seek the difference between the $11 million of excess interest they paid and the $1 million of statutory deposit interest they received. Pls' Resp. 14.

### DISCUSSION

### A. Partial Dismissal for Lack of Subject Matter Jurisdiction

Defendant argues that plaintiffs' interest claim must be dismissed under RCFC 12(b)(1) because this court's jurisdiction depends wholly upon the extent to which the United States has waived its sovereign immunity to suit, and no such waiver exists here. Defendant cites *Schortmann v. United States*, 82 Fed. Cl. 1 (2008) and argues that while "I.R.C. § 6611 waives the United States' sovereign immunity to authorize the allowance of interest on tax overpayments," § 6611 does not "authorize[], let alone mandate[], the conversion of a deposit into a payment at the taxpayer's request." Mot. To Dismiss 7.

Plaintiffs respond that this court has subject matter jurisdiction because I.R.C. § 7422 waives sovereign immunity for tax refund suits. *See* I.R.C. § 7422(a) (requiring a claim of refund to be filed with the Secretary before instituting a suit in any court "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . or any sum alleged to have been excessive or in any manner wrongfully collected"); I.R.C. § 6601(e)(1) (providing that any reference to "tax" under the I.R.C. "shall be deemed also to refer to interest imposed by this section on such tax"). Plaintiffs further cite 28 U.S.C. § 1491 (2018) as granting this court jurisdiction over "any claim against the United States founded either upon . . . any Act of Congress."

It is well-established that courts lack subject matter jurisdiction in suits against the federal government unless the United States has waived sovereign

6

immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976) ("United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.") (internal quotations omitted). The "no-interest" rule addressed in *Schortmann* is a specific assertion of sovereign immunity, which recognizes that the United States is immune from suits that seek an interest award as part of damages unless there is express congressional authorization. *Schortmann*, 82 Fed. Cl. at 5. The no-interest rule does not apply here, however, because seeking interest on overpayment—as was the case in *Schortmann*—is not the same as alleging that interest charged by the government was improper. *See, e.g., Libr. of Cong. v. Shaw,* 478 U.S. 310, 314 (1986) (explaining that the "requirement of a separate waiver [for an interest award] reflects the historical view that interest is an element of damages separate from damages on the substantive claim"); *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1125 (Fed. Cir. 2004) ("We hold that the Oil Companies have not demonstrated a waiver of sovereign immunity for post-judgment interest on final judgments against the United States . . . .").

The inapplicability of the no-interest rule, however, does not remove other hurdles to subject matter jurisdiction. For this court, which derives its jurisdiction from the Tucker Act, these hurdles principally involve whether there is a source of law outside the Tucker Act that creates the right to payment from the federal government. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) ("[T]he absence of a money-mandating source [is] fatal to the court's jurisdiction under the Tucker Act."). A separate source of law is necessary because although the Tucker Act waives sovereign immunity, it does not create any substantive right enforceable against the United States for monetary relief. *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009); *see* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ."). Our subject matter jurisdiction therefore turns on how "other sources of law (e.g. statutes or contracts)" provide the substantive basis for the monetary relief that parties seek. *See Navajo Nation*, 556 U.S. at 290.

Where that other source of law is not a contract with the government, two types of claims fall within the jurisdictional provision of the Tucker Act: a claim for illegal exaction or a claim under a money-mandating statute. *See Boeing Co. v. United States*, 968 F.3d 1371, 1382 (Fed. Cir. 2020). The distinction between the two lies not only in the necessary facts but also the underlying legal theory, to the extent that they are considered "flip side[s]" of each other. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1579 (Fed. Cir. 1996) (Nies, J., concurring).

In an illegal exaction claim, the plaintiff has already "paid money over to the

**Appx60**

Government, directly or in effect" and seeks the "return of all or part of that sum." *Eastport S.S. Corp., v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)); *see also Testan*, 424 U.S. at 400 (endorsing the *Eastport S.S. Corp.* formulation of different Tucker Act claims). The plaintiff alleges, in other words, that "the value sued for was improperly paid, exacted or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport,* 372 F.2d at 1007. In a money-mandating statute claim, on the other hand, "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury" because "the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Id*.

For subject matter jurisdiction to exist over a money-mandating statute claim, the statute that is relied upon must be amenable to "fair interpretation" as mandating compensation by the federal government. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). It was thus long assumed that an illegal exaction claimant must also "demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)) (internal quotations omitted). The Federal Circuit has clarified in *Boeing Company*, however, that the "money-mandating" jurisdictional requirement does not apply to illegal exaction claims, because such a requirement would erase the distinction between the two types of claims.  *Boeing Co.*, 968 F.3d at 1384 ("The [*Norman*] court's statement thus was not addressing an illegal exaction of the sort Boeing alleges . . . . Boeing's claim falls under the *Eastport S.S.* category for which the 'money-mandating' standard need not be met."). Thus, for subject matter jurisdiction to exist over an illegal exaction claim, all that is required is that "a party that has paid money over to the government and seeks its return . . . make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation." *Id*. at 1383.

The non-frivolous allegation standard is a relatively low standard. The illegal exaction claim need only "exceed a threshold that has been equated with such concepts as essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit." *Boeing Co.*, 968 F.3d at 1383 (quoting *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015)) (internal quotations omitted). Moreover, adverbs such as "wholly" and "obviously" in this context are "no mere throwaways" and have "cogent legal significance." *Shapiro*, 577 U.S. 39 at 46. Nor does this inquiry require the court to determine whether the complaint states "a nonfrivolous claim *on the merits*." *See Jan's Helicopter Serv., Inc., v. Fed. Aviation Admin*., 525 F.3d 1299, 1309 (Fed. Cir. 2008) (emphasis added); *see Aerolineas Argentinas*, 77 F.3d at 1574 (explaining that plaintiffs' failure to "establish that the exaction was

8

**Appx61**

contrary to law" does not "deprive the court of jurisdiction" because such a finding is an "adjudication on the merits").

As a threshold matter, plaintiffs' claim here is better characterized as an illegal exaction claim than a money-mandating statute claim. An illegal exaction claim presupposes an exaction, which exists in this case. The IRS has already collected underpayment interest from plaintiffs for the period at issue. Neither does the possibility of reading the refund suit provision of the I.R.C. as a money-mandating statute change the essential nature of plaintiffs' claim that the exaction was illegal.[7] Indeed, because I.R.C. § 7422(a) contemplates refund suits only for tax alleged to have been "erroneously or illegally assessed or collected," § 7422 operates more like a procedural statute that allows refund suits when plaintiffs can establish erroneous or illegal collection under another provision of law. In other words, refund suits such as the plaintiffs' necessarily require establishing illegal exaction.

Taking the allegations stated in the complaint as true, *see Aerolineas* 77 F.3d at 1572, we hold that plaintiffs have met the threshold for making a non-frivolous allegation of an illegal exaction claim. Here, plaintiffs allege that over $71 million of deposits were posted on May 8, 2015, that the IRS held them until their two-part return in August and October 2017, and that the IRS violated § 6603 by failing to suspend underpayment interest as of the date the deposits were posted, so that plaintiffs paid over $11 million in interest that they did not owe.

Such allegations are not "essentially fictitious," "wholly insubstantial," "obviously frivolous," and "obviously without merit." We therefore have subject matter jurisdiction over plaintiffs' claim, and we deny defendant's motion to dismiss.

## B. Partial Summary Judgment

Defendant moves in the alternative for partial summary judgment, arguing that the material facts are undisputed and that plaintiffs are not entitled to a refund of their interest payment as a matter of law. Defendant maintains that § 6603 mandates interest suspension only when the IRS uses a deposit for payment of tax and that plaintiffs cannot benefit from such a suspension without retroactive treatment of their deposits as having been applied as tax payments—a power that defendant argues this court lacks.

---

[7] Nonetheless, because I.R.C. § 7422 may fairly be read as a money-mandating statute, this court would have subject matter jurisdiction under the Tucker Act even if we were to treat plaintiffs' claim as a money-mandating statute claim rather than an illegal exaction claim.

**Appx62**

Plaintiffs respond that defendant, first of all, mischaracterizes their claim as requiring retroactive treatment of deposits as payments of tax. What they seek, rather, is a determination that the IRS improperly collected interest while the deposit was in its possession. To complete their argument, plaintiffs further contend that the IRS refused without legal grounds to use the deposits for tax payment. Although plaintiffs' response points out many facts not included in defendant's statement of the undisputed material facts, defendant asserts that any dispute is over the characterization of the facts or their materiality, rather than the facts in themselves. Because materiality refers to whether a fact "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), we turn to the governing law to determine which facts are material and whether defendant is entitled to judgment as a matter of law under the undisputed material facts. *See* RCFC 56(a).

To begin, the issue here is not whether this court may retroactively treat a deposit the IRS returned as having been used for a payment of tax. Rather, the proper question is whether the IRS violated the law by exacting underpayment interest when it was forbidden from doing so. Without a finding of illegality on the part of the IRS, plaintiffs cannot succeed on the merits of their illegal exaction claim. *See Aerolineas*, 77 F.3d at 1574 (explaining that an adjudication on the merits for an illegal exaction claim requires considering "whether the authorization on which the [agency] relies was misinterpreted, misapplied, or invalid"); I.R.C. § 7422(a) (referring to civil actions for refunds where taxes were "illegally assessed or collected" or any sum was "in any manner wrongfully collected"); *Illegal*, BLACK'S LAW DICTIONARY (11th ed., 2019) (defining "illegal" as "[f]orbidden by law"). We thus address each provision of law that might establish the necessary illegality.

As a general matter, the IRS has the statutory authority to collect underpayment interest under I.R.C. § 6601(a). *See* I.R.C. § 6601(a) (mandating underpayment interest "[i]f any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment"). The rate of interest is established by § 6621, and such interest must be paid from the last date prescribed for the payment of tax to the date actually paid. I.R.C. § 6601(a).

The IRS, however, may not collect underpayment interest in circumstances described under I.R.C. § 6603, which has several relevant subsections. First, §6603(a) permits a taxpayer to make a "cash deposit" with the IRS for any tax that has "not been assessed at the time of the deposit." Once a taxpayer makes a deposit as authorized by § 6603(a), underpayment interest is effectively suspended from the date of the deposit "to the extent such deposit is used by the Secretary to pay tax." § 6603(b) (providing that "the tax shall be treated as paid when the deposit is made"). To the extent the IRS does *not* use a deposit as a tax payment, § 6603(c)

10

**Appx63**

requires the IRS to return any amount of the deposit that the taxpayer requests in writing. § 6603(c) ("Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing."); *see also* Rev. Proc. 2005-18 § 6.91 ("A deposit made pursuant to section 6603 is not subject to a claim for credit or refund as an overpayment until the deposit is applied by the Service as payment of an assessed tax of the taxpayer. A taxpayer may request the return of all or part of a deposit at any time before the Service has used the deposit for payment of a tax.").

Certain logical conclusions follow from the plain language of these statutory provisions. First, a deposit is *not* a tax payment until and unless the IRS uses the deposit for a payment—these provisions would make no sense if a deposit was in fact the functional equivalent of a tax payment, regardless of whether the IRS used it for such a purpose. Plaintiffs' argument that they "cannot have been delinquent for the period of time that they had $71 million in Cash Deposits with the IRS against a $68 million liability," Pls' Resp. 16, is thus untenable. Second, if the IRS does not use any portion of a deposit to pay tax, no interest-suspension benefit is triggered under § 6603(b). Indeed, § 6603(b) makes clear that it is only "[t]o the extent such deposit is used by the Secretary to pay tax" that underpayment interest must be suspended. A taxpayer therefore has no statutory entitlement to a suspension of underpayment interest if the IRS does not actually use a deposit for a payment of tax.

Third, § 6603 does not require the use of deposits as tax payments, whether as a result of the IRS making an assessment or a taxpayer requesting the deposit to be used. Whereas other subsections of § 6603 mandate a certain outcome through the use of "shall," § 6603(a) is pointedly permissive: "A taxpayer *may* make a cash deposit with the Secretary which *may* be used by the Secretary to pay any tax imposed under subtitle A or B or chapter 41, 42, 43, or 44 which has not been assessed at the time of the deposit." (emphasis added). The decision to use a deposit for a payment of tax is thus subject to IRS discretion, and the statute does not limit such discretion with conditions or exceptions. There is, for instance, no provision comparable to §6603(c) that requires the IRS to use a deposit as a tax payment upon the taxpayer's request in writing.

At best, Revenue Procedure 2005-18 § 4.02 provides for § 6603 deposits to be "posted to the taxpayer's account as payment of tax upon the expiration of the 90 or 150-day period" after a taxpayer has received a notice of deficiency. This procedure, however, cannot establish illegality on the part of the IRS for not using the deposits as payments of tax in this case. Above all, IRS revenue procedures do not "confer substantive rights on taxpayers." *Giambrone v. Comm'r*, T.C. Memo. 2020-145, *9 (2020); *see also Fed. Nat'l Mortg. Ass'n v. United States*, 379 F.3d

11

**Appx64**

1303, 1308 (Fed. Cir. 2004) (holding that the Revenue Procedure at issue was "of the nature of an enforcement guideline—not a legislative-like interpretation—and thus ineligible for *Chevron* treatment"); *Est. of Shapiro v. Comm'r*, 111 F.3d 1010, 1017 (2d Cir. 1997) ("[T]he failure to comply with [a] Revenue [Procedure] . . . is not dispositive, as IRS procedures are mere guidelines without force of law.") (internal quotations omitted).

Even if IRS procedures could confer substantive rights, this procedure does not in any event contemplate a taxpayer's request as obligating the IRS to use a deposit for tax payment. In fact, it provides only for a taxpayer's ability to request that a deposit continue to be a deposit: the application of deposits as payments is *automatic* at the end of the 90 or 150-day period "unless the taxpayer . . . requests in writing before the expiration of that period that the deposit continue to be treated as a deposit . . . ." Rev. Proc. 2005-18 § 4.02. As for IRS's failure to automatically apply the Successor Trusts' deposits to the Original Trusts' liabilities in this case, the IRS explained to Dillon Trust Company that it could only use the deposits as tax payments when the taxpayer who owes the liability made the deposit. *See* I.R.S. Off. of Chief Couns. Mem. 20171801F (May 5, 2017) ("While a person making a deposit may direct the Service to use the deposit as payment of other of his liabilities, Rev. Proc. 2005-18 does not authorize a person to direct the Service to apply a deposit to pay another person's liability."). The IRS did not, at any rate, violate a provision of law that mandated the use of plaintiffs' deposits for tax payments.

Plaintiffs find fault with the IRS, nonetheless, for the inevitable discrepancies in this case between the taxpayers who made the deposits and the taxpayers who owed the liabilities. Plaintiffs assert that if the IRS had issued the statutory notices of liabilities to the Successor Trusts instead of the terminated Original Trusts, there would have been no administrative impediment to applying the deposits as payments. Pls' Resp. 6. They characterize the failure to do so as the "first mistake" the IRS made, once again citing internal guidance that directs the IRS to issue notices of deficiency for a terminated entity to the entity's successor in interest. *Id.* at 4; *see also* I.R.S. Field Serv. Advisory 200036022, 2000 WL 33119638. Plaintiffs then argue that this "first mistake" led directly to the IRS's "second mistake" of refusing to use the deposits as tax payments. Pls' Resp. 6.

Such an argument involving a series of "mistakes" fails to show, however, that the IRS violated the law in collecting underpayment interest—especially since the Field Service Advisory plaintiffs rely on states that it is "not to be cited as precedent." *See also Chai v. Comm'r*, 851 F.3d 190, 220 (2d Cir. 2017) ("Of course, the IRS's internal guidance is neither legally binding nor entitled to more deference than its persuasive value."); *United States v. Mead Corp.*, 533 U.S. 218, 234 (holding that Customs classification rulings made without notice-and-comment procedures are comparable to "interpretations contained in policy statements,

**Appx65**

agency manuals, and enforcement guidelines" that lack "force of law"). If anything, plaintiffs' argument effectively morphs into a claim for the abatement of interest attributable to unreasonable errors and delays by the IRS, a claim over which this court lacks subject matter jurisdiction. *See* I.R.C. § 6404(e); *Hinck v. United States*, 550 U.S. 501, 503 (2007) (holding that the Tax Court provides the exclusive forum for judicial review of a failure to abate interest under § 6404(e)(1)).

Even so, plaintiffs find it unacceptable that the IRS could be vested with discretion "so broad as to allow [it] to reap a windfall from its own bureaucratic incompetence or intransigence or both." Pls' Resp. 17. Yet Congress can and does sometimes vest agencies with discretion so broad that some agency decisions are considered "committed to discretion by law" and not even judicially reviewable. 5 U.S.C. § 701(a)(2) (2018). Where judicial review is not available, courts may *not* set aside the discretionary decisions as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)*; Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019). Although plaintiffs do not bring their claim here under the Administrative Procedure Act ("APA"),[8] case law involving "discretion by law" under § 701(a)(2) is instructive for showing the kind of statutory language necessary to limit agency discretion.

To be sure, courts interpret "agency discretion by law" narrowly, "restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce*, 139 S. Ct. at 2568 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 370 (2018)) (internal quotations omitted). For instance, the use of the word "may" is not sufficient to commit an agency's decision to discretion by law. *See Weyerhaeuser Co.*, 139 S. Ct. at 371; *In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021) ("But permissive language, alone, does not render a question committed to agency discretion under 5 U.S.C. § 701(a)(2)."). If a statute—whether in the same subsection or in others—sets forth relevant factors to guide the agency in the exercise of its discretion, the agency's discretion is limited even if permissive language is used. *See In re Vivint*, 14 F.4th at 1351 (rejecting agency discretion by law where the relevant statute provides that the agency "may take into account whether . . . the same or substantially the same prior art or arguments previously were presented"); *Weyerhaeuser Co.*, 139 S. Ct. at 371 (rejecting agency discretion by law because the Endangered Species Act requires the Secretary to "consider the economic and other impacts of designation when making his [discretionary] exclusion decisions"). Here, however, § 6603 does not set forth any factors that constrain IRS discretion on whether to use a taxpayer's

---

[8] We therefore need not consider whether the IRS's decision is even judicially reviewable.

deposit for payment of tax.[9]

The same is true of IRS discretion in the time it takes to return a deposit upon the taxpayer's request. At oral argument, plaintiffs contended that it was unlawful for the IRS to collect interest while it delayed the return of the deposits they requested. *See* Oral Arg. Tr. 26. According to plaintiffs, if the IRS has returned the deposits immediately when the request was made in March 2017, they could have paid their liabilities earlier and thus stopped interest sooner than August 2017. *See id*. Even if we were to assume that chain of event, however, this court could not find the IRS "delay" of five months to have violated the law. Although § 6603(c) makes it nondiscretionary for the IRS to return any deposit when a taxpayer makes a request in writing before the deposit is used for tax payment, it does not prescribe a timeline for the IRS in returning the deposits. For instance, § 6603(c) does not enumerate the number of days or months in which the IRS must return the deposits, nor does it use time-sensitive phrases such as "immediately" or "within a reasonable time." *See* § 6603(c) ("Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing."). This court therefore could not determine when the IRS should have returned the deposits under the law—in thirty days, sixty days, or ninety days?—such that any delay past that point would make the collection of underpayment interest illegal.

Against this backdrop, no provision of law allows for a finding of illegality necessary to support plaintiffs' illegal exaction claim.[10] For the IRS collection of underpayment interest here to have violated the law, one of two things must have been true: either the I.R.C. mandates applying a deposit as a tax payment when the taxpayer makes such a request (thus triggering interest suspension under § 6603(b)), or the I.R.C. requires suspension of interest when a § 6603 deposit is made, *even if the Secretary does not use the deposit for a payment of tax*. The plain language of the I.R.C. does not allow for either result.

---

[9] Plaintiffs also cite no Treasury Regulation that limits IRS discretion in this regard.

[10] The record leaves unclear whether the IRS suspended underpayment interest to the extent it applied the two separate deposits of $217,287.16 as payments for Trust 709204 and 709210's liabilities in May 2017. Because these deposits were used for tax payments, the IRS would have violated § 6603(b) if it did not suspend interest for such amounts from the date the deposits were made. The overwhelming majority of plaintiffs' deposits were not applied as payments, however, and where those deposits are concerned, we hold that the IRS collection of interest for the period at issue did not violate the law.

We thus hold that defendant is entitled to judgment as a matter of law because, under the undisputed material facts, the IRS's collection of interest for the period at issue did not violate the law.

<u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for partial dismissal for lack of subject matter jurisdiction is DENIED while the motion for partial summary judgment is GRANTED.

<u>s/Eric G. Bruggink</u>
Eric G. Bruggink
Senior Judge

**Appx68**

# In the United States Court of Federal Claims

No. 17-1898T, 17-2022T, 17-2023T
(Decided: February 9, 2023)

* * * * * * * * * * * * * * * * * * * * * * * *

DILLON TRUST COMPANY LLC, et al.,

                      *Plaintiffs*,

v.

THE UNITED STATES,

                      *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * *

Keywords: I.R.C. § 6603; Revenue Procedure 2005-18; RCFC 54(b); Motion for reconsideration; Illegal exaction; Abuse of discretion

*Lawrence M. Hill,* Steptoe & Johnson LLP, Washington, DC, with whom were *Richard A. Nessler*, *Steven R. Dixon*, *Caitlin R. Tharp*, for plaintiffs.

*Joseph A. Sergi*, Attorney of Record, United States Department of Justice, Tax Division, Court of Federal Claims Section, Washington, DC, with whom were *David A. Hubbert*, Deputy Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, *Dara B. Oliphant*, Assistant Chief, Civil Trial Section – Central, *Margaret E. Sheer*, Trial Attorney, *Jeffrey N. Nuñez*, Trial Attorney, *Ryan O. McMonagle*, Trial Attorney, *Emily K. Miller*, Trial Attorney, for defendant.

OPINION

BRUGGINK, *Judge*.

The undisputed facts are as follows.[1] In late 2014, the Internal Revenue Service ("IRS") notified nine original Dillon family trusts

---

[1] The facts set out here are a streamlined version of the statement of facts in our previous order (ECF No. 118), which we had taken as alleged in the

1

("Original Trusts") that they might be held liable as transferees under I.R.C. § 6901 (2018) for Humboldt Shelby Holding Corporation's deficiency for the tax year that ended on November 30, 2003. After receiving the notices addressed to each Original Trust, plaintiffs informed the IRS that six Original Trusts terminated between 2007 and 2012 and distributed their assets to a number of successor trusts ("Successor Trusts"); plaintiffs also informed the IRS that another Original Trust distributed its assets to its Successor Trusts even though it did not terminate.[2] Every one of these trusts had a different Employer Identification Numbers ("EIN"), which is the number the IRS assigns business entities for taxpayer identification.

In May 2015, plaintiffs sent the IRS a single check for $71.7 million and requested that the sum be allocated as thirty separate deposits for two Original and twenty-eight Successor Trusts. Plaintiffs made the deposits in anticipation of possible future assessments—no liabilities had yet been assessed. In October 2016, the IRS issued notices of liability to each of the nine Original Trusts. As for the Successor Trusts, the IRS issued only pre-assessment letters in October 2016; it was not until October 2018 that the IRS issued notices of liability to the Successor Trusts.

In January 2017, plaintiffs requested in writing that the IRS use $20.2 million of prior deposits to pay the respective liabilities assessed against Trust 8545 ($19.7 million), Trust 709204 ($248,655), and Trust 709210 ($248,655). Specifically, plaintiffs directed the IRS to pay those amounts by

---

following: (1) plaintiffs' complaints in the pending refund suits; (2) the complaint filed in *Dillon Tr. Co. LLC v. Koskinen*, No. 1:17-CV-01571 (D. Colo. June 27, 2017); (3) the parties' stipulation of facts; (4) plaintiffs' pretrial memorandum of fact and law; (5) the appendix to plaintiffs' opposition to defendant's partial motion to dismiss for lack of subject matter jurisdiction or partial summary judgment. As stated in the order, defendant asserted that any dispute was "over the characterization of the facts or their materiality, rather than the facts in themselves." Order at 10. Many of the facts set out here are now included in the parties' updated stipulation of facts. *See* ECF No. 126, 143.

[2] Dillon Trust Company has brought these consolidated refund suits as trustee for Trust 709204, Trust 709210, and Trust 8545, which are three Original Trusts that have not terminated. For ease of reading, we refer to "plaintiffs" when plaintiffs' counsel was acting on behalf of all Dillon family trusts, not just plaintiffs. The parties agree that the liabilities of the terminated Original Trusts and their Successor Trusts will be determined as if they were also parties to these refund suits.

2

**Appx70**

using the deposits that they had previously asked the IRS to allocate to Trust 709204, Trust 709210, and four Successor Trusts. The same letter to the IRS also stated that "[t]he remaining amount of the Dillon deposit, $52,168,388 should remain as a deposit."

IRS Agent Timothy Stern informed plaintiffs on March 6, 2017, however, that the Successor Trusts would need to submit a written request to the IRS and ask for the return of the deposits in order to make a tax payment for the Original Trusts. In doing so, Agent Stern relied on an IRS advice memorandum, which states that Revenue Procedure 2005-18 "does not authorize a person to direct the Service to apply a deposit to pay another person's liability." I.R.S. Off. of Chief Couns. Mem. 20171801F at 1 (decided Feb. 27, 2017, released May 5, 2017) ("CCM"). Although the IRS refused to use the Successor Trusts' deposits for payment of the Original Trusts' liabilities, it used the deposits that plaintiffs had asked to be allocated to Trust 709204 and Trust 709210—both Original Trusts—to pay for those same trusts' liabilities on May 29, 2017.

Per Agent Stern's instructions, plaintiffs wrote a letter to the IRS on March 16, 2017, requesting the return of the deposits that they had previously asked the IRS to allocate to four Successor Trusts. The request was followed by a mandamus action filed on June 27, 2017, which was voluntarily dismissed on July 31, 2017. Plaintiffs received those deposits as requested, with interest,[3] in August 2017. Plaintiffs then requested the return of the remaining $51.5 million in deposits and received them with interest in October 2017. Once the IRS returned the deposits, plaintiffs paid the Original Trusts' liabilities in full, including underpayment interest accrued during the period when the IRS held plaintiffs' deposits. (In the case of terminated Original Trusts, a Successor Trust made the tax payment on behalf of an Original Trust.)

In the pending refund suits, plaintiffs have made a separate claim regarding interest payment: namely, that they did not owe underpayment interest during the period when the IRS held their deposits.[4] In October 2022, defendant moved to dismiss that claim for lack of subject matter jurisdiction,

---

[3] The rate of interest for a returned deposit is lower than the rate of interest for an underpayment. *See* I.R.C. §§ 6603(d)(4), 6621.

[4] This amount of interest is a part of the refund sought in plaintiffs' other claim in these suits: namely, that they are entitled to a refund of *all* taxes, penalties, and interest paid because they are not liable as transferees under §6901.

or in the alternative, for partial summary judgment. Defendant argued that I.R.C. § 6603 mandates underpayment interest suspension only when the IRS uses a deposit for a payment of tax and that interest cannot be suspended for plaintiffs without retroactive treatment of their deposits as having been used for tax payments—a power that defendant argued this court lacks because sovereign immunity has not been waived in that respect.

We denied defendant's motion for partial dismissal, holding that plaintiffs have made a non-frivolous allegation of an illegal exaction claim, which is a type of claim over which this court has subject matter jurisdiction under the Tucker Act. We granted defendant's motion for partial summary judgment, however, because "under the undisputed material facts, the IRS's collection of interest for the period at issue did not violate the law." Order at 15. Plaintiffs then moved for reconsideration of our order granting partial summary judgment. Specifically, plaintiffs argue that reconsideration is appropriate because the court "(1) appears to have misunderstood that Plaintiffs *were* arguing that the IRS exceeded its discretion and then (2) made an erroneous decision beyond the scope of the parties' briefing by holding that the IRS has unfettered, unreviewable discretion to refuse to use a deposit to pay a tax." Pls.' Mot. for Recons. at 3.[5]

A motion for reconsideration is "not an invitation for litigants to treat interlocutory decisions as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *E&I Glob. Energy Servs., Inc. v. United States*, 152 Fed. Cl. 524, 533 (2021); *see also L-3 Commc'n Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 49 (2011) ("A motion

[5] For reference, plaintiffs advanced three arguments in their opposition to defendant's motion for partial summary judgment ("Pls.' Opp'n to Def.'s Mot."). First, they argued that they did not owe underpayment interest because they "did not have underpayments for the period the IRS held the cash deposits." Pls.' Opp'n to Def.'s Mot. at 15. Second, they argued that a "parade of IRS mistakes" (identified as Mistake #1 through 4 in the statement of facts) allowed the IRS to reap a $10 million windfall, and that whatever discretion the IRS may have under § 6603 "surely cannot be so broad as to allow the IRS to reap a windfall from its own bureaucratic incompetence or intransigence or both." *Id*. at 17. Finally, they argued that "there is no legal ground for the IRS's refusal to convert the cash deposits to tax payments," challenging the CCM the IRS relied on as "not entitled to any deference" and containing "specious reasoning by IRS counsel." *Id*. at 17-18. We understood then and still understand now that plaintiffs' second and third arguments challenge the IRS's exercise of discretion under § 6603.

for reconsideration is not intended . . . to give an unhappy litigant an additional chance to sway the court.") (internal citation and quotation marks omitted). Reconsideration of an interlocutory order under RCFC 54(b) is available as "justice requires," a determination left to the "wide discretion" of the court. *E&I Glob. Energy Servs.*, 152 Fed. Cl. at 533 (contrasting the standard under RCFC 54(b) against the "heightened standards" of RCFC 59(a)). Where legal conclusions are concerned, justice does not require a different outcome if the "issues are well-settled and the decisions well-reasoned." *See id.* at 536 (holding that there were "no compelling reasons" to revisit the court's legal conclusions).

Justice does not require a different outcome in this instance. In our previous order, we construed plaintiffs' assertion to be that interest collection was illegal because the IRS should have used the deposits that plaintiffs had allocated to the Successor Trusts to pay the Original Trusts' liabilities, in which case interest would have been suspended under § 6603 as of May 2015. To the extent the IRS's refusal to do so arose from a series of "mistakes," we held that this court does not have subject matter jurisdiction to review a claim for the abatement of interest attributable to unreasonable errors and delays by the IRS. *See* Order at 13; *Hinck v. United States*, 550 U.S. 501, 503 (2007) (holding that the Tax Court provides the exclusive forum for judicial review of a failure to abate interest under § 6404(e)(1)). Otherwise, we held that the necessary predicate for plaintiffs' illegal exaction claim was not met because the IRS's refusal to use the Successor Trusts' deposits did not violate relevant provisions of law.

As we have explained, the plain language of § 6603 makes clear that: (1) a deposit is not a tax payment until and unless the IRS uses the deposit to pay a tax;[6] (2) a taxpayer has no statutory entitlement to interest suspension if the IRS does not actually use a deposit for a payment of tax; (3) the decision to use a deposit for a payment of tax is subject to IRS discretion.[7] Even if the

---

[6] Not only is the distinction between deposits and payments clear on the face of § 6603, but legislative history also confirms that "[a] deposit is not a payment of tax prior to the time the deposited amount is used to pay a tax." H.R. Rep. No. 108-548, pt. 1, at 312. As such, the Tax Court's holding with regard to the designation of *payments* in *Dixon v. Comm'r* does not apply to this case. *See* 141 T.C. 173, 195 (2013) (holding that the IRS's failure to honor a corporation's designation of delinquent tax payments as payments for its employees' income tax liabilities was an abuse of discretion).

[7] Contrary to plaintiffs' assertion, our previous order did not hold that the absence of statutory constraints on the IRS's discretion made its actions

"undisputed purpose of § 6603 is to enable taxpayers to avoid interest liability," Pls.' Mot. for Recons. at 8, Congress pointedly left room for the IRS to *not* to use a deposit as a payment of tax by using the word "may" instead of "shall." *See* § 6603(a) ("A taxpayer may make a cash deposit with the Secretary which *may* be used by the Secretary to pay any tax . . . .") (emphasis added). Whereas § 6603(c) provides that "the Secretary shall return to the taxpayer any amount of the deposit . . . which the taxpayer requests in writing," there is no comparable requirement mandating the use of a deposit, either generally or in cases where the taxpayer makes such a request in writing. It is thus beyond doubt that the IRS's use of a deposit for tax payment is discretionary, not mandatory, under § 6603.

How the IRS has chosen to exercise that discretion is reflected in Rev. Proc. 2005-18, which provides in part that

> Upon completion of an examination . . . the Service will mail a notice of deficiency and the taxpayer will have a right to petition the Tax Court. The portion of the deposit that is not greater than the determined deficiency plus any interest . . . will be posted to the taxpayer's account as a payment of tax upon the expiration of the 90 or 150-day period during which assessment is stayed, unless the taxpayer files a petition with the Tax Court and requests in writing . . . that the deposit continue to be treated as a deposit during the applicable Tax Court proceeding. § 4.02(2).

The procedure, in short, does not contemplate a taxpayer's request as triggering the IRS's duty to use a deposit as a tax payment in the first place. A taxpayer's request is effective only for *preventing* the IRS's use of a deposit or for directing the IRS to apply *excess* deposits to another tax liability. *See* §4.02(3). The IRS's application of a deposit toward payment of

---

unreviewable. We expressly noted that plaintiffs do not bring their claim under the APA; nevertheless, we examined the case law under the APA because it was "instructive for showing the kind of statutory language necessary to limit agency discretion," and pointed out the absence of comparable language in § 6603. *See* Order at 13. The absence of statutory factors guiding the IRS's exercise of discretion (factors that also guide any review of the agency's actions) was relevant because an illegal exaction claim requires a showing that "the valued sued for was improperly paid, exacted or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *See id*. at 8 (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967). As it was, we found no provision of law that the IRS's exercise of discretion contravened.

an assessed liability is otherwise automatic—provided that the taxpayer that made the deposit is the same taxpayer that has been assessed the liability. Although Rev. Proc. 2005-18 does not explicitly say so, the CCM on which Agent Stern relied states that the procedure "does not authorize a person to direct the Service to apply a deposit to pay another person's liability." CCM at 1.

In the light of this statutory and regulatory framework, we held that "no provision of law allows for a finding of illegality necessary to support plaintiffs' illegal exaction claim," so that defendant was entitled to judgment as a matter of law. *See* Order at 14-15. There is, simply put, no provision of law that required the IRS to use the Successor Trusts' deposits to pay for the liabilities of the Original Trusts—whether because plaintiffs requested it or because the deposits should have been automatically applied. Had the IRS issued notices of liability to the Successor Trusts, not the Original Trusts, in October 2016, the result would have been different. Rev. Proc. 2005-18 would then have required the IRS to apply the Successor Trusts' deposits toward payment of the Successor Trusts' liabilities at the end of the period during which assessment had been stayed, unless those Trusts requested otherwise. But those are not the facts here.[8]

Nor was it an abuse of discretion for the IRS to refuse to use the Successor Trusts' deposits for payment of the Original Trusts' liabilities. *See Onan Corp. v. United States*, 19 Cl. Ct. 678, 681 (1990) (holding that the plaintiff stated no claim for an abuse of discretion because the announced procedure that the IRS failed to observe was "not adopted to further any existing right of taxpayers"). Rather, the agency's decision was based on a reasonable interpretation of Rev. Proc. 2005-18, as offered in the CCM. *See Am. Exp. Co. v. United States*, 47 Fed. Cl. 127, 136 (2000) (holding that the Commissioner's decision was not an abuse of discretion because there is "no evidence that the Commissioner ignored the Revenue Procedure, . . . [or] that he made an unreasonable determination"). Much as plaintiffs may disagree with the reasoning or the result, the CCM supports its position with an

---

[8] As for the IRS's failure to issue the notices of liability to the Successor Trusts in the first place, we held that such a failure did not violate the law because the Field Service Advisory that plaintiffs rely on specifically states that it is "not to be cited as precedent." *See* Order at 12. At best, it was a "mistake" as plaintiffs had described, for which a claim for the abatement of interest attributable to unreasonable errors and delays by the IRS may be available—but which this court lacks subject matter jurisdiction to review. *See id.* at 13.

7

**Appx75**

examination of the structure, purpose, and language of Rev. Proc. 2005-18.[9] Specifically, it points to § 4.02(3) and § 6.01 as presupposing that any deposit to be applied as a payment must have been made by the same taxpayer that has been assessed the liability. *See* CCM at 4. In the administration of taxes, including the use of deposits for tax payments, the question of which taxpayer has actually been assessed the liability at issue is not an unreasonable factor for the IRS to consider.

The significance of assessments in the context of deposits is underscored by plaintiffs' own explanation of the purpose and structure of §6603: "[I]f no tax is assessed against the taxpayer, there is no tax against which the IRS can apply the deposit." Pls.' Mot. for Recons. at 14. Nevertheless, plaintiffs view the identity of the assessed taxpayer as irrelevant, citing *United States v. Williams*, 514 U.S. 527, 535 (1995) (holding that I.R.C. § 1346(1) authorizes a refund suit by a party who was not assessed a tax but paid it under protest to remove a federal tax lien on her property). Specifically, they argue that the Successor Trusts were "plainly 'subject to' the tax that they sought to pay with the deposit, since they ultimately had to pay that tax (with interest) as alleged transferees." Pls.' Mot. for Recons. at 21. Being "subject to" the tax owed by the Original Trusts, plaintiffs assert that the Successor Trusts should have had the ability to make deposits to pay the Original Trusts' liabilities.

Plaintiffs' reliance on *Williams* in this regard is misplaced. In finding standing for the respondent's refund suit, the Court did not render the identities of assessed parties irrelevant in the general administration of taxes. Rather, the Court rejected the government's argument that only the assessed

---

[9] Although plaintiffs previously argued that the CCM was not entitled to any deference, citing *AMP Inc. & Consol. Subsidiaries v. United States*, 185 F.3d 1333, 1339 (Fed. Cir. 1999), the case is distinguishable. In *AMP Inc. & Consol. Subsidiaries* the court held that the revenue ruling was not entitled to deference because it was "self-serving" in light of the plaintiffs' refund claims that were pending when the ruling was issued and "inconsistent" with other regulations and pronouncements by the IRS. *Id*. Here, the CCM was not "self-serving" since there was no litigating position for the IRS to prepare vis-à-vis a pending claim: when issuing the CCM in February 2017, the IRS did not know that plaintiffs would file refund suits in December 2017 that included a separate claim for interest based on § 6603. The IRS also offered a position that was consistent with its pronouncements to date in relation to § 6603. *See* CCM at 5 ("More concerning is that the guidance issued to date to administer [§ 6603] does not authorize one depositor designating its deposit to be applied to another taxpayer's liability.").

8

**Appx76**

party may exhaust administrative remedies—a prerequisite for refund suits set forth in I.R.C § 7422—on narrower grounds. *See* 514 U.S. at 534-35. First, the Court reasoned that "[t]o read the term 'taxpayer' as implicitly limiting administrative relief to the party assessed is inconsistent with other provisions of the refund scheme, which expressly contemplate refunds to parties other than the one assessed." *See id*. at 534 (pointing out statutory language such as "the person who made the overpayment" and "the person who paid the tax"). Second, the Court reasoned that the respondent was a "taxpayer" qualified for administrative remedies, because "[i]n placing a lien on her home and then accepting her tax payment under protest, the Government surely subjected Williams to a tax, even though she was not the assessed party." *Id*. at 535 (citing the I.R.C. § 7701(a)(14) definition of a "taxpayer" as "any person subject to any internal revenue tax").

The Court's reasoning in *Williams* does not apply to this case to make the IRS's refusal to use the Successor Trusts' deposits either unlawful or an abuse of discretion. Most importantly, both legal and factual circumstances that underpinned the Court's analysis in *Williams* are missing. The statutory scheme for deposits does not expressly contemplate the IRS's use of deposits when the deposit was made by someone other than the assessed party, and plaintiffs have not alleged that the IRS "subjected" the Successor Trusts to the Original Trusts' tax liabilities by placing a lien on the Successor Trusts' property.[10] And as the Court took care to stress, the holding of *Williams* is narrow. *See id*. at 540 ("We do not decide the circumstances, if any, under which a party who volunteers to pay a tax assessed against someone else may seek a refund under § 1346(a)."). *Williams* certainly does not stand for the proposition that the IRS may never take into account which taxpayer was actually assessed when exercising discretion authorized by a statute.

We do not find a compelling reason to revise our holding that under the undisputed material facts, the IRS's collection of interest for the period at issue did not violate the law. Nor do we find that the IRS abused its discretion by refusing to use the Successor Trusts' deposits for payment of the Original Trusts' liabilities.

Because justice does not require a different outcome, plaintiffs' motion for reconsideration is DENIED.

---

[10] Although plaintiffs have alleged the "threat of collection actions" as necessitating their mandamus action, *see* Order at 5, they have not alleged that the IRS filed any liens on the Successor Trusts' property.

9

**Appx77**

<u>s/Eric G. Bruggink</u>
Eric G. Bruggink
Senior Judge

10

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1314

**Short Case Caption:** Dillon Trust Company LLC v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔] the filing has been prepared using a proportionally-spaced typeface and includes __13,999__ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/03/2024

Signature: /s/ Lawrence M. Hill

Name: /s/ Lawrence M. Hill