# No. 24-1314

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

---

**DILLON TRUST COMPANY LLC,**
**as trustee for Trusts 709204, 709210, and 8545,**

**Plaintiff-Appellant**

v.

**UNITED STATES,**

**Defendant-Appellee**

---

### ON APPEAL FROM THE JUDGMENT OF THE
### UNITED STATES COURT OF FEDERAL CLAIMS
### Nos. 1:17-cv-01898, 1:17-cv-02022, and 1:17-cv-02023;
### JUDGE ERIC G. BRUGGINK

---

### BRIEF FOR THE APPELLEE

---

DAVID A. HUBBERT
*Deputy Assistant Attorney General*

FRANCESCA UGOLINI   (202) 514-3361
JACOB EARL CHRISTENSEN  (202) 307-0878
GEOFFREY J. KLIMAS   (202) 307-6346
 *Attorneys*
 *Tax Division*
 *Department of Justice*
 *Post Office Box 502*
 *Washington, D.C. 20044*

July 1, 2024

# TABLE OF CONTENTS

**Page**

Table of contents.............................................................................................i

Table of authorities ......................................................................................iv

Glossary ........................................................................................................x

Statement of related cases ...........................................................................xi

Introduction ..................................................................................................1

Statement of the issues ................................................................................2

Statement of the case ...................................................................................3

    A.    The "intermediary" or "Midco" tax shelter.............................3

    B.    Proceedings in the CFC .........................................................5

Summary of argument ..................................................................................7

Argument:

    The CFC's determination regarding the existence and extent of the Trusts' transferee liability is correct and should be affirmed.........................................................................................9

        Standard of review .............................................................9

    A.    The CFC did not clearly err in finding the transactions at issue constituted a fraudulent conveyance under New York law...............................................................................10

        1.    Introduction............................................................10

            a.    Transferee liability under I.R.C. § 6901.............10

            b.    New York Uniform Fraudulent Conveyance Act...................................................11

2. The CFC properly determined that there was a "conveyance" ................................................................11

    a. New York law permits related transactions to be collapsed for purposes of determining that a fraudulent conveyance occurred ..............12

    b. The CFC's findings fully support its determination to collapse the transactions at issue ................................................................14

    c. The Trusts' contrary arguments lack merit .......23

        i. The CFC did not need to make additional factual findings ........................24

        ii. The CFC properly determined that HSHC's bid should have prompted further investigation ..................................29

        iii. The CFC faithfully applied *Diebold* and other caselaw ............................................35

B. The CFC did not clearly err in rejecting the Trusts' NYUFCA § 278(2) defense ....................................................40

  1. The Trusts had the burden of proof ............................41

  2. The Trusts did not even try to prove that they were "purchasers" ..........................................................45

  3. The Trusts did not prove that they acted "without actual fraudulent intent" ............................................46

C. The CFC did not clearly err in finding that the Government's claim included penalties ................................51

D. The CFC correctly held that the Trusts were not entitled to a refund of underpayment interest ...................................58

Conclusion.......................................................................................72
Statutory Addendum .......................................................................73
Certificate of compliance .................................................................82

**Cases:**                                                    **Page(s)**

*In re Allou Distributors, Inc.,*
        446 B.R. 32 (Bankr. E.D.N.Y. 2011)..............................42, 47
*Alterman v. Commissioner,*
        T.C. Memo. 2015-231 ...........................................26, 33-35
*BASR Partnership v. United States,*
        795 F.3d 1338 (Fed. Cir. 2015) .........................................43-44
*Baxter Healthcare Corp. v. Spectramed, Inc.,*
        49 F.3d 1575 (Fed. Cir. 1995) .............................................58
*Berlenbach v. Bischoff,*
        244 N.Y.S. 369 (Sup. Ct. Kings Cty. 1930) ..........................42
*Billy F. Hawk, GST Non-Exempt Marital*
        *Trust v. Commissioner,*
        924 F.3d 821 (6th Cir. 2019).....................................3, 21, 31
*Breest v. Haggis,*
        115 N.Y.S.3d 322 (App. Div., 1st Dept. 2019)......................45
*In re Cambridge Capital, LLC,*
        331 B.R. 47 (Bankr. E.D.N.Y. 2005)...................................39
*Chase Manhattan Bank v. Oppenheimer,*
        440 N.Y.S.2d 829 (Sup. Ct. Nassau Cty. 1981)....................39
*Citibank, N.A. v. Brigade Capital Mgmt.,*
        49 F.4th 42 (2d Cir. 2022)...............................................39-40
*In re CNB Int'l, Inc.,*
        440 B.R. 31 (W.D.N.Y. 2010) ...............................41-42, 46, 49
*Commissioner v. Stern,*
        357 U.S. 39 (1958) .......................................................10, 44
*Cullifer v. Commissioner,*
        651 F. App'x 847 (11th Cir. 2016).......................................71
*Daewoo Eng'g and Constr. Co., Ltd. v. United States,*
        557 F.3d 1332 (Fed. Cir. 2009) .............................................9
*Dandridge v. Williams,*
        397 U.S. 471 (1970) ...........................................................46
*Delaune v. United States,*
        143 F.3d 995 (5th Cir. 1998)...............................................67

**Cases (cont'd):**                                                               **Page(s)**

*Dep't of Commerce v. New York,*
588 U.S. 752 (2019) ...................................................................65

*Dick v. New York Life Ins. Co.,*
359 U.S. 437 (1959) ...................................................................44

*Diebold Found., Inc. v. Commissioner,*
736 F.3d 172 (2d Cir. 2013) ..................4, 12-13, 25, 27, 35-38

*Dillon Trust Co. LLC v. Koskinen,*
No. 1:17-cv-1571 (D. Colo.)......................................................62

*Diversified Group, Inc. v. Daugerdas,*
139 F. Supp. 2d 445 (S.D.N.Y. 2001).......................................19

*Dixon v. Commissioner,*
141 T.C. 173 (2013) ...................................................................69

*In re Dreier LLP,*
462 B.R. 474 (S.D.N.Y. Bankr. 2011) ...............................41-42

*Eisenberg v. Commissioner,*
155 F.3d 50 (2d Cir. 1998) ...................................................17-18

*Emmi v. Patane,*
220 N.Y.S. 495 (Sup. Ct. Onondaga Cty. 1927) ....................42

*Energy East Corp. v. United States,*
645 F.3d 1358 (Fed. Cir. 2011) ..........................................59, 70

*Facebook, Inc. v. Windy City Innovations, LLC,*
973 F.3d 1321 (Fed. Cir. 2020) ...............................................69

*Feldman v. Commissioner,*
779 F.3d 448 (7th Cir. 2015) ...............................................4, 53

*In re Foxmeyer Corp.,*
286 B.R. 546 (Bankr. D. Del. 2002) ..................................42, 47

*Frank Sawyer Trust of May 1992 v. Commissioner,*
712 F.3d 597 (1st Cir. 2013) ............................................4, 38-39

*HBE Leasing Corp. v. Frank,*
48 F.3d 623 (2d Cir. 1995) ...............................12-16, 25, 28

*Helvering v. Gowran,*
302 U.S. 238 (1937) ...................................................................46

*Helvering v. Mitchell,*
303 U.S. 391 (1938) ...................................................................55

*Hickok v. Cowperthwait,*
119 N.Y.S. 390 (App. Div., 2d Dept. 1909)............................42

**Cases (cont'd):**                                                  **Page(s)**

*Hinck v. United States,*
 550 U.S. 501 (2007) ............................................................67
*Humboldt Shelby Holding Corp. v. Commissioner,*
 T.C. Memo. 2014-47, *aff'd,*
 606 F. App'x 20 (2d Cir. 2015) ..............................................5
*In re Jacobs,*
 394 B.R. 646 (Bankr. E.D.N.Y. 2008)..............................42, 47
*Julia R. Swords Trust v. Commissioner,*
 142 T.C. 317 (2014) .........................................................33-34
*Kitt v. United States,*
 277 F.3d 1330 (Fed. Cir. 2002) ...........................................55
*Knopf v. Phillips,*
 2017 WL 6561163 (S.D.N.Y. Dec. 22, 2017),
 *vacated on other grounds,*
 802 F. App'x 639 (2d Cir. 2020) ......................................41-42
*Kreps v. Commissioner,*
 42 T.C. 660 (1964), *aff'd,*
 351 F.2d 1 (2d Cir. 1965) ..........................................52-53, 55
*Loftin & Woodward, Inc. v. United States,*
 577 F.2d 1206 (5th Cir. 1978) .............................................55
*Marine Midland Bank v. Murkoff,*
 508 N.Y.S.2d 17 (N.Y. App. Div. 1986) ...........................52-53
*McGraw v. Commissioner,*
 384 F.3d 965 (8th Cir. 2004) ..............................................53
*Nicely v. United States,*
 23 F.4th 1364 (Fed. Cir. 2022)............................................45
*Old Colony Trust Co. v. Commissioner,*
 279 U.S. 716 (1929) ...........................................................70
*In re Palmero,*
 2011 WL 3874866 (S.D.N.Y. Sept. 2, 2011), *aff'd,*
 546 F. App'x. 38 (2d Cir. 2014) ...........................................48
*Polselli v. Internal Revenue Serv.,*
 598 U.S. 432 (2023) ......................................................46, 55
*Premier Office Complex of Parma, LLC v. United States,*
 916 F.3d 1006 (Fed. Cir. 2019) .............................................9

**Cases (cont'd):** **Page(s)**

*Principal Life Ins. Co. and Subs. v. United States,*
95 Fed. Cl. 786 (2010) ...............................................59, 64, 66

*Ruderman v. United States,*
355 F.2d 995 (2d Cir. 1966) .................................................51

*S. Indus., Inc. v. Jeremias,*
411 N.Y.S.2d 945 (App. Div., 2d Dept. 1978)........................39

*Salus Mundi Found. v. Commissioner,*
776 F.3d 1010 (9th Cir. 2014) ...............................................4

*Schmitt v. Morgan,*
471 N.Y.S.2d 365 (1983) ...............................................14, 27

*Schussel v. Werfel,*
758 F.3d 82 (1st Cir. 2014) ...........................................52, 56

*Schweiker v. Hogan,*
457 U.S. 569 (1982) ..............................................................46

*Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc.,*
234 B.R. 293 (Bankr. S.D.N.Y. 1999) .............................51, 58

*Sharp Int'l Corp. v. State Street Bank and Trust
Co. (In re: Sharp Int'l Corp.),*
403 F.3d 43 (2d Cir. 2005) ...................................................47

*Shockley v. Commissioner,*
872 F.3d 1235 (11th Cir. 2017) .....................................4, 52-53

*Slone v. Commissioner,*
896 F.3d 1083 (9th Cir. 2018) ................................................4

*Slone v. Commissioner,*
T.C. Memo. 2022-6 ................................................................56

*Stanko v. Commissioner,*
209 F.3d 1082 (8th Cir. 2000)......................................17, 56-57

*Starnes v. Commissioner,*
680 F.3d 417 (4th Cir. 2012).............................................26, 38

*In re Tops Holding II Corp.,*
646 B.R. 617 (Bankr. S.D.N.Y. 2022) .............................47, 49

*Tricarichi v. Commissioner ("Tricarichi I"),*
908 F.3d 588 (9th Cir. 2018) .........................................3, 52-53

*Tricarichi v. Commissioner ("Tricarichi II"),*
T.C. Memo. 2015-201,
*aff'd,* 752 F. App'x. 455 (9th Cir. 2018) .....................25-26, 56

**Cases (cont'd):**                                                   **Page(s)**

*In re Tuller's, Inc.*,
    480 F.2d 49 (2d Cir. 1973) ..................................................45

*United States v. Diversified Group, Inc.*,
    2002 WL 31947904 (S.D.N.Y. Nov. 25, 2002) ......................19

*United States v. Mazzeo*,
    306 F. Supp. 2d 294 (E.D.N.Y. 2004),
    *vacated as moot*, 2004 WL 3079366
    (E.D.N.Y. Oct. 20, 2004)..............................................42, 58

*United States v. Orozco-Prada*,
    636 F. Supp. 1537 (S.D.N.Y. 1986), *aff'd*,
    847 F.2d 836 (2d Cir. 1988) ......................................13, 25, 40

*United States v. Sarubin*,
    507 F.3d 811 (4th Cir. 2007)...............................................55

*United States v. Watts*,
    786 F.3d 152 (2d Cir. 2015) ...............................................54

*United States v. Williams*,
    514 U.S. 527 (1995) ......................................................67, 69

**Statutes:**

Internal Revenue Code (26 U.S.C.):

    § 384 ...............................................................................31
    § 6404(e)..........................................................................67
    § 6404(h)(1)..................................................................67-68
    § 6501(c)(1) .....................................................................43
    § 6532(a) .........................................................................66
    § 6601(a) .........................................................................59
    § 6603........................................3, 60, 62-64, 68, 70, 72
    § 6603(a) .....................................................................60-61
    § 6603(b) ...............................................................60, 63, 72
    § 6603(c).................................................................60, 62, 64
    § 6603(d) .........................................................................63
    § 6603(d)(1) ....................................................................60
    § 6621(a)(2) ....................................................................60

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 6621(b) ........................................................................60, 63
§ 6901.......................................................1, 2, 6-7, 10
§ 6901(a)(1)(A) ................................................................ 10
§ 7454(a) ..................................................................43-45

New York Uniform Fraudulent Conveyance Act,
N.Y. Debt. & Cred. L. §§ 270-281:

§ 270 ......................................................................45, 54
§ 273 ........................................................2, 6-7, 11, 50-51, 54
§ 276 ..........................................................50-51, 54, 57-58
§ 278(1) ................................................................. 42, 46
§ 278(1)(a) ............................................................. 40, 52
§ 278(1)(b) ............................................................. 40, 52
§ 278(2) ................................................................8, 40-46
§ 281 ...........................................................................57

**Miscellaneous:**

H.R. Rep. 108-548, part 1 (2004) .............................................60, 68

https://www.vocabulary.com/dictionary/purchaser
(last visited June 27, 2024)...................................................... 45

Rev. Proc. 2005-18, 2005-1 C.B. 798
(Mar. 28, 2005) ..............................................59-61, 64-66, 68

Rev. Proc. 84-58, 1984-2 C.B. 501 (Aug. 13, 1984)....................59-60

S. Rep. 70-960 (1928)................................................................45

## GLOSSARY

| Abbreviation | Definition |
|---|---|
| CFC | U.S. Court of Federal Claims |
| DGI | Diversified Group Incorporated |
| HSHC | Humboldt Shelby Holding Company |
| Humboldt | Humboldt Corporation |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| NYUFCA | New York Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. L. §§ 270-281 |
| Shelby | Shelby Corporation |

## STATEMENT OF RELATED CASES

No prior appeal from this action has been before this Court or any other appellate court. Counsel for the United States are not aware of any cases that will directly affect, or be directly affected by, this Court's decision in the instant case.

# INTRODUCTION

These consolidated tax refund cases involve a tax-avoidance scheme known as an "intermediary" or "Midco" tax shelter. The Dillon trusts owned two corporations holding appreciated assets worth over $90 million. To avoid paying federal income tax of approximately $26 million that would have been triggered from a direct sale of the assets by the corporations, the trusts instead sold their shares in the corporations to a newly-created "intermediary" entity, Humboldt Shelby Holding Company ("HSHC"), at an inflated price that did not discount for the embedded tax liability. HSHC, which had financed the purchase using the corporations' assets as collateral, immediately sold the assets to a third-party buyer and used the proceeds to pay off its loan, leaving itself and the corporations without funds to pay the substantial tax liability resulting from the sale of the assets.

Unable to collect from HSHC, the IRS assessed the taxes, penalties, and interest owed by HSHC against the Dillon trusts as transferees under I.R.C. (26 U.S.C.) § 6901. The trusts paid the liabilities and filed these refund suits in the Court of Federal Claims ("CFC"). The CFC ruled for the Government, holding that the

-1-

transaction was a fraudulent conveyance under applicable New York state law and that the Dillon trusts were liable as transferees under I.R.C. § 6901.

## STATEMENT OF THE ISSUES

1. Did the CFC clearly err in finding that the transactions at issue should be collapsed, resulting in a determination that the Dillon trusts were fraudulent transferees under the New York Uniform Fraudulent Conveyance Act?

2. In determining the amount of the Dillon trusts' transferee liability, did the CFC clearly err in finding that they failed to establish their entitlement to an affirmative defense available only to "purchaser[s] … without actual fraudulent intent"?

3. In determining the amount of the Dillon trusts' transferee liability, did the CFC clearly err in including not only the underlying tax and underpayment interest but also penalties?

4. Did the CFC correctly hold, on summary judgment, that the Dillon trusts were not entitled to a refund of underpayment interest based on deposits made on behalf of 28 successor trusts where the IRS

honored the successor trusts' request to return the deposits with interest under I.R.C. § 6603?

## STATEMENT OF THE CASE

### A.    The "intermediary" or "Midco" tax shelter

In a Midco transaction, the shareholders of a closely held corporation with appreciated assets "cash out" by selling their shares to an entity that finances the purchase price (directly or indirectly) out of the proceeds from the corporation's contemporaneous sale of its assets to a third party.  The shareholders receive a "premium" for their shares—*i.e.*, an amount that exceeds the corporation's liquidation value, taking into account the corporate income tax generated by its asset sale—that is premised on the stock purchaser's purported ability to eliminate the taxable gain on the asset sale.  But the gain elimination strategy is invariably spurious, and by the time the IRS discovers the ploy and attempts to collect the unpaid tax, the intermediary corporation is defunct.  Six other circuit courts have analyzed the abusive nature of "Midco" transactions in at least eight other cases. *Billy F. Hawk, GST Non-Exempt Marital Trust v. Commissioner*, 924 F.3d 821 (6th Cir. 2019); *Tricarichi v. Commissioner*

*("Tricarichi I")*, 908 F.3d 588 (9th Cir. 2018); *Slone v. Commissioner*, 896 F.3d 1083 (9th Cir. 2018); *Shockley v. Commissioner*, 872 F.3d 1235 (11th Cir. 2017); *Feldman v. Commissioner*, 779 F.3d 448 (7th Cir. 2015); *Salus Mundi Found. v. Commissioner*, 776 F.3d 1010 (9th Cir. 2014); *Diebold Found., Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013); *Frank Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d 597 (1st Cir. 2013).

In 2003, the Dillon trusts (hereinafter the "Trusts") held over $90 million worth of blue-chip stocks and prime farmland through two corporations, Humboldt Corporation ("Humboldt") and Shelby Corporation ("Shelby"). (Appx2.) However, the Trusts' adjusted basis in those assets (*i.e.*, their purchase price subject to certain adjustments) was only approximately $16 million. (Appx2.) Well aware that selling the assets outright would trigger a $26 million tax liability on the built-in gain, the Trusts instead sold all of their shares in Humboldt and Shelby to HSHC, a newly formed company without any current or historical operations, for $86.8 million—a price that reflected 95% of the assets' face value. (Appx2, Appx16, Appx47.)

For its part, HSHC financed virtually the entire purchase price of Humboldt and Shelby with a loan from Rabobank, using Humboldt's and Shelby's assets as collateral.  (Appx3, Appx47.)  It then liquidated those assets (to pay off the Rabobank loan) and executed an abusive Son-of-BOSS tax shelter that generated fictitious losses to offset the taxable gains.  (Appx3.)

After an audit, the IRS disallowed HSHC's fictitious losses and assessed approximately $26 million of income taxes and $10.2 million of penalties against it for the 2003 tax year (Appx3), which were sustained by the Tax Court.  *See Humboldt Shelby Holding Corp. v. Commissioner*, T.C. Memo. 2014-47, *aff'd*, 606 F. App'x 20 (2d Cir. 2015).  When HSHC was unable to pay those liabilities, the IRS made assessments against the Trusts as HSHC's transferees.  (*Id.*)  The Trusts paid the liabilities, submitted formal refund claims, and, when those claims were not resolved in their favor, initiated these refund suits.  (Appx3-4.)

## B.    Proceedings in the CFC

Following discovery, the Government moved for summary judgment on the Trusts' claim that they were entitled to use deposits

made on behalf of successor entities to forestall the accrual of underpayment interest on their liabilities.  The CFC granted the motion, holding that the Trusts had identified no source of law that required the IRS to use deposits made by one taxpayer to pay the liability of another and, in fact, any discretion the IRS might have had to so use the successors' deposits disappeared once the successors requested that the deposits be returned with interest at the federal short-term rate.  (Appx54-68.)  The Trusts filed a motion for reconsideration, which the court denied.  (Appx69-78.)

The CFC held an 11-day bench trial on the remaining issues. Following trial, the court found that there was a conveyance from HSHC to the Trusts, the conveyance rendered HSHC insolvent, and the conveyance was made without fair consideration.  (Appx24-49.)  It therefore determined the Trusts were fraudulent transferees within the scope of the New York Uniform Fraudulent Conveyance Act ("NYUFCA"), N.Y. Debt. & Cred. L. §§ 270-281, and, accordingly, were responsible for the unpaid taxes, penalties, and interest to the same extent as HSHC as transferees under I.R.C. § 6901.  (Appx49-52.)

## SUMMARY OF ARGUMENT

The CFC found after a trial that the transactions at issue constituted a fraudulent conveyance under § 273 of the New York Uniform Fraudulent Conveyance Act and that the Trusts were liable for the taxes, penalties, and interest assessed against HSHC as its transferees under I.R.C. § 6901. The CFC's fact-bound conclusions are firmly grounded in the record, and its judgment should be affirmed.

1. The Trusts concede that, if there was a conveyance from HSHC to the Trusts, that conveyance was fraudulent as to the United States and the Government is entitled to relief under the NYUFCA. However, the Trusts rely on a technical argument that, because the transactions, by design, avoid a direct conveyance from HSHC to the Trusts within the meaning of the relevant fraudulent-transfer statute, they fall outside the statute's reach. However, the CFC determined that the Trusts had constructive knowledge that the series of transactions at issue would render HSHC unable to pay its tax liabilities and that those transactions were, therefore, properly collapsed for purposes of establishing that a fraudulent conveyance occurred. The court's

-7-

determination in this regard is undergirded by detailed factual findings and should be sustained as not clearly erroneous.

2. The CFC also correctly rejected the Trusts' attempt to avail themselves of NYUFCA § 278(2), which provides a limitation on liability for transferees that establish they were "purchaser[s] … without actual fraudulent intent." Here, the Trusts did not act as "purchasers" in any of the relevant transactions, rendering the provision facially inapplicable. Furthermore, the CFC found that the presence of multiple badges of fraud prevented the Trusts from showing they acted "without actual fraudulent intent," and that finding is not clearly erroneous.

3. The CFC likewise correctly determined that the Trusts' transferee liability included not only HSHC's income tax liability for the 2003 tax year and underpayment interest that accrued thereon, but also HSHC's penalty liability for the 2003 tax year. In doing so, the court followed the majority of courts to consider the issue and treated the tax, penalty, and interest components of the relevant liability as a single "claim" that related back to the date of transfer.

4.  Separate from the merits, the CFC correctly held, based on the undisputed facts, that the Trusts could not use deposits made on behalf of different, successor entities to forestall the accrual of underpayment interest on their own liabilities, at least where, as here, the successor entities requested that the IRS return the deposits with interest and thereby deprived the IRS of discretion to use the funds for any other purpose.

## ARGUMENT

**The CFC's determination regarding the existence and extent of the Trusts' transferee liability is correct and should be affirmed**

### Standard of review

The majority of issues in this case were resolved by the CFC following trial.  This Court reviews the CFC's factual findings for clear error and its legal conclusions de novo.  *Daewoo Eng'g and Constr. Co., Ltd. v. United States*, 557 F.3d 1332, 1335 (Fed. Cir. 2009).  The CFC resolved the remaining issue on summary judgment.  This Court reviews the grant of partial summary judgment de novo.  *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019).

**A.    The CFC did not clearly err in finding the transactions at issue constituted a fraudulent conveyance under New York law**

**1.    Introduction**

**a.    Transferee liability under I.R.C. § 6901**

Section 6901 provides a procedural mechanism for the IRS to collect unpaid taxes from persons to whom a delinquent taxpayer has transferred property.  The statute provides that the liability of such transferee "at law or in equity" for the transferor's unpaid tax shall be assessed and collected in the same manner as the underlying tax. I.R.C. § 6901(a)(1)(A).  So understood, § 6901 "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes." *Commissioner v. Stern*, 357 U.S. 39, 42 (1958).  Thus, the existence and extent of the liability of a transferee under § 6901 is determined under state law—here, that of New York.

### b. New York Uniform Fraudulent Conveyance Act

New York adopted the Uniform Fraudulent Conveyance Act ("NYUFCA") in 1925.[1] *See* N.Y. Debt. & Cred. L. §§ 270-281.  As relevant here, the NYUFCA permits a creditor to establish that a conveyance is fraudulent—and therefore avail itself of the NYUFCA's remedial provisions—by establishing constructive fraud:

> **Conveyances by insolvent.**  Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

NYUFCA § 273.

### 2. The CFC properly determined that there was a "conveyance"

Here, the CFC found that (i) there was a "conveyance" from HSHC to the Trusts within the meaning of the NYUFCA, (ii) the conveyance rendered HSHC insolvent and unable to pay its substantial federal tax liability, and (iii) the conveyance was made without fair consideration. (Appx24-49.)  On appeal, the Trusts concede both HSHC's insolvency

---

[1] In 2019, New York prospectively replaced the NYUFCA with the Uniform Voidable Transactions Act.

and the absence of fair consideration; they challenge only the court's finding that there was a conveyance from HSHC to the Trusts. But the court's finding in this regard was not clearly erroneous.

### a. New York law permits related transactions to be collapsed for purposes of determining that a fraudulent conveyance occurred

For the NYUFCA to apply in this case, there must have been a "conveyance" from HSHC to the Trusts within the meaning of the statute. *See Diebold Found., Inc. v. Commissioner*, 736 F.3d 172, 186 (2d Cir. 2013). If the form of the transactions here is respected, then there was no such conveyance—as would be the case, by design, in every Midco transaction. *Id.* Thus, the threshold issue faced by the CFC was whether the transactions should be collapsed such that, under New York law, the court could deem the requisite conveyance to have occurred in substance despite the transactions' form. (Appx29.)

"'It is well established that multilateral transactions may under appropriate circumstances be collapsed and treated as phases of a single transaction for analysis under the UFCA.'" *Diebold*, 736 F.3d at 186 (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995)). To collapse multiple transactions, two elements must be met.

First—and undisputed in this case—the consideration received from the first transferee must be reconveyed for less than fair consideration or with an actual intent to defraud creditors. Second—and the focus of this appeal—the transferees against which relief is sought (here, the Trusts) "'must have actual or constructive knowledge of the entire scheme that renders [their] exchange with the debtor [here, HSHC] fraudulent.'" *Diebold*, 736 F.3d at 186 (quoting *HBE Leasing*, 48 F.3d at 635).

The "constructive knowledge" standard is satisfied if, "based upon the surrounding circumstances, [the transferees] 'should have known'" of the debtor's fraudulent scheme. *Diebold*, 736 F.3d at 187 (quoting *HBE Leasing*, 48 F.3d at 636). Constructive knowledge includes "inquiry knowledge," *i.e.*, that the transferees "'were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but … failed to make such inquiry.'" *Id.* (quoting *HBE Leasing*, 48 F.3d at 636). Some courts applying New York law have held that transferees with inquiry knowledge are charged with "the knowledge that ordinary diligence would have elicited." *Diebold*, 736 F.3d at 187 (quoting *United States v. Orozco-*

*Prada*, 636 F. Supp. 1537, 1543 (S.D.N.Y. 1986), *aff'd*, 847 F.2d 836 (2d Cir. 1988) (Table)). Other courts have applied a more stringent standard for inquiry knowledge, in which the transferees must have engaged in some form of "active avoidance of the truth." *HBE Leasing*, 48 F.3d at 636 (citing *Schmitt v. Morgan*, 471 N.Y.S.2d 365, 367 (1983)). But regardless of which standard is applied here, there is ample support for the CFC's determination that the Trusts had constructive knowledge of HSHC's scheme to leave its taxes unpaid. The court's determination that a fraudulent conveyance occurred should, therefore, be affirmed.

> **b.    The CFC's findings fully support its determination to collapse the transactions at issue**

As discussed below, the evidence adduced at trial showed that the Trusts:  (i) were sophisticated parties; (ii) were acutely aware that the appreciated assets had substantial imbedded tax liabilities; (iii) intentionally structured the transactions at issue so that the liabilities would be passed on to HSHC without being triggered; (iv) postdated a document to obscure the preplanned nature of the transactions; (v) did virtually no due diligence to ensure that HSHC had

the means to pay the embedded liabilities once they were triggered; and (vi) ignored numerous red flags showing that HSHC was unable to pay those liabilities even if it wanted to and, in fact, had no intention of paying them. In sum, the evidence supporting the CFC's finding of constructive knowledge is overwhelming and by no means clearly erroneous.

i. As the CFC found, the Trusts were represented by several layers of sophisticated professionals at all relevant times. (Appx45.) First, the Trusts had trustees with backgrounds in finance. (Appx5745-5746.) Second, the Trusts received advice about the transactions from the Dillons' family office, which was comprised of professionals with investment and tax expertise. (Appx5748-5749.) Third, the Trusts were represented by Shearman & Sterling LLP, a multinational law firm that provided tax and estate planning services. (Appx5751-5752.)

ii. Over several decades, the Trusts had acquired substantial holdings in blue-chip stocks and prime farmland, which they held through Humboldt and Shelby. (Appx2.) The adjusted cost basis in these assets was approximately $16 million. (*Id*.) However, the assets had appreciated to a value of over $90 million by the year 2000. (*Id*.)

The CFC found that the Trusts were well aware that, if they were to sell the appreciated assets, they would incur substantial capital gains taxes. (Appx47.) Indeed, the Trusts' professionals not only advised them of the embedded tax liability, but repeatedly calculated the amount of that liability for them. (Appx5756-5758, Appx5781-5782.)

iii. The professionals created a series of proposals for the Trusts to divest themselves of the appreciated assets. (Appx5757-5760.) For each proposal, the professionals determined the tax consequences and advised the Trusts of those consequences. (*Id.*)

From the series of proposals, the Trusts selected a three-phase divestiture plan that had the tripartite goals of (i) reducing Humboldt and Shelby to mere holding companies for cash and cash equivalents, (ii) ensuring that none of the $26 million embedded tax liability was triggered while the appreciated assets remained in the Trusts' hands, and (iii) selling Humboldt and Shelby to the highest bidder, with the embedded tax liabilities following into the hands of the new owner. (Appx5760-5819.) In phase one, the Trusts renegotiated a pending sale of some of their farmland so that Humboldt and Shelby would receive a three-year installment note, rather than cash (and thereby defer capital

gains taxes until the notes reached maturity post-divestiture). (Appx5760-5761.)  In phase two, the Trusts negotiated a sale of the remaining farmland in exchange for three-year installment notes, with a corresponding deferral of capital gains taxes.  (Appx5761-5771.)  In phase three, the Trusts held an "auction" at which Humboldt and Shelby were sold to the highest bidder.  (Appx5771-5819.)

iv.  Before executing the three-phase plan, the Trusts' representatives created a diagram illustrating each phase.  (Appx4949-4950, Appx6631.)  They later postdated the diagram, making it appear as if the diagram were created after the plan had already been executed.  (Appx4959-4960, Appx6631.)

v.  To arrive at the fair market value of appreciated assets with built-in gains, one must take into account not only the assets' face value but also the amount of the embedded tax liability.  (Appx39-44.)  *E.g., Stanko v. Commissioner*, 209 F.3d 1082, 1086-87 (8th Cir. 2000); *Eisenberg v. Commissioner*, 155 F.3d 50, 57-59 (2d Cir. 1998).  Here, that meant the approximately $90 million face value of the assets held by Humboldt and Shelby had to be adjusted to account for the $26 million embedded tax liability.  But Diversified Group Incorporated

("DGI") offered to pay $86.8 million so that HSHC could acquire Humboldt and Shelby, reflecting only a nominal 5% discount based on the embedded tax liabilities. (Appx2.)

Because Humboldt and Shelby were not operating companies, the CFC found that the substantial premium underlying DGI's bid could not be explained by "a desire to obtain operating control of the companies" nor by "the presence of goodwill." (Appx41.) Indeed, the only conceivable reason (aside from tax avoidance) that DGI would have paid any premium whatsoever for HSHC to acquire Humboldt and Shelby was if it had tax attributes that could absorb some or all of the embedded tax liabilities. (*Id.*)

Nonetheless, as the court found, the Trusts were "remarkably uninterested in performing any serious due diligence" on DGI (or HSHC) to determine whether it had tax attributes that could absorb the embedded tax liabilities. (Appx48.) The Trusts had no prior familiarity with DGI and were "surprised" when it submitted a bid. (Appx4260, 4265.) One of the Trusts' lawyers therefore asked a legal assistant to "run [DGI's] name," a task which took 36 minutes and did not—by the lawyer's own admission—constitute "research." (Appx4258-4259,

Appx4266, Appx8998.)  Indeed, it appears that the assistant did not even look for litigation involving DGI, as he failed to locate a federal court opinion describing DGI's business model as "conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes."  *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 448 (S.D.N.Y. 2001).

The Trusts and their representatives also never spoke to anyone at HSHC or DGI, including DGI's principal, James Haber.  (Appx48.) Nor did they seek information or documents concerning HSHC's or DGI's plans, assets, liabilities, or tax attributes.  (*Id.*)  To the contrary, they seem to have abandoned even the pretense of conducting due diligence immediately upon being informed that those plans were "proprietary."  (Appx4264-4265.)  They also apparently failed to look for litigation involving DGI after its bid had been accepted, as doing so would have located a federal court opinion showing that the IRS was actively investigating whether "DGI ha[d] violated the tax laws regarding the registration and maintenance of records concerning tax shelters."  *United States v. Diversified Group, Inc.*, 2002 WL 31947904,

at *1 (S.D.N.Y. Nov. 25, 2002).[2]  The CFC therefore found that, "[i]n

short, neither the Dillons, their advisors, or [their principal advisor at

Shearman & Sterling] did any investigation into the bona fides of DGI

or Haber[.]"  (Appx19.)

 vi.  The Trusts' failure to undertake even the most rudimentary

due diligence would have been troubling even if there were no red flags

showing that HSHC lacked both the ability and intention to pay the

imbedded tax liabilities.  However, the CFC found that there were

numerous such red flags, which rendered the Trusts' lack of due

diligence inexcusable.  (Appx45-49.)  It thus opined that, under the

circumstances, the Trusts' acceptance of DGI's refusal to disclose its

plans on "proprietary" grounds "was either monumental naivete, gross

negligence, or a useful fig leaf," before ultimately finding that it was "a

useful fig leaf."  (Appx47.)  It further found that the Trusts chose not to

conduct further due diligence on DGI because they "did not want to

---

[2] On appeal, the Trusts dismiss the foregoing court opinions as "innocuous."  (Appx31.)  However, that dismissal cannot be reconciled with their representation below that they "wanted to avoid [tax shelter] promoters."  (Appx5230.)

know what an investigation would reveal." (Appx47-48.) These findings find fulsome support in the trial record.

As a threshold matter, one of the Trusts' lawyers warned them that an ill-intentioned bidder without any offsetting tax attributes might attempt to acquire Humboldt and Shelby to execute an abusive Midco tax shelter, and another bidder, Deutsche Bank, warned the Trusts about accepting a bid from any entity planning to use "thinly capitalized [special purpose vehicles] funded with principally borrowed cash." (Appx4284-4286, Appx5762-5763, Appx6158-6160.) The Trusts also knew, or could have easily found out, that HSHC was a newly formed company without any current or historical operations. (Appx47; *see also* Appx5799-5800, Appx6174-6178, Appx8005.) As such, it was highly unlikely that HSHC had any net operating losses or other tax attributes that could be used to absorb the $26 million embedded tax liability. (Appx47.) *See Billy F. Hawk,* 924 F.3d at 830 (discussing limitations on a company's ability to acquire other companies with preexisting gains to offset its preexisting losses). To borrow the Trusts' phrasing, it was readily apparent that HSHC was "idiosyncratically unable to" use tax attributes to absorb that liability. (Br. 26 n.4.)

Furthermore, the Trusts knew, or could have easily found out, that HSHC had no other means to pay the $26 million tax liability that it was taking on. The Trusts knew or should have known that HSHC was thinly capitalized. (Appx47.) They also knew or should have known that it had taken out a loan from Rabobank to finance virtually the entire purchase price for Humboldt and Shelby, using the companies' assets as collateral. (*Id.*; *see also* Appx5795-5796, Appx5805, Appx5808-5814, Appx8096.) Consequently, HSHC could only pay off the Rabobank loan by selling Humboldt's and Shelby's assets, thereby triggering a tax liability that HSHC could not pay even if it wanted to.

Moreover, the Trusts should have known that HSHC was not simply naive in taking on Humboldt's and Shelby's tax liabilities without a corresponding ability to pay them, but rather that it planned to leave the tax liabilities unpaid. As discussed above, routine due diligence would have disclosed both that DGI was in the business of marketing tax strategies and that it was under investigation for its practices concerning tax shelters. In addition, the Trusts knew that HSHC intended to convert some of the notes into cash immediately,

that HSHC could redeem all the notes well in advance of their maturity dates, and that the parties' agreement left HSHC without any real restrictions on its ability to sell Humboldt's and Shelby's assets. (Appx48.) And to top it off, the Trusts' principal advisor refused to provide them with a tax opinion about the bona fides of the transaction. (Appx51.)

At bottom, the CFC had more than sufficient evidence to find that "there were plenty of indicators of fraud," the Trusts "could not deal with [DGI] in presumed innocence, or in good faith," and the Trusts "clearly did not want to know the facts about HSHC because that would have jeopardized their ability to accept an unrealistic bid for the corporate stock." (Appx48.)

### c. The Trusts' contrary arguments lack merit

Aside from a few quibbles, the Trusts do not seriously contest the above facts found by the court. Instead, they advance three arguments that, in their view, undercut the CFC's determination that they had constructive knowledge of HSHC's scheme to leave its taxes unpaid. None of their arguments is persuasive, much less indicative of any clear error that would warrant reversal.

### i. The CFC did not need to make additional factual findings

First, the Trusts make two related arguments regarding additional facts that they contend the CFC was required to find in order to sustain a "constructive knowledge" determination. To the extent that the appropriate standard for inquiry knowledge is the lesser knowledge-that-ordinary-diligence-would-have-elicited test, the Trusts contend that the court erred in finding only that they failed to conduct a reasonable inquiry in the face of red flags. According to the Trusts, the court needed to go further and find that, if had they conducted a reasonable inquiry, then they would have discovered HSHC's "entire scheme" to avoid paying taxes. (Br. 18-22.) To the extent that the appropriate standard for inquiry knowledge is the more-active-avoidance-of-truth test, the Trusts contend that the court erred in finding only that they displayed "passivity" in the face of red flags. According to the Trusts, the court needed to go further and find that they took "active steps" to avoid discovering HSHC's scheme to avoid paying taxes. (Br. 32-33.) The Trusts are wrong on both counts.

a. As to the Trusts' first contention, the proper test is whether they "'were aware of circumstances that should have led them to inquire

further into the circumstances of the transaction, but … failed to make such inquiry.'" *Diebold*, 736 F.3d at 187 (quoting *HBE Leasing*, 48 F.3d at 636). Thus, transferees seeking to avoid liability under the NYUFCA cannot simply "ignore[ ] warning signs which should have put them on notice that something was awry and that a further inquiry would be prudent." *Orozco-Prada*, 636 F. Supp. at 1544-45. Rather, they must "use ordinary thoughtfulness," "make accessible inquiries," and "ask the obvious questions." *Id.* at 1543.

So understood, resolution of a transferee's "inquiry knowledge" turns on whether a reasonable inquiry would have alerted the transferee to "'the entire scheme that renders [the] exchange with the debtor fraudulent.'" *Diebold*, 736 F.3d at 186 (quoting *HBE Leasing*, 48 F.3d at 635). Nonetheless, the question is not whether a reasonable inquiry would have alerted the Trusts to "the plan's minute details." *Tricarichi v. Commissioner ("Tricarichi II")*, T.C. Memo. 2015-201, at [*47], *aff'd*, 752 F. App'x. 455 (9th Cir. 2018). Rather, the question is whether the transferee "knew, or at least should have known but for active avoidance, that the entire scheme was fraudulent and would have left [the debtor] unable to pay its tax liability." *Diebold*, 736 F.3d

at 188; *see also Starnes v. Commissioner*, 680 F.3d 417, 434 (4th Cir. 2012) (considering "whether the inquiry a reasonably diligent, similarly-situated person would have undertaken [would have] revealed MidCoast's plan to leave Tarcon unable to pay its 2003 taxes"); *Alterman v. Commissioner*, T.C. Memo. 2015-231, at [*55] (considering whether a reasonable inquiry would have revealed "that AC's tax liability would not be paid"); *Tricarichi II*, T.C. Memo. 2015-201, at [*47] (considering whether a reasonable inquiry would have revealed "the tax-avoidance scheme").

As discussed above, the trial record fully supports the CFC's finding that the Trusts knew or should have known that HSHC was unable to pay Humboldt's and Shelby's imbedded tax liabilities and had no intention of doing so. Based on the foregoing authority, the Trusts were properly charged with inquiry knowledge of HSHC's tax-avoidance scheme and the transactions were properly collapsed.

The Trusts' contrary argument (Br. 18, 22) is based on the CFC's passing statement that, if they had inquired about Haber's plans, it "is no doubt true" that he "would not have revealed" those plans (*i.e.*, that he intended to direct HSHC to engage in an abusive Son-of-BOSS tax

shelter).  (Appx48.)  But this argument rests on the false premise that Haber himself must have been the sole source of inquiry knowledge in this case.  As the CFC set forth in detail (Appx45-49), there were many facts from various sources (apart from any personal admission to fraud by Haber) supporting the court's finding that the Trusts should have known that "the entire scheme was fraudulent and would [leave HSHC] unable to pay its tax liability."  *Diebold*, 736 F.3d at 188.  The CFC reasonably concluded that, under the circumstances, any refusal by Haber to divulge his plans would only have been "further proof that [the Trusts] could not deal with him in presumed innocence, or in good faith."  (Appx48.)

b.  As to the Trusts' second contention, the touchstone for a "more active avoidance of the truth" is the transferee's motive for failing to conduct a reasonable inquiry.  *Schmitt*, 471 N.Y.S.2d at 936.  In particular, the question is whether the transferee's failure to inquire was motivated by the desire to "shield[ ] himself from knowledge that a fraudulent conveyance had occurred."  *Id.*  Where such motivation is present, the transferee's "failure to inquire represent[s] a conscious

turning away from the subject" sufficient to support a finding of active avoidance. *HBE Leasing*, 48 F.3d at 636-37.

As already discussed, the trial record fully supports the CFC's finding that the Trusts' failure to inquire was motivated by a desire not to know what an investigation would reveal. Based on the foregoing authority, the Trusts were once again properly charged with inquiry knowledge of HSHC's tax-avoidance scheme and the transactions were properly collapsed.

The Trusts' contrary argument (Br. 32) is based on the CFC's statement that active avoidance means an individual "take[s] active steps" to avoid finding out the truth. (Appx34.) However, the court neither cited any authority supporting an "active steps" requirement nor explained what such a requirement would entail; the Trusts have provided no such authority or explanation, and we are aware of none. Under the circumstances present here, as in *HBE Leasing*, the Trusts' "failure to inquire" constituted active avoidance. 48 F.3d at 637. No more was required.

### ii. The CFC properly determined that HSHC's bid should have prompted further investigation

At trial, the evidence showed that DGI and another entity, TranStar Capital Corporation, submitted bids "at virtually full value of the underlying assets" (*i.e.*, without applying a significant discount for the embedded tax liabilities). (Appx16-17, Appx45.) Relying on the factual record and two experts' testimony about those facts, the CFC found that, under the circumstances, these bids lacked "economic validity" and constituted "the first and most important red flag" that should have prompted the Trusts to investigate further. (Appx45.) On appeal, the Trusts spend ten pages launching myriad, scattershot attacks at this finding. (Br. 22-32.) But their attacks are unavailing.

First, the Trusts recast the CFC's opinion as finding that "intent to commit tax fraud was the only economically plausible explanation" for the bids received. (Br. 22.) The court found no such thing. As we have just explained, it found that, where the Trusts received bids that included only a nominal discount for the embedded tax liability, that constituted a red flag that should have prompted further inquiry.

Second, the Trusts argue that DGI's and TranStar's bids were *per se* reasonable because they were "produced by market forces." (Br. 25-26.) However, this argument is based on the Trusts' assumption that the bidders had offsetting tax attributes. (Br. 22-23, 26.) As the CFC recognized, the Trusts were not justified in making such an assumption because they (i) conducted no due diligence to determine whether it was true; (ii) ignored substantial evidence that, at the very least, DGI had no such tax attributes; and (iii) had "been warned that there were unscrupulous bidders searching for fattened milch cows like Humboldt and Shelby to plunder through fraudulent tax schemes."[3] (Appx16, Appx40, Appx47-49.)

Third, the Trusts assert that their use of an auction, rather than a simpler method of divestiture with lower transaction costs, was designed "[t]o find buyers with such [offsetting tax] attributes." (Br. 23, 30.) But this assertion is belied by the fact that the Trusts

---

[3] Because the Trusts no longer contest HSHC's insolvency or the absence of fair consideration, their discussion concerning the assets' precise fair market value is misplaced. (Br. 24-25.) For purposes of resolving the constructive-knowledge inquiry, it is sufficient that a sales price which included only a nominal discount for the embedded tax liabilities would be a red flag that should have prompted further inquiry.

neither attempted to locate bidders with such attributes to participate in the auction nor tried "to determine whether the bidders which did show up were in a position to absorb capital gains." (Appx16.) Thus, the court found that it was much more likely that the Trusts' use of an auction "merely offered a useful ambiguity about [their] motivations." (Appx46.)

Fourth, the Trusts speculate that a particularly risk-averse bidder (or, apparently, two such bidders) with $26 million of offsetting tax attributes might have been willing to pay 95% of the assets' fair market value so that it could immediately "sell those assets on the open market for their market value" and "easily make a 5% profit." (Br. 27-28.) In this scenario, the Trusts opine that the bidder would want to avoid the risk of its tax attributes losing value due to inflation, as well as the risk of its portfolio losing value due to a downturn in the market. (*Id.*) However, their speculation ignores I.R.C. § 384, which would have prevented a bidder from implementing such a strategy. *See Billy F. Hawk*, 924 F.3d at 830. In any event, the Trusts cannot demonstrate that the CFC clearly erred by piling speculation on top of their unwarranted assumption about the bidders' tax attributes.

Fifth, in a remarkable display of chutzpah, the Trusts chide the CFC for not addressing the bona fides of the bids submitted by TranStar and Deutsche Bank, which respectively offered 95% and 86% of the assets' face value. (Br. 23-25.) However, the reason that the court was unable to do so was because the Trusts apparently conducted even less due diligence on these two bids than the paltry 36 minutes they spent running DGI's name through a database. And again, the court's finding was not that tax fraud was the only possible explanation for the bids applying a nominal discount for the embedded tax liabilities; its finding was that the Trusts should have conducted further inquiry if they wanted to accept such bids. (Appx45.)

Sixth, the Trusts note (Br. 26) that one of HSHC's attorneys, a third-year associate named Lana Yang, testified that she would not "knowingly assist a client in committing fraud" and "had no reason not to" believe that the information provided by HSHC was truthful. (Appx4748-4749, Appx4872-4873.) Whatever the evidentiary weight of this testimony, it certainly does not support the Trusts' position that, because Ms. Yang failed to "sniff out [HSHC's] fraud," they could

"hardly be expected" to do more than spend 36 minutes running DGI's name through a database. (Br. 26.)

Seventh, the Trusts rely on *Julia R. Swords Trust v. Commissioner*, 142 T.C. 317 (2014), and *Alterman v. Commissioner*, T.C. Memo. 2015-231. (Br. 29-30.) Both cases are readily distinguishable.

In *Julia R. Swords*, the Tax Court emphasized that its decision not to impose transferee liability was based on Virginia's fraudulent-transfer law, rather than New York's. 142 T.C. at 344. The court observed that, unlike New York, Viriginia had not adopted the Uniform Fraudulent Conveyance Act or its successor, the Uniform Fraudulent Transfer Act, both of which extend greater protection to creditors. *Id.* at 344-45. The court also observed that, unlike New York, Virginia did not permit multiple transactions to be collapsed for purposes of establishing that a fraudulent transfer occurred. *Id.* at 345. And the court further opined that, even if transactions could be collapsed under Virginia law, it would be inappropriate to do so there, where the transferees had no background in business or tax; did not actively seek a buyer to purchase their appreciated assets; and possessed no

-33-

information that would have led them to believe that the buyer might lack a legitimate tax planning method. *Id.* at 345-50 & n.34. In the case at bar, the opposite is true.

In *Alterman*, the transferees received two offers for their company that held appreciated assets: one from MidCoast Investments, Inc., and one from DGI (the same company that submitted HSHC's bid in the case at bar). T.C. Memo. 2015-231, at [*10]. The transferees conducted due diligence on both companies that included requesting information about their assets, operations, and plans for addressing the embedded tax liabilities. *Id.* at [*10-*16]. While MidCoast provided extensive information about its operations and plans, DGI declined to provide even the most basic information. *Id.* Accordingly, the transferees declined to move forward with DGI and began negotiating exclusively with MidCoast. *Id.* at [*15-*16]. The transferees then secured significant, meaningful guarantees from MidCoast, including that the buyers would not dissolve the company that held the appreciated assets; that the buyers would operate the company as an asset recovery business; and that they buyer would ensure that the company maintained a net worth of $1.5 million at the end of the year for at least

four years "to make sure funds were available to pay … any of that tax liability that was due." *Id.* at [\*16-\*18]. In declining to impose transferee liability, the Tax Court relied on the transferees' extensive due diligence and insistence on meaningful guarantees. *Id.* at [\*50-\*65]. In contrast, no such facts are present here.

### iii.   The CFC faithfully applied *Diebold* and other caselaw

The leading case applying the NYUFCA to a Midco tax shelter is *Diebold Found., Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013). On appeal, the Trusts argue that the CFC "erred in extending the Second Circuit's *Diebold* decision." (Br. 33-37.) The Trusts are wrong. The CFC's decision represents a faithful application of *Diebold* as well as other cases applying the NYUFCA and comparable fraudulent transfer statutes.

a. Similar to the case at bar, *Diebold* involved a Midco tax shelter where shareholders held appreciated assets, the shareholders transferred the assets to a buyer for an inflated purchase price, and the buyer failed to pay the embedded tax liabilities when it sold the assets. 736 F.3d at 175-81. The Second Circuit was thus tasked with determining whether the shareholders had constructive knowledge of

-35-

the buyer's scheme to leave the taxes unpaid, such that the transactions should be collapsed for purposes of finding a fraudulent conveyance under the NYUFCA. *Id.* at 187-89.

In determining that the shareholders had constructive knowledge, the court looked first to the shareholders' "recogni[tion] of the 'problem' of the tax liability arising from the built-in gains" on their appreciated assets. *Diebold*, 736 F.3d at 188 (such recognition was "of great import"). The court also took into account that the shareholders "specifically sought out parties that could help them avoid the tax liability," that the shareholders were "extremely sophisticated actors" represented by a team of tax professionals, and that the shareholders knew that some tax professionals were making "very favorable offers" to acquire appreciated assets for the purpose of executing Midco tax shelters. *Id.* The court further considered "the huge amount of money involved," the fact that the shareholders knew that a fair purchase price for the appreciated assets "would be reduced based on the need to pay the … tax liability," and the fact that the actual purchase price included only a nominal discount. *Id.* On these facts, the court held that "it is obvious that the parties knew, or at least should have known but for

active avoidance, that the entire scheme was fraudulent and would have left Double D unable to pay its tax liability." *Id.*

As discussed at pp. 14-23, *supra*, every factor relied upon by the Second Circuit in *Diebold* is also present here. The Trusts are therefore incorrect in claiming that the CFC extended *Diebold* (Br. 33), much less that it did so improperly.

b. To be sure, the Second Circuit went on to state that its holding was "also" supported by the shareholders' "sophisticated understanding of the structure of the entire transaction," which it characterized as another "fact that courts consider when determining whether to collapse a transaction." *Diebold*, 736 F.3d at 188. The court also stated that the Trusts' attempt to conceal the extent of their knowledge provided additional support for its holding. *Id.* at 189. However, the Second Circuit made these statements *after* it had already held that the constructive knowledge standard was satisfied, thus negating any argument that its constructive-knowledge determination was dependent on such facts. Indeed, these facts get startling close to actual knowledge and, as the CFC noted here, it would "make[ ] no sense" to

predicate a finding of constructive knowledge on the existence of actual

knowledge.  (Appx34.)

At all events, as we explained at pp. 24-26, *supra*, the question for

constructive knowledge is whether the Trusts knew or should have

known that the transactions would leave HSHC unable to pay the

embedded tax liability.  The CFC did not clearly err in finding that

standard was satisfied here.

c.  Nor is there merit to the Trusts' claim that *Diebold* is an

outlier.  (Br. 33-35.)  As the Second Circuit explained, constructive

knowledge depends on "the totality of the circumstances."  *Diebold*,

736 F.3d at 188.  It is thus unsurprising that, on facts different from

both *Diebold* and the case at bar, courts have declined to find

constructive knowledge.  *E.g.*, *Frank Sawyer Trust*, 712 F.3d at 606

(transferees conducted due diligence on both the buyer and the

transaction); *Starnes*, 680 F.3d at 434 (transferees were unsophisticated

and secured meaningful guarantees from the buyer).  Simply pointing

out that cases with different facts have come out differently does

nothing to undermine *Diebold*'s continuing validity, much less satisfy

the Trusts' "high hurdle" of showing that the CFC clearly erred.  *See*

*Frank Sawyer Trust*, 712 F.3d at 606.

Finally, the Trusts cite *Citibank, N.A. v. Brigade Capital Mgmt.*,

49 F.4th 42, 64 (2d Cir. 2022), for the proposition that the extent of a

party's duty to inquire is limited to "that of a reasonable and prudent

person *whose interests would be served by obtaining the knowledge in*

*question.*"  (Br. 36 (emphasis added).)  They then argue that, since their

interests would not have been served by inquiring into the bona fides of

the transaction—which might, after all, have led to their having actual

knowledge of HSHC's fraudulent intent—they should not be charged

with constructive knowledge thereof.  This argument does not

withstand scrutiny.

As the Trusts concede (Br. 20-21), *Citibank* is not a fraudulent

transfer case.  Cases applying the NYUFCA have consistently held that

the statute imposes a duty on transferors and transferees to protect

innocent creditors.  *In re Cambridge Capital, LLC*, 331 B.R. 47, 61

(Bankr. E.D.N.Y. 2005); *Chase Manhattan Bank v. Oppenheimer*,

440 N.Y.S.2d 829, 831 (Sup. Ct. Nassau Cty. 1981); *S. Indus., Inc. v.*

*Jeremias*, 411 N.Y.S.2d 945, 948 (App. Div., 2d Dept. 1978).  Thus,

while parties may be free to maintain ignorance when engaging in some endeavors, they cannot engage in "ostrich-like behavior" at the expense of creditors and still avoid liability under NYUFCA. *Orozco-Prada*, 636 F. Supp. at 1545. The Trusts assert that this reading of NYUFCA effectively "commandeer[s] private entities to serve as IRS agents." (Br. 35.) This is false. As the CFC recognized, it simply prevents transferors and transferees from "mak[ing] a virtue of willful ignorance" at innocent creditors' expense. (Appx48-49.)

At all events, conducting further due diligence on HSHC and the contemplated transactions would have served the Trusts' interests insofar as it would have given them insight into whether HSHC had the means to honor its pledge to indemnify them for any post-closing tax liabilities that arose. (Appx6714.) Thus, even if the rule in *Citibank* were extended to the context of the Uniform Fraudulent Conveyance Act, the Trusts would have had a duty to inquire further.

### B. The CFC did not clearly err in rejecting the Trusts' NYUFCA § 278(2) defense

Once a creditor has established that a fraudulent conveyance occurred, NYUFCA § 278(1)(a) and (b) provide that the creditor may have the conveyance set aside to the extent necessary to satisfy its

claim or, alternatively, disregard the conveyance. However, NYUFCA § 278(2) provides a potential limitation on liability:

> A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

Thus, a transferee within the scope of NYUFCA § 278(2) may "only [be] liable for the difference between the amount it received and the value it conveyed." *In re CNB Int'l, Inc.*, 440 B.R. 31, 43 (W.D.N.Y. 2010).

As discussed below, the Trusts cannot avail themselves of NYUFCA § 278(2) for two reasons, each of which is sufficient to render the provision inapplicable. First, the Trusts did not even try to establish that they were "purchasers." Second, the Trusts failed to establish that they acted "without actual fraudulent intent." This Court should, therefore, affirm the CFC's conclusion that the § 278(2) limitation does not apply.

### 1. The Trusts had the burden of proof

Courts have consistently characterized NYUFCA § 278(2) as an "affirmative defense" or "safe harbor." *In re Dreier LLP*, 462 B.R. 474, 484-85 (S.D.N.Y. Bankr. 2011); *see also Knopf v. Phillips*, 2017 WL 6561163, at *8 (S.D.N.Y. Dec. 22, 2017), *vacated on other grounds*,

802 F. App'x 639 (2d Cir. 2020); *United States v. Mazzeo*, 306 F. Supp. 2d 294, 313-14 (E.D.N.Y. 2004), *vacated as moot*, 2004 WL 3079366 (E.D.N.Y. Oct. 20, 2004); *In re Foxmeyer Corp.*, 286 B.R. 546, 579 (Bankr. D. Del. 2002). This characterization is consistent with the fact that § 278(2) only comes into play after liability has been established. *See In re CNB Int'l*, 440 B.R. at 41-42. This characterization is also consistent with the fact that a portion of an adjacent provision that insulates bona fide purchasers from liability, NYUFCA § 278(1), has likewise been characterized as a defense. *See id.*

Because NYUFCA § 278(2) is properly characterized as a defense, courts have repeatedly held that transferees bear the burden of proving that defense, just as they would bear the burden of proving any other defense. *Knopf*, 2017 WL 6561163, at *8; *In re Dreier*, 462 B.R. at 484-85; *In re Allou Distributors, Inc.*, 446 B.R. 32, 62 (Bankr. E.D.N.Y. 2011) (citing *In re Jacobs*, 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008)); *In re Foxmeyer*, 286 B.R. at 580-82; *Berlenbach v. Bischoff*, 244 N.Y.S. 369, 371 (Sup. Ct. Kings Cty. 1930) (citing *Hickok v. Cowperthwait*, 119 N.Y.S. 390, 394 (App. Div., 2d Dept. 1909); *Emmi v. Patane*, 220 N.Y.S. 495, 498 (Sup. Ct. Onondaga Cty. 1927)). The Trusts fail to

identify any authority supporting their position that creditors bear not only the burden of proving that a fraudulent conveyance occurred but also of disproving a transferee's § 278(2) defense. (Br. 38-39.)

*BASR Partnership v. United States*, 795 F.3d 1338 (Fed. Cir. 2015), is not to the contrary. In *BASR*, this Court considered I.R.C. § 6501(c)(1), which authorizes the IRS to assess tax outside the normal three-year limitations period "[i]n the case of a false or fraudulent return with the intent to evade tax." The Court held that, for purposes of § 6501(c)(1), the relevant fraudulent intent is the taxpayer's, not an affiliated third party's. In support of this holding, the Court looked to other I.R.C. provisions "deal[ing] with the consequences of intentional tax evasion." One such provision is I.R.C. § 7454(a), which provides that "[i]n any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary." In passing, this Court commented that, in enacting I.R.C. § 7454(a), "Congress intended for the government to always carry the burden of proof for any fraud allegation." *BASR*, 795 F.3d at 1342-45. The Court, however, had no

occasion to actually apply § 7454(a) in *BASR*, so its comments about the reach of the provision were dicta.

*BASR* does not affect the burden of proof on the Trusts' NYUFCA § 278(2) defense. As the CFC correctly held (Appx27-29), state law determines the burden of proof where, as here, a federal court is adjudicating a claim grounded in state law. *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959). This holding carries special force in the fraudulent conveyance context, where it is well established that "[t]he Government's substantive rights … are precisely those which other creditors would have" under state law. *Stern*, 357 U.S. at 47. Moreover, the structure, text, and history of I.R.C. § 7454(a) demonstrate that it applies only to Tax Court proceedings, not refund suits in the CFC. To wit: § 7454(a) is located in Chapter 76, Subchapter C, of the Code which governs proceedings in the Tax Court; it refers to "the petitioner" and "the Secretary," which are proper parties to Tax Court proceedings but not refund suits; and its legislative history shows it was enacted based on Congress's concern about how the Board of Tax Appeals (the predecessor to the Tax Court) was allocating the

burden of proof in cases involving fraud.  *See* S. Rep. 70-960, at 38

(1928).  And, as noted, *BASR's* comments about § 7454(a) were dicta.

### 2. The Trusts did not even try to prove that they were "purchasers"

The plain text of NYUFCA § 278(2) limits its applicability to

"purchaser[s]."  The NYUFCA does not, however, define the term

"purchaser."  *See* NYUFCA § 270 (definitions section).  The term should

therefore be afforded its ordinary meaning.  *Nicely v. United States*,

23 F.4th 1364, 1369 (Fed. Cir. 2022); *Breest v. Haggis*, 115 N.Y.S.3d

322, 326 (App. Div., 1st Dept. 2019).

In ordinary usage, a purchaser means "a person who buys."

https://www.vocabulary.com/dictionary/purchaser (last visited June 27,

2024).  A natural reading of NYUFCA § 278(2) thus excludes sellers

that, like the Trusts, did not buy anything.  *In re Tuller's, Inc.*, 480 F.2d

49, 52 (2d Cir. 1973).  The Trusts have never sought to establish that

they were a "purchaser" under this provision.  And, indeed, they could

not have done so given that they were the sellers in the transaction (of

the Humboldt and Shelby stock, for which they received consideration),

not the purchasers.  Consequently, the Trusts cannot avail themselves

of a § 278(2) defense.

To be sure, a New York bankruptcy court construed NYUFCA § 278(2) as providing a defense to all transferees, without regard to whether they were purchasers or sellers. *In re CNB Int'l*, 440 B.R. at 43 n.7. However, the bankruptcy court's construction of § 278(2) effectively rewrites it to apply to "any person"—language that the legislature used in § 278(1), but conspicuously omitted in § 278(2). *See Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023). This Court should not expand § 278(2) beyond its textual moorings.[4]

### 3. The Trusts did not prove that they acted "without actual fraudulent intent"

a. For purposes of NYUFCA § 278(2), a transferee has "actual fraudulent intent" if it "participated or acquiesced in the transferor's fraudulent design." *In re CNB Int'l*, 440 B.R. at 44 n.8 (cleaned up). Thus, a transferee cannot avail itself of § 278(2) if, among other things,

---

[4] Although the Government did not argue in the CFC that the Trusts were not "purchasers" under § 278(2), the Trusts had the burden to establish each element of their defense under that provision, including their status as a purchaser. Moreover, it is well settled that an appellee may defend the judgment in its favor on any ground founded in the record, including grounds not relied on at the trial level. *Schweiker v. Hogan*, 457 U.S. 569, 585 n.24 (1982); *Dandridge v. Williams*, 397 U.S. 471, 475 n.6 (1970); *Helvering v. Gowran*, 302 U.S. 238, 245 (1937).

it had knowledge of the transferor's fraudulent intent. *In re Foxmeyer*, 286 B.R. at 580-81. In applying this standard, courts have held that the evidence required to establish "actual fraudulent intent" is consistent with, if not identical to, the evidence required to establish good faith. *Id.* at 581-82; *In re Allou Distributors*, 446 B.R. at 62.

b. The CFC did not clearly err in finding that the Trusts failed to establish that they acted "without actual fraudulent intent." (Appx49-51.) The court began by recognizing (Appx51) that "[a]ctual fraudulent intent is rarely susceptible to direct evidence and may be inferred from the circumstances surrounding the transaction." *In re Jacobs*, 394 B.R. at 659. The court further recognized (Appx51) that certain circumstances, known as "badges of fraud," are "so commonly associated with fraudulent transfers that their presence gives rise to an inference of [fraudulent] intent." *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re: Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation and internal quotations omitted). And it is well established that "the confluence of several [badges of fraud] in one transaction generally provides conclusive evidence of an actual intent to defraud." *In re Tops Holding II Corp.*, 646 B.R. 617, 675 (Bankr. S.D.N.Y. 2022) (citation

and internal quotations omitted).  This is true when considering both the intent of the transferor and the intent of the transferee.  *In re Palmero*, 2011 WL 3874866, at *15 (S.D.N.Y. Sept. 2, 2011), *aff'd*, 546 F. App'x. 38 (2d Cir. 2014).

Here, the CFC concluded that several badges of fraud were present:

- the Trusts received too much consideration in exchange for the value they transferred to HSHC and "had every reason to know they were receiving too much consideration";

- the transactions left HSHC insolvent, and the Trusts "knew or should have known" that the transactions would do so; and

- the Trusts were sophisticated parties who were well aware of the appreciated assets' built-in gains and nonetheless "did virtually no due diligence about HSHC, despite warning signs that," among other things, HSHC "had no real way to absorb the built in tax liabilities."

(Appx51.)  The Trusts dispute neither the CFC's conclusion that several badges of fraud were present nor the factual findings underlying that

conclusion.  This, standing alone, provides a sufficient basis for affirmance.

On appeal, the Trusts argue that the badges of fraud found by the court "boil down to the court's belief that [the Trusts] should have suspected that HSHC would not have legitimate offsetting tax attributes and should have investigated further."  (Br. 40.)  They then argue, without citation to the record, that the court should have accepted their representatives' testimony "that they did not intend to commit fraud."  (*Id.*)

The Trusts' position turns fraudulent conveyance law on its head. Given that the presence of several badges of fraud would have been sufficient for the CFC to make a finding that the Trusts had actual fraudulent intent, *In re Tops Holding II*, 646 B.R. at 675, it is assuredly sufficient to sustain the court's finding that the Trusts did not prove they lacked such intent.  Indeed, the badges of fraud on which the court relied are highly probative of the relevant question—namely, whether the Trusts "acquiesced in the transferor's fraudulent design."  *See In re CNB Int'l*, 440 B.R. at 44 n.8 (citation and internal quotations omitted).

The court was not required to accept the Trusts' self-serving testimony

to the contrary.[5]

c. Pivoting, the Trusts aver that the Government relied

exclusively on a constructive-fraud theory under NYUFCA § 273 and

did not advance an actual-fraud theory under NYUFCA § 276. (Br. 39-

40.) Based on this averment, the Trusts claim that their "lack of

fraudulent intent was undisputed." (Br. 40.) The Trusts are incorrect.

In fact, the Government *did* advance an actual-fraud theory as an

alternative to its constructive-fraud theory. (Appx5435-5436 (invoking

NYUFCA § 276 and arguing that "HSHC bought Humboldt and Shelby

with the actual intent to hinder, delay, or defraud the IRS").) Although

the CFC stated that "the government does not rely on actual fraud

under § 276 to establish liability" (Appx27), that statement was

incorrect. But even if the Government had proceeded exclusively under

a constructive-fraud theory, that would not preclude a finding of actual

_____

[5] The CFC did not reach the Government's argument that the facts demonstrating that the transactions should be collapsed also demonstrated that the Trusts had actual fraudulent intent (or, at a minimum, could not establish a lack of such intent). (Appx50, Appx5598-5602.) If this Court were to reject the lower court's "badges of fraud" conclusion, it should remand the case for that court to consider this alternative argument in the first instance.

fraud. *See Ruderman v. United States*, 355 F.2d 995, 998 (2d Cir. 1966) ("actual fraud is not limited to fraudulent conveyances which fall within the definitions of § 276 of New York's Debtor and Creditor Law … but may include transfers which are denoted as 'constructively fraudulent'").

Moreover, it is irrelevant whether the Government proceeded under a constructive-fraud theory or an actual-fraud theory, as neither requires a creditor to establish the fraudulent intent of the *transferee.* To the contrary, constructive-fraud claims are adjudicated "without regard to … actual intent," NYUFCA § 273, and actual-fraud claims are adjudicated based on the intent of the *transferor*, *Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999) (collecting cases). At all events, the evidence adduced at trial demonstrated that the Trusts failed to meet their burden of proving an absence of fraudulent intent.

### C. The CFC did not clearly err in finding that the Government's claim included penalties

The Trusts next argue that the extent of their transferee liability should be limited to the underlying tax and underpayment interest that accrued on that tax, thereby excluding approximately $10.2 million of

penalties.  (Br. 41-44.)  However, the CFC correctly included—and certainly did not clearly err in including—the penalties as part of the Trusts' liability.  (Appx51.)

1.  As discussed above, a creditor that has established a fraudulent conveyance under the NYUFCA may have the conveyance set aside to the extent necessary to satisfy its claim or, alternatively, disregard the conveyance.  *See* NYUFCA § 278(1)(a) & (b).  These remedies are designed to effectuate the NYUFCA's overarching purpose—namely, "enabl[ing] a creditor to obtain his due despite efforts on the part of a debtor to elude payment."  *Marine Midland Bank v. Murkoff*, 508 N.Y.S.2d 17, 24 (N.Y. App. Div. 1986) (citation and internal quotations omitted).

Consistent with this purpose, courts have generally held that a creditor's rights against a fraudulent transferee extend to both the underlying claim and accruals on that claim, so long as the total amount of transferee liability does not exceed the value of the asset transferred.  *Tricarichi I*, 908 F.3d at 591-93; *Shockley*, 872 F.3d at 1256; *Schussel v. Werfel*, 758 F.3d 82, 92-93 (1st Cir. 2014); *Kreps v. Commissioner*, 42 T.C. 660, 670 (1964), *aff'd*, 351 F.2d 1 (2d Cir. 1965).

This makes sense because the creditor would have been able to reach the full value of the asset to satisfy its claim, including accruals, had the fraudulent transfer not occurred. *Marine Midland Bank*, 508 N.Y.S.2d at 24 (remedies under the NYUFCA are "geared toward re-establishing the status quo ante"). In the tax context, accruals for which a transferee may be liable include both interest and statutory additions to tax such as penalties. *Tricarichi I*, 908 F.3d at 591-93; *Shockley*, 872 F.3d at 1256; *Feldman*, 779 F.3d at 450; *McGraw v. Commissioner*, 384 F.3d 965, 978 (8th Cir. 2004); *Kreps*, 42 T.C. at 670.

Here, it is undisputed that the total amount of HSHC's income tax liability for the 2003 tax year, including penalties and interest, was less than the value of the assets they received. (Appx1576-1577, Appx2563-2564, Appx2567-2568.) The CFC therefore correctly found that the Trusts' transferee liability included penalties. (Appx51.) On appeal, the Trusts ignore the reasoning employed by the court.

2.a. As we understand it, the Trusts' theory for resisting the penalty portion of their transferee liability consists of two prongs. First, the Trusts posit that the United States should be considered not one creditor, but two. (Br. 41-43.) At the time of the relevant transactions,

the Trusts posit that the United States was a *present* creditor as to

HSHC's underlying 2003 income tax liability, as well as underpayment

interest that would accrue on that tax liability; however, the United

States was a *future* creditor as to the penalty component of that same

liability. (*Id.*) Second, the Trusts argue that (i) future creditors can

only recover if they proceed under an actual-fraud theory (NYUFCA

§ 276), rather than a constructive-fraud theory (NYUFCA § 273), and

(ii) the United States proceeded solely under a constructive-fraud

theory. (*Id.*) As discussed below, both prongs of the Trusts' theory are

misplaced.

2.b. NYUFCA § 270 defines a "creditor" as "a person having any

claim, whether matured or unmatured, liquidated or unliquidated,

absolute, fixed or contingent." *See United States v. Watts*, 786 F.3d 152,

163 (2d Cir. 2015) (definition of creditor is "broad") (citations and

internal quotations omitted). In keeping with this broad definition,

courts applying the NYUFCA have long held that, when a taxpayer

transfers property during a particular tax year, the United States is

considered a present creditor with respect to taxes incurred during that

year, "even though the transferor's tax liability was unknown at the

time of transfer" and contingent upon the occurrence or non-occurrence of post-transfer events. *Kreps*, 42 T.C. at 670. Similarly, the United States is considered a present creditor with respect to "penalties (additions to tax) and interest in connection" with the underlying taxes, even though such penalties and interest are likewise unknown and contingent at the time of transfer. *Id.* (citations omitted).

Treating the United States as a single creditor for the entire tax liability is also logical as all three components of the liability—tax, penalties, and interest—arise as a matter of law without the need for a formal assessment. *Polselli*, 598 U.S. at 442 (taxes); *Loftin & Woodward, Inc. v. United States*, 577 F.2d 1206, 1245-47 (5th Cir. 1978) (penalties); *United States v. Sarubin*, 507 F.3d 811, 814-15 (4th Cir. 2007) (interest). All three components also serve revenue-raising or remedial functions, rather than a punitive function. *See Helvering v. Mitchell*, 303 U.S. 391, 401 (1938); *Kitt v. United States*, 277 F.3d 1330, 1337 (Fed. Cir. 2002). And treating all three components as a single claim that relates back to the date of transfer provides a "simple rule" that furthers the purpose of the Uniform Fraudulent Conveyance Act

and conforms to the holdings of the majority of circuit courts to consider the issue. *Schussel*, 758 F.3d at 94; *supra*, pp. 52-53.

We acknowledge that the Eighth Circuit reached a contrary conclusion in *Stanko v. Commissioner*, 209 F.3d 1082 (2000). However, it did so without having to reach the issue, as its remand to redetermine the value of the transferred asset had the potential to moot the transferee's liability for accruals. *Id.* at 1086-87. It also did so without considering either the UFCA's broad definition of "creditor" or the overlapping nature of taxes, penalties, and interest. *See id.* at 1088. When those considerations are taken into account, the United States is best understood as a single creditor for the tax, penalties, and interest attributable to the year of the transfer. *See also Tricarichi II*, T.C. Memo. 2015-201, at [*61] (declining to follow *Stanko* in applying Uniform Fraudulent Transfer Act based on the broad definition of "claim" used therein, which included any "right to payment" even if "unliquidated" and "unmatured"); *Slone v. Commissioner*, T.C. Memo. 2022-6, at [*10-*11] (same).

*Stanko* is also distinguishable. As the Eighth Circuit noted, under Nebraska law at the relevant time, a future creditor could only prevail

on a fraudulent conveyance claim if it "pleads and proves that the conveyance was made to defraud subsequent creditors *whose debts were in contemplation at the time.*" *Stanko*, 209 F.3d at 1087 (citations and internal quotations omitted) (emphasis added).  However, nothing in the text of the NYUFCA or caselaw applying it requires that a transfer be made with intent to defraud a specific creditor, present or future.  Nor does anything in the text of the NYUFCA or caselaw applying it require that a future creditor's claim be "in contemplation" at the time of the transfer.  While it is true that the NYUFCA should generally be applied consistently with other states' construction of the UFCA, *see* NYUFCA § 281, this Court need not blindly adopt Nebraska's judicially created gloss in derogation of nearly a century of New York caselaw more faithfully applying the statutory text.

2.c.  Even if the United States were a future creditor as to the penalty component of HSHC's 2003 tax liability, the Trusts acknowledge that they could still have potential liability therewith under a NYUFCA § 276 theory, involving actual fraudulent intent.  (Br. 41-42.)  Although the Trusts aver that the Government did not advance an actual-fraud theory under § 276 (*id.*), we showed the fallacy

of that averment at p. 50, *supra*. Thus, to the extent this Court were to

hold that the Government can only recover penalties if it prevails on an

actual-fraud theory, it should remand the issue to the CFC to consider

the Government's § 276 theory in the first instance.[6]

**D.    The CFC correctly held that the Trusts were not
entitled to a refund of underpayment interest**

Finally, the Trusts argue that they should not be liable for

between $6 million and $12 million of underpayment interest that

accrued over a roughly two-and-a-half year period from 2015 to 2017,

during which the IRS held deposits made on behalf of 28 successor

trusts. (Br. 44-57; *see also* Appx2805 (stipulation regarding the amount

---

[6] The Trusts note (Br. 42) that some cases applying NYUFCA
§ 276 have broadly held that a conveyance is fraudulent as to future
creditors only if the transferee had "intent to defraud, or participated in
such fraud." *E.g.*, *Mazzeo*, 306 F. Supp. 2d at 314. However, no such
gloss appears in the statutory text. *Id.* Other cases have construed this
judicially created gloss more narrowly, holding that "[t]he intent of the
transferee only becomes relevant … if the defendant is not the initial
transferee." *E.g.*, *Secs. Investor Prot. Corp.*, 234 B.R. at 318. This Court
need not resolve the scope of this gloss, as the CFC has not yet had
occasion to consider the Government's § 276 theory and its arguments
concerning the Trusts' fraudulent intent. *See Baxter Healthcare Corp.
v. Spectramed, Inc.*, 49 F.3d 1575, 1585 (Fed. Cir. 1995) ("we sit as a
court to review claims that a trial judge erred, and not as a court of first
instance").

of interest at issue).)  The CFC correctly held that this argument failed as a matter of law.  (Appx54-78.)

1.  Under I.R.C. § 6601(a), interest on an underpayment of tax generally begins to accrue on the date that the payment was due, regardless of whether the IRS has formally assessed the liability. *Energy East Corp. v. United States*, 645 F.3d 1358, 1360 (Fed. Cir. 2011).  Recognizing that some taxpayers might want to forestall the accrual of preassessment interest while the amount of their liability remains in dispute, the IRS has long permitted taxpayers to make "deposits," *i.e.*, remittances akin to cash bonds that the IRS holds for the benefit of the taxpayer on whose behalf they were made. *Principal Life Ins. Co. and Subs. v. United States*, 95 Fed. Cl. 786, 800-01 (2010); Rev. Proc. 84-58, 1984-2 C.B. 501 (Aug. 13, 1984).  If the IRS ultimately assesses additional taxes, then the deposit can be used to pay the liability and the deposit date is treated as the payment date (thereby avoiding underpayment interest).  Rev. Proc. 2005-18, 2005-1 C.B. 798, at Sect. 4 (Mar. 28, 2005).  Taxpayers also remain free to request that their deposits be returned, without having to submit formal refund

claims.  *Id.* at Sect. 6.  Historically, taxpayers were not entitled to interest on returned deposits.  Rev. Proc. 84-58, at Sect. 5.04.

In 2004, Congress enacted I.R.C. § 6603, which largely codified the IRS's longstanding practices concerning deposits.  Under I.R.C. § 6603, taxpayers can continue to make deposits that "may be used by the Secretary to pay" later assessed taxes, with the taxes "treated as paid when the deposit is made."  I.R.C. § 6603(a), (b).  Taxpayers can also continue to request that their deposits be returned without having to submit formal refund claims, and, with an exception not relevant here, "the Secretary shall return" taxpayers' deposits upon request.  I.R.C. § 6603(c).  In an important change, taxpayers are now generally entitled to interest on returned deposits, albeit at the federal short-term rate rather than the higher rate applicable to tax underpayments.  I.R.C. §§ 6603(d)(1) & (4), 6621(a)(2) & (b).

Understood within this framework, I.R.C. § 6603 was intended "to help taxpayers better manage their exposure to underpayment interest" by allowing them to earn interest on returned deposits, thus reducing the risk of a depositing taxpayer having to "make a potentially indefinite-term investment in a non-interest bearing account."  H.R.

Rep. 108-548, part 1, at *305 (2004).  Consistent with I.R.C. § 6603(a)'s directive that deposits "shall be made in such manner as the Secretary shall prescribe," the IRS has issued Rev. Proc. 2005-18, which provides "procedures for taxpayers to make, withdraw, or identify deposits."

2.  Applying these principles to the case at bar, the CFC correctly held that the Trusts were not entitled to a refund of underpayment interest.  (Appx54-78.)  In late 2014 and early 2015, the IRS issued notices of proposed liability to the nine original trusts.  (Appx2555-2556.)  In May 2015, attorneys representing the trusts made approximately $71.7 million of deposits:  $500,000 on behalf of two of the original trusts and $71.2 million on behalf of 28 trusts that were successors to the remaining seven original trusts.  (Appx2556-2557.)

Consistent with its notices of proposed liability, the IRS thereafter assessed tax liabilities against the nine original trusts.  (Br. 7.)  The IRS then used the $500,000 of deposits made on behalf of two of the original trusts to pay those trusts' liabilities.  (Appx2563.)  The IRS did not, however, use the remaining $71.2 million of deposits made on behalf of 28 *successor trusts* to pay the liabilities assessed against the other seven *original trusts*, as it determined that it was inappropriate to

use deposits made on behalf of one taxpayer to pay liabilities assessed against a different taxpayer. (2017 IRS Non-Docketed SAR LEXIS 2, IRS NSAR 20171801F, at [*5] (Feb. 27, 2017); Appx 2561-2562.)

In March 2017, attorneys representing the trusts requested that the IRS return $19.8 million of deposits made on behalf of four of the successor trusts, plus interest under I.R.C. § 6603. (Appx2562); *see also Dillon Trust Co. LLC v. Koskinen*, No. 1:17-cv-1571 (D. Colo.) (mandamus suit seeking the same relief). In August 2017, the IRS returned the four successor trusts' deposits, plus interest under I.R.C. § 6603, as they had requested. (Appx2563.)

Later that month, the attorneys representing the trusts requested that the IRS return the remaining $51.5 million of deposits made on behalf of the remaining 24 successor trusts, plus interest under I.R.C. § 6603. (Appx1892-1893, Appx2564-2565.) In October 2017, the IRS returned the remaining successor trusts' deposits, plus interest under I.R.C. § 6603, as requested. (Appx2566-2567.)

Under the plain terms of I.R.C. § 6603(c), the IRS was required to return the deposits when the trusts' attorneys so requested. It is undisputed that the IRS returned the deposits. (Appx2563, Appx2566-

2567.) Under the plain terms of I.R.C. §§ 6603(d) and 6621(b), the IRS was also required to pay interest on those deposits at the federal short-term rate. It is undisputed that the IRS paid such interest. (Appx2563, Appx2566-2567.)

Of course, if the IRS had used the successor trusts' deposits to pay the liabilities assessed against the original trusts, then the liabilities would have been treated as paid on the date of deposit and substantial underpayment interest would have been avoided. *See* I.R.C. § 6603(b). This is of no moment. As the CFC correctly recognized (Appx64, Appx73), such treatment is only appropriate "[t]o the extent that such deposit is used by the Secretary to pay tax." I.R.C. § 6603(b). Here, it is undisputed that the successor trusts' deposits were not used to pay the liabilities assessed against the original trusts. (Appx2563, Appx2566-2567.) Accordingly, the Trusts in this case received all that they were due under I.R.C. § 6603 and are entitled to no more.

3. Undeterred, the Trusts point out that I.R.C. § 6603(b) gives the IRS discretion to use a deposit to pay a later assessed liability. (Br. 48.) They contend that, by not using the successor trusts' deposits to pay liabilities assessed against the original trusts, the IRS abused its

discretion. (Br. 48-56.) Even if this contention had merit, the trusts waived it by their course of conduct—namely, requesting the return of their deposits and thereby depriving the IRS of discretion to use the funds for any other purpose. *See* I.R.C. § 6603(c).

In any event, the Trusts' contention lacks merit. As the CFC recognized, nothing in I.R.C. § 6603 obligates the IRS to use a taxpayer's deposit to pay a liability assessed against that taxpayer, much less a liability assessed against another taxpayer. (Appx64, Appx67); *Principal Life Ins.*, 95 Fed. Cl. at 800-01 (taxpayer had no "unilateral contractual right to redesignate its deposit as payment"). Similarly, the court recognized that nothing in Rev. Proc. 2005-18 so obligates the IRS. (Appx64-65.) *See Principal Life Ins.*, 95 Fed. Cl. at 800-01. Furthermore, in declining to use the successor trusts' deposits to pay the original trusts' liabilities here, the IRS reasoned that while a transferee's liability is derivative of the transferor's liability, the two liabilities are not interchangeable. 2017 IRS Non-Docketed SAR LEXIS 2, at [*4-*5]. The IRS then reviewed the text, structure, and history of I.R.C. § 6603 and Rev. Proc. 2005-18 and, after doing so, expressed concern that there was no guidance authorizing one taxpayer

-64-

to "designat[e] its deposit to be applied to another taxpayer's liability." *Id.* at [*5]. In addition, the IRS expressed concern about allowing one taxpayer's attorney to direct that the taxpayer's deposit be used to pay another taxpayer's liability. *Id.* at [*5-*6].

The Trusts largely ignore the IRS's reasoning, asserting only that it is not entitled to deference. (Br. 56-57.) Whether that reasoning is entitled to deference is, however, entirely beside the point. The IRS's exercise of discretion is appropriately measured against its contemporaneous explanation in support thereof. *See Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019). The Trusts cannot establish that the IRS abused its discretion by failing to meaningfully engage with the IRS's reasoning, as the CFC correctly recognized. (Appx76-76 (holding that the IRS's determination was supported by its "examination of the structure, purpose, and language of Rev. Proc. 2005-18" and was not based on the consideration of any "unreasonable factor[s]").)

Indeed, the IRS's concerns are well founded. Even without considering the difference between the taxpayer who made a deposit and the taxpayer whose liability is being paid, converting a deposit to a

payment has serious ramifications.  For example, it means that the

taxpayer loses the ability to have the funds returned upon request and

can only recover them by paying the liability in full, submitting a

formal refund claim, and filing a refund suit if the claim is not allowed.

*Principal Life Ins.*, 95 Fed. Cl. at 796-77.  It also means that the

taxpayer's time to recover the funds is governed by the limitations

period in I.R.C. § 6532(a), rather than the potentially indefinite period

available to request the return of a deposit.  *Id.* at 796.

Additional issues arise when one taxpayer's deposit is used to pay

another taxpayer's liability.  For example, using a taxpayer's deposit to

full-pay the taxpayer's own liability does not generally deprive the

taxpayer of its right to be issued a notice of deficiency and contest the

liability in the Tax Court.  Rev. Proc. 2005-18, at Sect. 4.02(2).

However, it is not clear whether that would still be the case if one

taxpayer's deposit were used to full-pay another taxpayer's liability.

*See Principal Life Ins.*, 95 Fed. Cl. at 796 n.19.  Perhaps more

significantly, the depositing taxpayer which allowed its funds to be used

to pay another taxpayer's liability might be considered a mere

"volunteer" unable to bring a refund suit to recover the funds in its own

right, *see United States v. Williams*, 514 U.S. 527, 540 (1995), and the taxpayer whose liability was satisfied using a third party's funds might lack standing to bring a refund suit to recover someone else's money, *see Delaune v. United States*, 143 F.3d 995, 1006 (5th Cir. 1998). The IRS's bright-line rule, under which deposits can only be used to satisfy the liability of the taxpayer on whose behalf they are made, forestalls these issues.

4. In the proceedings below, the Trusts opposed summary judgment by arguing that a series of IRS mistakes prevented the successor trusts' deposits from being used to pay the original trusts' liabilities. (Appx1589-1600, 1605-1607.) However, as the CFC held (Appx65-66), this would effectively make their claim one under I.R.C. § 6404(e), *i.e.*, abatement of interest attributable to unreasonable errors and delays by the IRS, over which the Tax Court would have exclusive jurisdiction. I.R.C. § 6404(h)(1); *Hinck v. United States*, 550 U.S. 501, 503 (2007). Both in their motion for reconsideration and on appeal, the Trusts have attempted to recast their "IRS mistakes" argument as an "IRS abuse of discretion" argument. (Appx2579-2600 (using the phrase "abuse of discretion" for the first time); Br. 48-56.) The CFC correctly

rejected the Trusts' attempt to circumvent the jurisdictional limits of I.R.C. § 6404(h)(1) (Appx73), and this Court should do likewise.

The Trusts' arguments also fail on their own terms. First, they observe that neither I.R.C. § 6603 nor Rev. Proc. 2005-18 expressly prohibits the IRS from using one taxpayer's deposit to pay another taxpayer's liability. (Br. 52.) But, as the CFC observed, it is equally true that neither I.R.C. § 6603 nor Rev. Proc. 2005-18 expressly "contemplate[s] a taxpayer's request as obligating the IRS to use a deposit for … payment" of another taxpayer's liability. (Appx65.)

Second, the Trusts argue that using the successor trusts' deposits to pay the original trusts' liabilities would have furthered the purpose of I.R.C. § 6603, which they characterize as "enabling taxpayers to manage their exposure to underpayment interest." (Br. 53 (citation and internal quotations omitted).) But honoring the successor trusts' request to return the deposits, plus interest under I.R.C. § 6603, also served that purpose by preventing them from having made an "investment in a non-interest bearing account." *See* H.R. Rep. 108-548, part 1, at *305.

Third, the Trusts assert that the IRS has "no legitimate interest" in preventing one taxpayer from directing that its deposit be used to pay another taxpayer's liability. (Br. 53.) But as we have already explained, the IRS had a strong interest in adopting a bright-line rule—rather than the amorphous facts-and-circumstances test advocated by the Trusts—where no existing guidance contemplates the practice put forward by the Trusts; the ramifications of allowing this practice are both serious and uncertain; and the actions of the depositing taxpayer could adversely impact the rights of the assessed taxpayer. *Supra,* pp. 64-67; *see also Facebook, Inc. v. Windy City Innovations, LLC,* 973 F.3d 1321, 1330 (Fed. Cir. 2020) (statutes "must be read in their context and with a view to their place in the overall statutory scheme") (citation and internal quotations omitted).

Fourth, the Trusts observe (Br. 53-56) that a taxpayer remitting a voluntary payment generally has the right to make a contemporaneous designation of the liability to which the payment should be applied, including the liability of a third party. *Dixon v. Commissioner,* 141 T.C. 173, 185 (2013); *cf. Williams,* 514 U.S. at 535 (party whose property was subject to tax lien against a different taxpayer could pay the underlying

tax, submit a refund claim, and seek a refund); *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929). This is a red herring. The question before this Court is not whether the successor trusts were permitted to pay the liabilities assessed against the original trusts. The question is whether payment of the original trusts' liabilities should be treated as having been made on the date that the successor trusts made deposits on their own behalf, even though those deposits were later returned to the successor trusts at their request, plus interest under I.R.C. § 6603.

For this reason, the CFC was correct in rejecting the Trusts' reliance on caselaw concerning payments. (Appx73, Appx76-77; *see also* Appx64 ("a deposit is *not* a tax payment until and unless the IRS uses the deposit for a payment").) In any event, such caselaw favors the Government's position, not the Trusts'. In *Energy East*, this Court held that a parent corporation was not entitled to offset its subsidiaries' overpayments against its own liability to avoid underpayment interest, even though the parent and subsidiaries later merged into a consolidated group and became severally liable for each other's taxes. 645 F.3d at 1361-63. There is no compelling reason why a different result should follow here.

As a last resort, the Trusts appeal to equity.  (Br. 54.)  However, resort to equity is inappropriate here, where the Trusts' problems are of their own making.  On the front end, the attorneys representing the trusts were in receipt of notices of proposed liability that the IRS had issued to the nine original trusts.  But they chose not to make deposits on behalf of seven of those nine trusts.  They also chose not to consult with the IRS about what would happen if they made deposits on behalf of the 28 successor trusts, rather than the seven original trusts.  Instead, they blindly made deposits in the manner described above, resulting in a mismatch between the taxpayers who made the deposits and the taxpayers with the assessed liabilities.

On the back end, the attorneys representing the trusts had the opportunity to remedy their missteps by simply leaving the successor trusts' deposits with the IRS.  Once the IRS made transferee assessments against the successor trusts (which now held the assets of the seven defunct original trusts), the successor trusts' deposits could have been used to pay the successor trusts' liabilities and cross-credited against the original trusts' liabilities (for which the successor trusts were now severally liable).  *Cullifer v. Commissioner*, 651 F. App'x 847,

850 (11th Cir. 2016).  And under I.R.C. § 6603(b), the successor trusts' deposit date would have been treated as the payment date (thereby avoiding underpayment interest).  Instead, the trusts requested that the IRS return the deposits, plus interest under I.R.C. § 6603, locking in the result of which they now complain.

## CONCLUSION

The judgment of the CFC is correct and should be affirmed.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Geoffrey J. Klimas

| | |
|---|---|
| FRANCESCA UGOLINI | (202) 514-3361 |
| JACOB EARL CHRISTENSEN | (202) 307-0878 |
| GEOFFREY J. KLIMAS | (202) 307-6346 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

JULY 1, 2024

# STATUTORY ADDENDUM

26 U.S.C. § 6603.................................................................................74

26 U.S.C. § 6901.................................................................................76

N.Y. Debt. & Cred. L. § 270 ............................................................80

N.Y. Debt. & Cred. L. § 273 ............................................................80

N.Y. Debt. & Cred. L. § 276 ............................................................80

N.Y. Debt. & Cred. L. § 278 ............................................................81

**26 U.S.C. § 6603--Deposits made to suspend running of interest on potential underpayments, etc.**

**(a) Authority to make deposits other than as payment of tax.--**A taxpayer may make a cash deposit with the Secretary which may be used by the Secretary to pay any tax imposed under subtitle A or B or chapter 41, 42, 43, or 44 which has not been assessed at the time of the deposit. Such a deposit shall be made in such manner as the Secretary shall prescribe.

**(b) No interest imposed.--**To the extent that such deposit is used by the Secretary to pay tax, for purposes of section 6601 (relating to interest on underpayments), the tax shall be treated as paid when the deposit is made.

**(c) Return of deposit.--**Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing.

**(d) Payment of interest.--**

**(1) In general.--**For purposes of section 6611 (relating to interest on overpayments), except as provided in paragraph (4), a deposit which is returned to a taxpayer shall be treated as a payment of tax for any period to the extent (and only to the extent) attributable to a disputable tax for such period. Under regulations prescribed by the Secretary, rules similar to the rules of section 6611(b)(2) shall apply.

**(2) Disputable tax.--**

**(A) In general.--**For purposes of this section, the term "disputable tax" means the amount of tax specified at the time of the deposit as the taxpayer's reasonable estimate of the maximum amount of any tax attributable to disputable items.

**(B) Safe harbor based on 30-day letter.**--In the case of a taxpayer who has been issued a 30-day letter, the maximum amount of tax under subparagraph (A) shall not be less than the amount of the proposed deficiency specified in such letter.

**(3) Other definitions.**--For purposes of paragraph (2)--

**(A) Disputable item.**--The term "disputable item" means any item of income, gain, loss, deduction, or credit if the taxpayer--

**(i)** has a reasonable basis for its treatment of such item, and

**(ii)** reasonably believes that the Secretary also has a reasonable basis for disallowing the taxpayer's treatment of such item.

**(B) 30-day letter.**--The term "30-day letter" means the first letter of proposed deficiency which allows the taxpayer an opportunity for administrative review in the Internal Revenue Service Independent Office of Appeals.

**(4) Rate of interest.**--The rate of interest under this subsection shall be the Federal short-term rate determined under section 6621(b), compounded daily.

**(e) Use of deposits.**--

**(1) Payment of tax.**--Except as otherwise provided by the taxpayer, deposits shall be treated as used for the payment of tax in the order deposited.

**(2) Returns of deposits.**--Deposits shall be treated as returned to the taxpayer on a last-in, first-out basis.

## 26 U.S.C. § 6901--Transferred assets.

**(a) Method of collection.**--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

   **(1) Income, estate, and gift taxes.--**

   **(A) Transferees.**--The liability, at law or in equity, of a transferee of property--

   **(i)** of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

   **(ii)** of a decedent in the case of a tax imposed by chapter 11 (relating to estate taxes), or

   **(iii)** of a donor in the case of a tax imposed by chapter 12 (relating to gift taxes),

   in respect of the tax imposed by subtitle A or B.

   **(B) Fiduciaries.**--The liability of a fiduciary under section 3713(b) of title 31, United States Code, in respect of the payment of any tax described in subparagraph (A) from the estate of the taxpayer, the decedent, or the donor, as the case may be.

   **(2) Other taxes.**--The liability, at law or in equity of a transferee of property of any person liable in respect of any tax imposed by this title (other than a tax imposed by subtitle A or B), but only if such liability arises on the liquidation of a partnership or corporation, or on a reorganization within the meaning of section 368(a).

**(b) Liability.--**Any liability referred to in subsection (a) may be either as to the amount of tax shown on a return or as to any deficiency or underpayment of any tax.

**(c) Period of limitations.--**The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows:

> **(1) Initial transferee.--**In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor;
>
> **(2) Transferee of transferee.--**In the case of the liability of a transferee of a transferee, within 1 year after the expiration of the period of limitation for assessment against the preceding transferee, but not more than 3 years after the expiration of the period of limitation for assessment against the initial transferor;

except that if, before the expiration of the period of limitation for the assessment of the liability of the transferee, a court proceeding for the collection of the tax or liability in respect thereof has been begun against the initial transferor or the last preceding transferee, respectively, then the period of limitation for assessment of the liability of the transferee shall expire 1 year after the return of execution in the court proceeding.

> **(3) Fiduciary.--**In the case of the liability of a fiduciary, not later than 1 year after the liability arises or not later than the expiration of the period for collection of the tax in respect of which such liability arises, whichever is the later.

**(d) Extension by agreement.--**

> **(1) Extension of time for assessment.--**If before the expiration of the time prescribed in subsection (c) for the assessment of the liability, the Secretary and the transferee or fiduciary have both consented in writing to its assessment after such time, the liability may be assessed at any time prior to the expiration of the

period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. For the purpose of determining the period of limitation on credit or refund to the transferee or fiduciary of overpayments of tax made by such transferee or fiduciary or overpayments of tax made by the transferor of which the transferee or fiduciary is legally entitled to credit or refund, such agreement and any extension thereof shall be deemed an agreement and extension thereof referred to in section 6511(c).

**(2) Extension of time for credit or refund.**--If the agreement is executed after the expiration of the period of limitation for assessment against the taxpayer with reference to whom the liability of such transferee or fiduciary arises, then in applying the limitations under section 6511(c) on the amount of the credit or refund, the periods specified in section 6511(b)(2) shall be increased by the period from the date of such expiration to the date of the agreement.

**(e) Period for assessment against transferor.**--For purposes of this section, if any person is deceased, or is a corporation which has terminated its existence, the period of limitation for assessment against such person shall be the period that would be in effect had death or termination of existence not occurred.

**(f) Suspension of running of period of limitations.**--The running of the period of limitations upon the assessment of the liability of a transferee or fiduciary shall, after the mailing to the transferee or fiduciary of the notice provided for in section 6212 (relating to income, estate, and gift taxes), be suspended for the period during which the Secretary is prohibited from making the assessment in respect of the liability of the transferee or fiduciary (and in any event, if a proceeding in respect of the liability is placed on the docket of the Tax Court, until the decision of the Tax Court becomes final), and for 60 days thereafter.

**(g) Address for notice of liability.**--In the absence of notice to the Secretary under section 6903 of the existence of a fiduciary relationship, any notice of liability enforceable under this section required to be mailed to such person, shall, if mailed to the person subject to the liability at his last known address, be sufficient for purposes of this title, even if such person is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

**(h) Definition of transferee.**--As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee, and with respect to estate taxes, also includes any person who, under section 6324(a)(2), is personally liable for any part of such tax.

**(i) Extension of time.**--For extensions of time by reason of armed service in a combat zone, see section 7508.

**N.Y. Debt. & Cred. L. § 270 (2000)--Definition of terms.**

In this article "assets" of a debtor means property not exempt from liability for his debts. To the extent that any property is liable for any debts of the debtor, such property shall be included in his assets.

"Conveyance" includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance.

"Creditor" is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

"Debt" includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.


**N.Y. Debt. & Cred. L. § 273 (2000)--Conveyances by insolvent.**

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.


**N.Y. Debt. & Cred. L. § 276 (2000)--Conveyance made with intent to defraud.**

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

**N.Y. Debt. & Cred. L. § 278 (2000)--Rights of creditors whose claims have matured.**

1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,

> a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

> b. Disregard the conveyance and attach or levy execution upon the property conveyed.

2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1314

**Short Case Caption:** Dillon v. US

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13,990__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __07/01/2024__

Signature: /s/ Geoffrey J. Klimas

Name: Geoffrey J. Klimas

-82-

Save for Filing