# No. 24-1314

# In the United States Court of Appeals for the Federal Circuit

**DILLON TRUST COMPANY LLC,**
**as trustee for Trusts 709204, 709210, and 8545,**

*Plaintiff-Appellant,*

v.

**UNITED STATES,**

*Defendant-Appellee.*

**On Appeal from the U.S. Court of Federal Claims**
**Nos. 1:17-cv-01898, 1:17-cv-02022 & 1:17-cv-02023**
**The Honorable Eric G. Bruggink**

## REPLY BRIEF OF PLAINTIFF-APPELLANT DILLON TRUST COMPANY LLC

Mark C. Savignac
Caitlin R. Tharp
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000
msavignac@steptoe.com
ctharp@steptoe.com

Lawrence M. Hill
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
lhill@steptoe.com

*Attorneys for Plaintiff-Appellant*
*Dillon Trust Company LLC*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................2

    I.   The Claims Court erred in holding the Taxpayer liable as a transferee. .....2

        A.   The Government's claims of "concessions" and "technical arguments" are spurious. ................................................................3

        B.   The Government's bid to resuscitate the Claims Court's analysis fails. .............................................................................................4

        C.   The Claims Court's ruling turned on an undisputed error of law. .......11

        D.   The Government must show "active avoidance," not mere passive failure to actively investigate. .........................................................13

    II.   The Claims Court erred in holding the Taxpayer liable for more than the alleged net value of the transfer it received. ........................................14

        A.   "Purchaser" .................................................................................14

        B.   Burden of proof .............................................................................15

        C.   Actual fraudulent intent ..................................................................16

    III.   The Claims Court erred in holding the Taxpayer liable for HSHC's tax penalty. ..............................................................................................16

        A.   The "accrual" theory .....................................................................17

        B.   The Government's bid for a remand ................................................21

    IV.   The Claims Court erred in holding that underpayment interest accrued while the IRS had the use of the Taxpayer's money. ...............................23

        A.   Forfeiture ......................................................................................23

B. Return requests .................................................................23

C. Abuse of discretion.............................................................26

CONCLUSION ..............................................................................29

**Page(s)**

**Cases**

*BASR Partnership v. United States,*
795 F.3d 1338 (Fed. Cir. 2015) ........................................................................15

*In re CNB International, Inc.,*
440 B.R. 31 (W.D.N.Y. 2010) .....................................................................14, 15

*Commissioner v. Stern,*
357 U.S. 39 (1958) ............................................................................................19

*Department of Commerce v. New York,*
588 U.S. 752 (2019) ..........................................................................................28

*Diebold Foundation, Inc. v. Commissioner,*
736 F.3d 172 (2d Cir. 2013) .....................................................................5, 6, 13

*Durland v. Crawford,*
183 A.D. 763 (N.Y. App. Div. 1918) ....................................................18, 20, 22

*Eisenberg v. Commissioner,*
155 F.3d 50 (2d Cir. 1998) .......................................................................1, 4, 8

*Energy East Corp. v. United States,*
645 F.3d 1358 (Fed. Cir. 2011) ........................................................................27

*FDIC v. Malin,*
802 F.2d 12 (2d Cir. 1986) ..............................................................................15

*Granite Management Corp. v. United States,*
416 F.3d 1373 (Fed. Cir. 2005) ........................................................................21

*HBE Leasing Corp. v. Frank,*
48 F.3d 623 (2d Cir. 1995) .................................................................................3

*Radio Steel & Manufacturing Co. v. MTD Products, Inc.,*
731 F.2d 840 (Fed. Cir. 1984) ..........................................................................21

*Stanko v. Commissioner,*
209 F.3d 1082 (8th Cir. 2000) .....................................................................18, 19

*Starnes v. Commissioner*,
    680 F.3d 417 (4th Cir. 2012) ................................................................12

*United States v. Mazzeo*,
    306 F. Supp. 2d 294 (E.D.N.Y. 2004) ...........................................18, 22

**Statutes**

5 U.S.C. § 706 ........................................................................................24

26 U.S.C. § 368 ........................................................................................1

26 U.S.C. § 6603 .........................................................................23, 24, 26

NYUFCA § 270 ......................................................................................19

NYUFCA § 273 ................................................................................17, 19

NYUFCA § 276 ........................................................................16, 17, 21, 22

NYUFCA § 278 ................................................................................15, 16

**Other Authorities**

110 T.C.M. (CCH) 507 .............................................................................7

Black's Law Dictionary (12th ed. 2024) ...............................................15

H.R. Rep. No. 108-548, pt. 1 ...................................................................23

IRS Office of Chief Counsel Memorandum 20171801F...........................28

# INTRODUCTION

The Government would have this Court believe that the Taxpayer undertook a recognized tax-shelter scheme—an "intermediary" or "Midco" shelter—in which the seller evades a corporate gains tax by selling the corporation to a buyer with a "purported ability to eliminate the taxable gain on the asset sale" that is "invariably spurious." U.S. Br. 1, 3. In its opening statement at trial, however, the Government insisted that "this is not an intermediary tax shelter case. The Government doesn't have to prove that it was." Appx2847.

In fact, there is *zero* evidence that the Taxpayer viewed the transaction as a "Midco" or "intermediary" shelter or that it was seeking such a shelter. The evidence is to the contrary. *E.g.*, Appx9, Appx11, Appx15-16, Appx17, Appx4138-4139, Appx3933. Moreover, stock sales are both commonplace and contemplated by the Tax Code, 26 U.S.C. § 368(a)(1)(C). Most corporations own appreciated assets when sold (Appx3933), meaning that the stock sale allows the corporation's owner to avoid the tax that it would have incurred had it realized the gains through an asset sale. And, "[w]here there is a relatively sizable number of potential buyers who can avoid or defer the tax, the fair market value of the shares might well approach the pre-tax market value" of the corporation's assets, because "[p]otential buyers who could avoid or defer the tax would compete to purchase the shares." *Eisenberg v. Commissioner*, 155 F.3d 50, 59 n.16 (2d Cir. 1998).

1

There is no record basis for the Government's blanket insistence that such buyers' tax attributes are "invariably spurious." U.S. Br. 3. In this case, consistent with *Eisenberg*'s reasoning, three potential buyers bid up the price to 95% of the underlying assets' market value. Contrary to its "invariably spurious" assertion, the Government frankly admits (at 32) that it did not prove that the other bidders—which included Deutsche Bank—would have committed tax fraud.

Unfortunately, HSHC and Haber did commit tax fraud, and the Government failed to collect from them. But that does not make the Taxpayer—which undisputedly had no intent to defraud (Appx26-27)—liable for the Government's loss.

## ARGUMENT

### I.   The Claims Court erred in holding the Taxpayer liable as a transferee.

The Government agrees that the judgment can stand only if "the Trusts had constructive knowledge of HSHC's scheme to leave its taxes unpaid." U.S. Br. 14. The Government also agrees that the Taxpayer had "constructive knowledge" only if it was "'aware of circumstances that should have led [it] to inquire further … but … failed to make such inquiry'" and "engaged in some form of 'active avoidance of the truth.'" U.S. Br. 13-14 (citations omitted).[1]

---

[1] The Government says that some courts have applied a less "stringent" standard. U.S. Br. 13-14. But it does not advocate that standard.

The Claims Court's ruling on this dispositive point is fatally flawed.  *See* Opening Br. 15-37.  The Government's attempt to resuscitate it fails.  *See* U.S. Br. 10-40.

**A. The Government's claims of "concessions" and "technical arguments" are spurious.**

The Government says that the Taxpayer relies only on a "technical argument" that there was no "direct conveyance from HSHC to the Trusts" and "concede[s]" that, if there was a conveyance, it "was made without fair consideration and "was fraudulent as to the United States." U.S. Br. 7, 11-12.  This rhetoric has no basis.

*First*, the point that the Taxpayer is not liable unless the transactions are "collapsed" is no mere "technical argument."  It is the test under New York law, as the Government concedes (at 12-13).  And it turns on whether the Taxpayer is properly charged with "actual or constructive knowledge … of the debtor's fraudulent scheme." U.S. Br. 13.  There is nothing "technical" about the notion that the Taxpayer cannot be liable for a third party's fraud if the Taxpayer did not even have *constructive knowledge* of the scheme.  To the contrary, the knowledge requirement "reflects the UFCA's policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995).

*Second*, the Taxpayer does not "concede" that HSHC received less than fair consideration in the Stock Sale. HSHC paid around $86 million in exchange for two companies whose assets were worth around $91 million. Appx41, Appx50. That deal would be highly *profitable* for any buyer with the tax attributes to avoid tax on the assets' gains, and it is undisputed that such buyers exist. The stock was therefore fair consideration for the purchase price, regardless of whether *HSHC* actually possessed the tax attributes to make it profitable. *See* Opening Br. 24-26 & n.4; *Eisenberg v. Commissioner*, 155 F.3d 50, 58 n.15, 59 n.16 (2d Cir. 1998). The Taxpayer has simply focused on the collapsing analysis because that is the governing framework—as the Government and the Claims Court agree.

**B. The Government's bid to resuscitate the Claims Court's analysis fails.**

1. Like the Claims Court, the Government rests its case mainly on unremarkable facts that do nothing to advance its position: The Taxpayer was advised by professionals, the Taxpayer and its advisers knew that Humboldt and Shelby would incur tax liability if they sold their appreciated assets, and the Taxpayer and its advisers chose a Stock Sale to avoid incurring such liability. *See* U.S. Br. 14-17. Seeking to minimize one's tax bill is lawful and commonplace, and it is *undisputed* that a sale of the Humboldt and Shelby stock to a buyer with tax attributes to absorb the losses would have been a lawful means of achieving that

4

goal.  In short, the evidence that the Taxpayer recognized potential tax liability and sought to lawfully avoid it is not probative of wrongdoing.

Apparently recognizing as much, the Government seeks to conjure up evidence of bad faith by insisting that "the Trusts' representatives … postdated [a] diagram."  U.S. Br. 4.  But the Claims Court made no finding of deceptive postdating, and this Court does not sit to make fact-findings that the trial judge declined to make following an 11-day trial.  Nor does the Government explain how the *date* on the diagram could be sinister in any event.  It is not as if the Government otherwise treats the diagram as significant here.

The absence of evidence of bad faith makes this case very different from *Diebold Foundation, Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013).  There, the taxpayers "had a 'sophisticated understanding' of the structure of the entire transaction" and deleted text that evinced that understanding.  *See* Opening Br. 33-35.  The Government apparently believes that its "postdated diagram" theory is its best argument for a *Diebold*-style cover-up.  But, again, the Claims Court did not accept that baseless theory.

So the Government changes tack and insists that, though the Second Circuit in *Diebold* "stated that the [taxpayers'] attempt to conceal the extent of their knowledge provided additional support for its holding," the holding was not "dependent on such facts."  U.S. Br. 37.  Nonsense.  *Diebold* says that the analysis

turns on "the totality of the circumstances from all the facts," and it addressed the deleted language in the background section of its opinion, well before reaching any conclusion. 736 F.3d at 178-79, 188. Then, after referencing the cover-up evidence in its discussion section, the Second Circuit concluded: "Taken together, these circumstances should have caused the [taxpayer] representatives to inquire further." *Id.* at 189. In short, the decision below is a substantial and unwarranted extension of *Diebold*. *See also* Opening Br. 33-36.

2. In the end, the Government's argument boils down to this: Anyone who sells a company for a price *below* the market value of the company's assets but *above* the asset value minus the tax that would apply to unrealized gains on the assets must perform some indefinite level of "due diligence" to investigate whether the buyer has access to tax attributes that would enable it to avoid that tax legitimately and turn a profit on the stock sale. *See, e.g.*, U.S. Br. 18. There is no such rule.

a. Such a rule would undoubtedly be convenient for the IRS. But it has no basis in existing law—if the IRS wants such a rule, it must seek it from Congress, not the courts. *First*, NYUFCA is a generally applicable state law on *fraudulent transfers*. It does not require "due diligence" into every transaction. It requires that the transferee not do a deal if it knows that the transferor is committing fraud. *Diebold*, 736 F.3d at 187. *Second*, "the Commissioner's own expert [in *Alterman v. Commissioner*] admitted there are *no standards for sell-side due diligence*" in cash

6

sales, because "[a] seller's main concern is whether the buyer will be able to close the deal." 110 T.C.M. (CCH) 507, at *57 (emphasis added). The Taxpayer pointed this out in its opening brief (at 36), and the Government has no response.

**b.** Nor is there any basis for the view that the transaction here was inherently suspicious because the bids exceeded the value of the underlying assets minus the tax that Humboldt and Shelby would have incurred had they realized the unrealized gains. The Claims Court concluded that no rational buyer would pay more than that unless it intended to commit tax fraud. Rather than defend that indefensible conclusion, the Government insists that the Claims Court "found no such thing." U.S. Br. 29. Yet it elsewhere quotes the Claims Court as having declared that "these bids lacked 'economic validity'" and were "unrealistic." U.S. Br. 23, 29. And it echoes the Claims Court's erroneous belief that the fair market value of the stock was the value of the underlying assets minus the "embedded tax liability." U.S. Br. 17-18.

As the Taxpayer has shown, the Government and Claims Court are wrong. *See* Opening Br. 22-32. The Government's cited Second Circuit authority confirms the Taxpayer's point. Like the Taxpayer, the Second Circuit recognizes that "[w]here there is a relatively sizable number of potential buyers who can avoid or defer the tax, the fair market value of the shares might well approach the pre-tax market value of the [entity's underlying assets]. Potential buyers who could avoid

7

or defer the tax would compete to purchase the shares ….” *Eisenberg*, 155 F.3d at 59 n.16. The Taxpayer's auction, which the Government and Claims Court inexplicably paint as somehow sinister (*e.g.*, U.S. Br. 30-31), was intended to find potential buyers and cause them to compete. And it succeeded, yielding three bids that exceeded the price that the Government and Claims Court wrongly deem the "fair market value" and that tended toward the market value of the underlying assets (while still remaining some $5 million below that value—a discount that only the Government could dismiss as "nominal," U.S. Br. 18, 29, 30 n.3).

**c.** The decision below must also be reversed under the Government's novel argument that the Claims Court did *not* believe that "tax fraud was the only possible explanation for the bids." U.S. Br. 32. If there *were* other economically rational explanations, then the bids were not inherently suspicious "red flags," and any notion that NYUFCA required heightened scrutiny falls apart.

The Government dismisses the Taxpayer's arguments as "speculation." U.S. Br. 31. But the Claims Court speculated that *no* rational buyer would have offered as much as DGI/HSHC, TranStar, and Deutsche Bank all did (as did Citi, *see* Opening Br. 24 n.3). The Taxpayer's point is simply that *some* buyers could rationally decide to do so (and, in fact, did). The Government certainly has not proved the contrary by clear and convincing evidence.

The Government's only response to the Deutsche Bank and TranStar bids is that the Claims Court could not address them because the Taxpayer did not collect enough evidence about them. U.S. Br. 32. That is absurd. The Government bore the burden of establishing a fraudulent conveyance by clear and convincing evidence, and it had all the investigative power of the Federal Government if it thought it could prove that Deutsche Bank was planning a tax fraud. (The record shows that it was not. Appx9403-9409.) Anyway, the Taxpayer's point is simply that the bid from a reputable—and highly rational—international bank cannot be dismissed as a presumptively fraudulent "red flag," as the Claims Court's theory requires.

Finally, the Government seeks (at 33-35) to distinguish the Taxpayer's cited authorities on their facts. But it has no response to the Tax Court's recognition that a seller of a company with unrealized gains may reasonably contemplate that the buyer has a lawful plan to address the tax implications. *See* Opening Br. 29-30.

**d.** Even if NYUFCA did require "due diligence" here, the Government has failed to prove a relevant deficiency in the Taxpayer's diligence. DGI was recommended to the Taxpayer by a known business associate, Richard Zack, whom the Taxpayer believed to be reputable. Appx3008, Appx7612. As the Government admits, the Taxpayer also inquired into the buyer's plans but was, predictably, rebuffed because the plans were "proprietary." U.S. Br. 19. The Claims Court found

9

that further inquiry would not have revealed the scheme, and the Government does not argue otherwise. Appx36. As is typical for cash stock sales, the Taxpayer did not demand the buyer's financing documents and was not aware of the terms of the buyer's financing. Appx3904, Appx3935-3936, Appx4347, Appx5121. NYUFCA does not require such a demand.

Nor did NYUFCA (or any applicable tax law) require that the Taxpayer obtain a tax opinion. And the tax attorney did not provide a tax opinion here because tax opinions are unnecessary for cash stock sales—not because he viewed the transaction as suspicious. Appx4190-4191, Appx4296-4297. To the contrary, neither he nor the Shearman & Sterling M&A partner found anything concerning or suspicious about the stock sale. Appx3926; Appx4190; Appx4205. Moreover, counsel's warnings about avoiding tax promoters—and the Taxpayer's consequent decisions to avoid certain entities—show that the Taxpayer and its advisor were acting in good faith, not that they were looking to deal with a fraudster. The same is true of the Taxpayer's negotiation and enforcement of representations and warranties to ensure that all taxes would be paid. *See* Opening Br. 6, 34-35. Finally, vague, self-serving warnings from one bidder—who did not even know who the other bidders were—demand no deference.

The Government notes that HSHC was a new entity. But it does not explain why it believes that it could not have access to relevant tax attributes (much less why

NYUFCA required the Taxpayer to hold that belief). Nor does it dispute the Taxpayer's point that the use of SPVs is commonplace and unremarkable. The Government asserts (at 31) that the Tax Code would have prevented certain uses of certain tax attributes, but, again, it does not support its assertion, much less show that NYUFCA required the Taxpayer to analyze in greater detail how the details of the Tax Code might arguably apply to its counterparty's potential plans.

Finally, while the Claims Court and the Government fault the Taxpayer for failing to find stray statements about DGI and taxes in non-germane and even unpublished court rulings, NYUFCA does not require exhaustive Westlaw searches, and the stray statements were innocuous anyway (which the Government does not dispute). *See* Opening Br. 31-32.

In truth, irrespective of the fact that this was a cash sale, there is no level of diligence that would have satisfied the Government. The upshot of its position is that, having entered into the transaction with HSHC, the Taxpayer is presumed guilty until proven innocent. But that is not the law.

## C. The Claims Court's ruling turned on an undisputed error of law.

1. The Claims Court ruled that the "inquiry knowledge" test does not consider whether inquiry would have revealed the scheme: "plaintiffs contend that the government must prove that further inquiry would have revealed Haber's fraudulent scheme. *We disagree.* We believe it is sufficient to show that there were

indicators of potential fraud and a refusal to ask questions, irrespective of whether Haber would have admitted his plans in detail." Appx36 (emphasis added). As the Taxpayer showed, the Claims Court was wrong: The transferee is charged with *only* the knowledge that the creditor proves (by clear and convincing evidence) would have been learned through reasonable inquiry. *See* Opening Br. 18-22; *Starnes v. Commissioner*, 680 F.3d 417, 434 (4th Cir. 2012).

The Government makes no effort to defend the Claims Court's legal error. It *concedes* that "inquiry knowledge turns on whether a reasonable inquiry would have alerted the transferee to the entire scheme that renders the exchange with the debtor fraudulent." U.S. Br. 25 (brackets and quotation marks omitted). In other words, the Government and the Taxpayer agree on the law.

2.      The Government says that the Taxpayer's "argument rests on the false premise that Haber himself must have been the sole source of inquiry knowledge." U.S. Br. 27. Not so. If the Government proved that reasonable inquiry into other sources would somehow have yielded knowledge of Haber's "entire scheme," that would suffice. But the Government has no such proof. Its argument is simply that, when HSHC refused to disclose proprietary tax planning, the Taxpayer was obliged to scuttle the deal. That is not an argument about what an inquiry would have revealed; it is an argument about what the Taxpayer should have done when its inquiry failed to reveal anything. Nothing in NYUFCA supports such an argument.

12

**3.** Anyway, the Claims Court did not find that any inquiry would have revealed the fraudulent scheme. Rather, it held that the Government did not need to prove that further inquiry would reveal the scheme. Appx36. Since that holding was undisputedly erroneous, the imposition of transferee liability must be reversed.

**D. The Government must show "active avoidance," not mere passive failure to actively investigate.**

The Government does not dispute that constructive knowledge requires proof that the transferee "actively avoided informing [itself] of the truth" of the fraudulent scheme. Appx34. Since there was no evidence (and no finding) of *active avoidance* here, there can be no transferee liability. *See* Opening Br. 32-33.

The Government responds that "active avoidance" does not equate to "active steps" to avoid the truth—even though the Claims Court held otherwise and the two formulations are practically identical. *See* U.S. Br. 28. On the Government's view, "active avoidance" includes passive "failure to inquire." U.S. Br. 28.

The Government's position disregards the plain meaning of "active avoidance." It also ignores that *Diebold* was *distinguishing* between "active avoidance" and a less demanding test charging the transferee with "the knowledge that ordinary diligence [i.e., reasonable inquiry] would have elicited." 736 F.3d at 187.

Having waived any argument that the less demanding test should govern, the Government bore the burden of satisfying the more demanding one by proving active

avoidance.  In fact, it failed to meet either standard.  At most, the Government argued, and the Claims Court found, only that the Taxpayer made certain inquiries but should have done more—not that it made any active decision to restrict its inquiries to avoid a truth that inquiry would have yielded.

## II. The Claims Court erred in holding the Taxpayer liable for more than the alleged net value of the transfer it received.

The Government does not dispute that, under NYUFCA § 278(2), "a purchaser who does not have actual fraudulent intent … is liable only for the difference between the value it conferred to the debtor and the amount it received in exchange." *In re CNB International, Inc.*, 440 B.R. 31, 42 (W.D.N.Y. 2010).  The Claims Court found that "difference" to be approximately $21 million.  *See* Opening Br. 37.  It also found that the Government *did not even try* to show that the Taxpayer had actual fraudulent intent.  Appx26-27.  Thus, even if there was a fraudulent transfer, the Taxpayer's liability is not more than $21 million.  *See* Opening Br. 37-41.

### A. "Purchaser"

Section 278(2) protects a "purchaser who without actual fraudulent intent has given less than a fair consideration."  The Government contends, for the first time, that the Taxpayer was not a "purchaser" because it was "the seller[] in the transaction."  U.S. Br. 45.  The Government apparently seeks to limit § 278(2) to transferees who give value in the form of cash rather than other assets.

14

The argument is fanciful. In context, "purchaser" refers to a transferee who gives value ("consideration") for the transferred property, as opposed to a transferee that receives the property gratuitously. (By contrast, § 278(1)'s broader term "person" sweeps in both.) Indeed, while the Government invokes a website called "vocabulary.com," reputable sources define "purchase" to broadly encompass "[t]he acquisition of an interest in real or personal property by sale … or any other voluntary transaction." Black's Law Dictionary (12th ed. 2024).

This understanding of who can claim § 278 protection underlies both *CNB* (as the Government admits at 46) and *FDIC v. Malin*, 802 F.2d 12, 18-20 (2d Cir. 1986) (wife who received property from husband under separation agreement was "*bona fide* purchaser for value" entitled to § 278 protection, even though she did not pay money to "purchase" the property but rather received it in satisfaction of the husband's marital support obligation).

## B. Burden of proof

As the Claims Court recognized, "New York law plainly holds that the party seeking to set aside a conveyance under the NYUFCA bears the burden." Appx28 (collecting cases). Federal procedure is the same: "When alleging taxpayer fraud … the IRS bears the burden." *BASR Partnership v. United States*, 795 F.3d 1338, 1344 (Fed. Cir. 2015). Nothing in § 278(2) changes that. *See* Opening Br. 38-39. And the Government's bankruptcy and trial court rulings cannot overcome this clear rule.

## C. Actual fraudulent intent

Whoever bears the burden, nothing in the record suggests that the Taxpayer acted with "actual fraudulent intent." As the Claims Court recognized, the Government *never even argued that*. *See* Appx26-27.

The Government now challenges the Claims Court's ruling that it did not establish (or even assert) actual fraud. *See* U.S. Br. 50-51. Even on the Government's account, though, it merely asserted that "HSHC bought Humboldt and Shelby with the actual intent" to defraud. *Id.* at 50. *HSHC's* intent says nothing about the § 278(2) question: whether *the Taxpayer* had "actual fraudulent intent."

There is no evidence that it did. In fact, the Taxpayer simply acted on the advice of its longstanding, trusted tax counsel at Shearman & Sterling (Appx2912-2913; Appx4091), and there is nothing in the record to suggest that counsel acted with actual fraudulent intent. Appx3926; Appx4190; Appx4205. Section 278(2) therefore caps the Taxpayer's liability at $21 million.

## III. The Claims Court erred in holding the Taxpayer liable for HSHC's tax penalty.

NYUFCA allows a creditor to recover only "[w]here a conveyance or obligation is fraudulent as to [such] creditor." NYUFCA § 278(1). A conveyance made with *actual intent* to defraud, in violation of NYUFCA § 276, "is fraudulent as to both present and future creditors." NYUFCA § 276. But a *constructive*

fraudulent transfer, in violation of NYUFCA § 273, is *not* fraudulent as to *future* creditors. *See* Opening Br. 41-42.

The Government does not dispute these points. *See* U.S. Br. 51-58. But it defends the penalty award on two grounds. *First*, the Government argues that the penalty should be deemed an "accrual" on the underlying tax liability that should be recoverable under NYUFCA along with the tax itself. *Second*, the Government argues that the Claims Court erred in finding that it failed to establish a § 276 claim for intentional fraudulent transfer and that the case should be remanded so that it can seek to establish such a claim.

This Court should reject both arguments.

## A. The "accrual" theory

While the Claims Court erroneously based its holding on federal law (Appx51; *see* Opening Br. 42), the Government (at 10) correctly concedes that state law governs the extent of a transferee's liability and thus bases its arguments on NYUFCA. Unsurprisingly, though, NYUFCA was not enacted with the goal of aiding the IRS and contains no special rule for federal tax penalties. Rather, a conveyance is fraudulent as to "future creditors" of the transferor only if the creditor proves intentional fraudulent transfer under NYUFCA § 276, as opposed to constructive fraudulent transfer under NYUFCA § 273. As the Claims Court recognized, the Government only proceeded under § 273. Appx27. It therefore

17

cannot recover as a future creditor. It can recover only to the extent that it was a creditor at the time of the transfer between the Taxpayer and HSHC. And, at that time, it was not owed any underpayment penalty. That penalty came into existence only when, after the transfer, HSHC engaged in a separate transaction, which the taxpayer was not a party to, and chose to file a bogus tax return.

As the Government concedes (at 56), the Eighth Circuit has so held, rejecting transferee liability for a federal tax penalty because "penalties for negligent or intentional misconduct by the transferor that occurred many months after the transfer, such as penalties for failure to file a return and for substantial underpayment of the year-end tax liability, are not, by any stretch of the imagination, existing at the time of the transfer." *Stanko v. Commissioner*, 209 F.3d 1082, 1087-88 (8th Cir. 2000).

The Government has no answer to the clear New York law holding that "a conveyance will not be held to be fraudulent against subsequent creditors unless the grantee herself received it with an intent to defraud, or participated in such fraud." *United States v. Mazzeo*, 306 F. Supp. 2d 294, 314 (E.D.N.Y. 2004) (collecting New York cases); *see Durland v. Crawford*, 183 A.D. 763, 765-66 (N.Y. App. Div. 1918). That is why, citing out-of-state decisions, the Government asks this Court for a special rule that, "[i]n the tax context, accruals for which a transferee may be liable include both interest and statutory additions to tax such as penalties." U.S. Br. 53.

But Congress and the Supreme Court have ruled out any special fraudulent transfer rule to assist the IRS "[i]n the tax context." *See Commissioner v. Stern*, 357 U.S. 39, 47 (1958); Opening Br. 15-16. The Government does not even attempt to argue that NYUFCA creditors in general have the benefit of its proposed "accrual" rule.

Nor do the Government's cases (U.S. Br. 52-53) support its penalties-are-accruals theory. They address whether prejudgment interest on tax liability is determined by federal or state law. They do not address the point that is dispositive here: NYUFCA § 273 only allows recovery of *existing* liability, and penalties incurred by the transferor's post-transfer misdeeds "are not, by any stretch of the imagination, existing at the time of the transfer." *Stanko*, 209 F.3d at 1088.[2]

The Government says that *Stanko* is "distinguishable" because Nebraska law required post-transfer creditors to prove that the conveyance "was made to defraud subsequent creditors *whose debts were in contemplation at the time*." U.S. Br. 56-57. But any distinction between New York and Nebraska law regarding what a future creditor must prove to recover is irrelevant to the antecedent question of

---

[2] Unlike the penalties, prejudgment interest can arguably be viewed as part of the liability existing at the time of the transfer, since NYUFCA § 270 speaks of "any claim, whether matured or unmatured, liquidated or unliquidated, fixed or contingent." By contrast to interest that accrues automatically, a penalty incurred through post-transfer misconduct cannot be characterized as having existed at the time of the transfer, even in "unmatured," "unliquidated," or "contingent" form.

whether a tax penalty created by the transferor's post-transfer misdeeds is a future debt or one that somehow existed at the time of the transfer.

The Government caricatures the Taxpayer's position as "posit[ing] that the United States should be considered not one creditor, but two." U.S. Br. 53. But there is nothing absurd or even counterintuitive about the notion that, at the time of the transfer, the Government may have been a present creditor as to the tax liability but was at most a *future* creditor with respect to the penalties that HSHC later incurred. New York law explicitly acknowledges such distinctions. *See Durland*, 183 A.D. at 765-766 ("no person before the court who was a creditor *as to his present demand* at the time of the transfer"; "as to subsequent creditors, *or as to debts created subsequently with those who may have been creditors as to other items at the time*" (emphases added)).

Finally, the Government posits that it would be "logical" to allow it to recover penalties because penalties supposedly "arise … without the need for a formal assessment" and "serve revenue-raising or remedial functions." U.S. Br. 55. It is not clear why the Government thinks these arbitrary factors have any relevance to the legal question here. The Government also insists that its preferred rule is "simple." *Id.* But New York has already chosen its governing rule. That rule is not particularly complicated. But, simple or not, it is binding on the IRS as on any NYUFCA plaintiff.

20

**B. The Government's bid for a remand**

As a fallback, the Government asks for a remand so that it can ask the Claims Court to hold that the transfer was intentional fraud under § 276 and that the Government can recover as a "future creditor[]" under that provision. *See* U.S. Br. 57-58. This remand bid fails for at least three reasons.

*First*, following trial, the Claims Court rejected any § 276 claim, finding that the Government had not even attempted to prove actual fraud under that provision. Appx27. Although it says it disagrees with that ruling (U.S. Br. 50), the Government chose not to cross-appeal. "If … the appellee seeks to change or modify the judgment rather than just affirm it, the appellee must file a cross-appeal." *Granite Management Corp. v. United States*, 416 F.3d 1373, 1378 (Fed. Cir. 2005). Here, the Government does not suggest that its failed § 276 claim provides a basis for affirmance; it argues that this Court should vacate and remand for the Claims Court to consider entering the § 276 claim that it previously rejected. "Because the government did not cross-appeal on that issue, it cannot now raise it." *Id.*; *see also Radio Steel & Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d 840, 844 (Fed. Cir. 1984).

*Second*, the Claims Court was correct to find that the Government did not advance (much less prove) a § 276 claim. The Claims Court based its ruling on the lengthy trial that it presided over and on the parties' closing arguments and pre- and

post-trial submissions. Appx4. The Government cannot show clear error with a single out-of-context snippet from one of those submissions. *See* U.S. Br. 50.

*Third*, it would not be enough for the Government to simply prove that *HSHC* acted with fraudulent intent under § 276. It would also have to prove that the Taxpayer received the transfer with actual intent to defraud: "It must not only appear that the grantor made the transfer with the intent to defraud such subsequent creditors, but that it was received with like intent on the part of the grantee." *Durland*, 183 A.D. at 765-66; *see Mazzeo*, 306 F. Supp. 2d at 314. The Government does not pretend that it could prove *that* by clear and convincing evidence. *See* U.S. Br. 50 (claiming only that the Government argued below that *HSHC* acted with actual intent to defraud). Rather, it suggests in a footnote that it views the rule as judge-made and wants the Claims Court to reject it following the requested remand. U.S. Br. 58 n.6. Judge-made or not, though, it is the longstanding law of New York and therefore binds the IRS when it proceeds under NYUFCA.[3]

---

[3] The Government suggests that there is debate about the law in New York, but it cites only a single bankruptcy court decision. Even if such a decision could overrule the New York appellate court in *Durland* on a question of New York law, though, the bankruptcy court was not addressing the rule at issue here when it made the broad statement that the Government invokes.

**IV. The Claims Court erred in holding that underpayment interest accrued while the IRS had the use of the Taxpayer's money.**

At a minimum, the Claims Court erred in upholding the IRS's assessment of interest for the period when the IRS *had the Taxpayer's money*. Congress enacted 26 U.S.C. § 6603 to provide "an effective way for taxpayers to manage their exposure to underpayment interest" by making deposits. H.R. Rep. No. 108-548, pt. 1, at 305, 2004 WL 1380512. The IRS abused its discretion when it arbitrarily thwarted that statutory purpose by refusing to apply the deposits to the tax liability and instead assessed some $11 million in interest for the years when it was sitting on the Taxpayer's $71 million deposit. *See* Opening Br. 44-57.

The Government's response (U.S. Br. 58-72) is mostly irrelevant and entirely unpersuasive.

**A. Forfeiture**

The Government insinuates (at 67) that the Taxpayer forfeited its argument below. Not so. *See* Appx72 n.5.

**B. Return requests**

When the IRS refused to use the deposits to pay the tax assessed against the dissolved Original Trusts, the Taxpayer requested that the IRS return the deposits so that the Taxpayer could use them to pay that tax. *See* Opening Br. 46-48. The Government now argues that the return request somehow undermines the Taxpayer's position. The argument fails.

*First*, the Taxpayer did not "waive[]" its abuse-of-discretion argument by "requesting return of the[] deposits and thereby depriving the IRS of discretion to use the funds for any other purpose" (such as paying the tax). U.S. Br. 64. The Taxpayer requested return of the deposits only *after* the IRS had abused its discretion by refusing to use the deposits to pay the tax.

*Second*, the Government suggests that the return of the deposits, with interest, fulfilled the purpose of § 6603 "by preventing [the Taxpayer] from having made an 'investment in a non-interest-bearing account.'" U.S. Br. 68. But, as the Government admits, that interest was "at the federal short-term rate rather than the higher rate applicable to tax underpayments," so the agency's refusal to use the deposits to pay the tax resulted in "substantial underpayment interest." *Id.* at 60, 63. By saddling the Taxpayer with "substantial underpayment interest" that would have been avoided if the IRS had used the deposits to pay the tax as requested, the agency arbitrarily thwarted the undisputed purpose of § 6603. *See* Opening Br. 45 & n.7.

*Third*, the Government's arguments (at 71-72) that "the Trusts' problems are of their own making" are frivolous.[4] The Government faults the Taxpayer for

---

[4] Contra the Government (at 71), the Taxpayer is not "appeal[ing] to equity." The Taxpayer is making a classic legal argument that a federal agency abused its discretion. But many of the factors that make an agency action inequitable are *also* relevant to showing that it was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Here, these factors include the arbitrariness of requiring the Successor Trusts to *pay* the Original Trusts' liability while prohibiting them from making *deposits* on that liability, the eight-figure magnitude of the harm inflicted by

making deposits on behalf of the Successor Trusts rather than the Original Trusts whose liabilities were ultimately assessed against the Successor Trusts. U.S. Br. 71. But those Original Trusts had been dissolved: They no longer existed, had no assets, and could not make deposits. *See* Opening Br. 46-48. The Taxpayer informed the IRS of these facts. Appx56. Nothing put the Taxpayer on notice that the IRS would still assess the tax against the defunct entities, much less refuse to apply deposits made on behalf of the Successor Trusts to the tax assessed against the Original Trusts. After all, the Taxpayer knew that the IRS would ultimately assess the Successor Trusts with the Original Trusts' tax liability and require them to *pay* that liability, so it was logical to expect that the agency would likewise allow them to *make deposits to pay* that liability. In any event, a federal agency cannot wriggle out of its abuse of discretion by insisting that the taxpayer should have foreseen that the agency would behave arbitrarily and protected itself from that arbitrary act ex ante.

The Government also blames the Taxpayer for requesting return of the deposits to pay the Original Trusts' tax rather than leaving them with the IRS and ultimately having them applied to the Successor Trusts' tax when it was assessed against them. *See* U.S. Br. 71-72. But the IRS took another *two years* before it actually assessed the tax against the Successor Trusts. Appx70. In the meantime,

---

the agency as compared to its flimsy excuse for its action, and the fundamental unfairness of charging the Taxpayer interest for years when the IRS *had the Taxpayer's money*.

the IRS had assessed it against the Original Trusts. The Taxpayer needed tens of millions of dollars to pay that tax promptly, before the IRS, which had instituted collection actions, started issuing liens and levies. Appx2562, Appx10217. Again, the Taxpayer's return request did not retroactively cure the agency's abuse of discretion.

## C. Abuse of discretion

On the merits, the Government offers little to defend the IRS's refusal to use the deposits to pay the tax. It disclaims (at 65) any bid for judicial deference to the made-for-litigation IRS guidance. *See* Opening Br. 56-57. And it leaves undisputed the Taxpayer's three key points: (1) the applicable statute and revenue procedure gave the IRS discretion to use the deposit to pay the tax; (2) honoring the Taxpayer's request that the deposit be used to pay the tax would have served the central purpose of § 6603, whereas rejecting the request undermined that purpose; and (3) an agency abuses its discretion when it exercises that discretion in a manner contrary to the purpose of the relevant Act of Congress. *See* Opening Br. 48-56; U.S. Br. 63, 68 (effectively conceding the first two points and remaining silent on the third). The counterarguments that the Government does offer are unavailing.

*First*, the Government says that the statute and revenue procedure do not "expressly" *require* it to honor a depositor's request to use the deposit to pay another entity's tax. U.S. Br. 68. But an agency must exercise its discretion in a manner

that honors the statute's purpose rather than thwarting that purpose, regardless of whether the purpose is express or implied. *See* Opening Br. 49-50.

*Second*, the Government says that the Taxpayer's point that the IRS can, does, and must honor an entity's attempts to *pay* another entity's tax liability is "a red herring" because payments and deposits are two different things. U.S. Br. 69-70. The Government is missing the point, which is that the IRS has no rational basis for treating third-party deposits (which protect the taxpayer) and third-party payments (which protect the IRS) differently—in other words, the differential treatment is arbitrary and an abuse of discretion. *See* Opening Br. 53-56.[5]

*Third*, the Government weakly suggests that allowing an entity to have its deposit used to pay a related entity's tax could raise "concerns." U.S. Br. 65-67. The argument is frivolous. Some of the "serious ramifications" that the Government purportedly fears apply when a taxpayer has its deposit used to pay *its own* tax: In short, it would be harder for the depositor to get the money back if it later changed its mind. *See id.* at 65-66. The Government adds that "it is not clear" whether using a deposit to pay a third party's liability "might" affect the rights of the depositor or the third party to later litigate the tax liability. *Id.* at 66-67. But there is no conceivable reason why these scenarios—which the Government has apparently

---

[5] The Government is wrong (at 70) to claim support from *Energy East Corp. v. United States*, 645 F.3d 1358, 1361-63 (Fed. Cir. 2011), which rejected the taxpayers' position because it was *foreclosed* by the statutory text.

drawn from footnotes in a 2010 Claims Court ruling—would be treated differently when one entity *uses its deposit to pay* another's taxes than when an entity merely *pays* another's taxes without using a deposit.

Finally, the Government correctly concedes that an agency's "exercise of discretion is appropriately measured against its contemporaneous explanation in support thereof." U.S. Br. 65. Yet while the Government points to IRS Office of Chief Counsel Memorandum 20171801F ("CCM") as "the IRS's reasoning" here, the CCM actually does not include most of the "concerns" and other arguments that the Government now belatedly raises. Rather, the CCM simply says that the statute and revenue procedure do not *require* the agency to apply a deposit to another entity's tax liability and that the tax liability of a transferee (here, the Successor Trusts) is not "the same" as or "interchangeable with" the liability of the transferor (here, the Original Trusts)—an irrelevant assertion that does nothing to justify the agency action. In short, the IRS's contemporaneous reasoning is utterly unpersuasive. And an agency action cannot be upheld on bases other than those that the agency offered at the time. *See Department of Commerce v. New York*, 588 U.S. 752, 780-81 (2019).

**CONCLUSION**

Seeking to minimize one's tax bill is lawful and commonplace. The Taxpayer did so, following Shearman & Sterling's advice, and had the misfortune of dealing with a fraudster. With the benefit of 20/20 hindsight, the IRS insists that the Taxpayer should have unraveled the fraud and protected the IRS. And, because the Taxpayer did not do so, the IRS demands not just the value that the Taxpayer allegedly received from HSHC, but also later interest and penalties that, all together, approach the full market value of Humboldt and Shelby at the time of the stock sale.

There is no lawful basis for the punitive award here. And the IRS's insistence that the Taxpayer bore a demanding, albeit futile, duty of inquiry even as the agency seeks deference for its behavior with the deposits is ironic and indefensible. This Court should reverse the judgment and direct judgment for the Taxpayer.

Respectfully submitted,

/s/ Lawrence M. Hill

| | |
|---|---|
| Mark C. Savignac | Lawrence M. Hill |
| Caitlin R. Tharp | STEPTOE LLP |
| STEPTOE LLP | 114 Avenue of the Americas |
| 1330 Connecticut Avenue, NW | New York, NY 10036 |
| Washington, D.C. 20036 | (212) 506-3900 |
| (202) 429-3000 | lhill@steptoe.com |
| msavignac@steptoe.com | |
| ctharp@steptoe.com | |
| | *Counsel for Plaintiff-Appellant* |
| September 19, 2024 | *Dillon Trust Company LLC* |

29

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32(b)(1) because it contains 6,999 words, excluding material excluded under Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b)(2).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements to Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in 14-point, proportionally-spaced Times New Roman font.

/s/ Lawrence M. Hill
Lawrence M. Hill

*Counsel for Plaintiff-Appellant*
*Dillon Trust Company LLC*

September 19, 2024